**ALBERT Y. DAYAN**
**Attorney at Law**
**80-02 Kew Gardens Rd., #902**
**Kew Gardens, N.Y. 11415**
**Tel: (718) 268-9400**
**Fax: (718) 268-9404**

August 11, 2021

By ECF

The Honorable Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Jack Cabasso
                  Docket No. 19-CR-582 (DRH) (ARL)

Dear Judge Hurley:

        Please accept this letter-reply to the Government's opposition to Mr. Cabasso's July 8, 2021 Motion to modify defendant's conditions of his pretrial release (the "Motion" or "Mot.," Dkt. No. 199) and as opposition to the Government's cross-motion to return the defendant to home confinement and revoke his permission to communicate with Aventura's former customers, employees and new business customers.

    I.    *Defendant Did "Contemporaneously" Maintain Records, Provided When Requested, and Complied with All Other Pretrial Requests – (See Exhibit A – July 29, 2021 email to Pretrial Services with attached bi-weekly contact list reports for all periods)*

        A.    <u>Defendant Maintained Contact Records and Provided When Requested by Counsel</u>

        The Government referenced they received a single list of contacts on November 25, 2020 from myself as Counsel for Mr. Cabasso, which was the established protocol. Nothing further beyond the first list of contacts was ever requested from Mr. Cabasso by the Government, Pretrial Services or myself. Notwithstanding, that no further requests for records were made, Mr. Cabasso did in fact maintain "contemporaneous" contact records referenced in "Exhibit A" and immediately emailed it to Pretrial Officer Moore when the request was made on the 29th day of July, 2021.

        Since the initial request for the contact lists, in the 10-month period in question: (a) the Government never mentioned to the undersigned nor the Court directly or indirectly that they were expecting the contact lists, (b) Pretrial services, who received defendant's monthly submitted reports, regular documentation regarding other matters and made numerous personal visits, also never once referenced or requested the contact lists until the day before the Government filed their cross-motion, (c) when Pretrial Services did ask Mr. Cabasso for the contact lists there was no inference of timeliness (d) in Court status conferences in December

2020, March 2021, June 2021, the Government and Pretrial Services made no mention of any contact list or compliance issues, and (e) from November 25, 2020 and well into 2021 the Government participated in numerous communications with the undersigned on *"various matters"* and no mention of contact lists.

   B. <u>The Defendant Complied with All Pretrial Requests Including Maintaining All Contact Records</u>

Mr. Cabasso has submitted to Pretrial Services his monthly status reports, medical visit reports and legal travel permissions as requested. There were no other Pretrial Services requests.

   C. <u>Timing of the Request for Contact Lists</u>

**On the day prior to the Government's cross-motion submission,** Pretrial Services Officer Moore, contacted Mr. Cabasso requesting a video visit to his home. Mr. Cabasso complied. Pretrial Services Officer Moore also requested a tour and walk through of Mr. Cabasso's place of work, at the Aventura facility. Mr. Cabasso complied.

In the same series of communications, ostensibly at the prompting of the Government, Mr. Moore respectfully requested the contact lists as referenced in "Exhibit A" which Mr. Cabasso furnished immediately when requested. No mention of anything being previously due.

   II. *Government First Oral and Written Statements Made to the Magistrate for Purposes of Detention are Presently Unsupported and Diametrically Opposed by Rule 16 "Evidence" and other evidence Attached as Exhibits Herein.*

Notwithstanding that the Government's first oral and written statements made to the Magistrate for purposes of detention were unsupported when made and now and are diametrically opposed by undeniable Rule 16 "evidence" produced, they nevertheless refuse to waver from the Complaint, Arraignment, Bail Detention Memorandum, Indictment and other oral statements made to the Magistrate for purposes of determining defendant's initial bail conditions. (a) Aventura was one big fraud with no legitimate business the Government could find, (b) The U.S. Government was "unknowingly" purchasing Chinese security cameras, (c) Mr. Cabasso created a national security risk, (d) Aventura manufactured nothing in the United States, and (e) in the 13-year span alleged in the Indictment, Aventura committed an $88,000.000.00 fraud (representing the entire amount of Aventura's gross revenues).

   A. <u>Aventura's gross revenue of $88,000.000.00 was predominantly the result of services and consulting contracts with respect to U.S. Government and non-related private sector business. U.S. Government and U.S. Government Official Websites Rightfully Designated Aventura's U.S. Government Business mainly as "Services" and Products Unrelated to This Indictment.</u>

Any U.S. Government award of more than $25,000 must be displayed on a publicly accessible and searchable website to give the American public access to information on how their tax dollars are being spent. <u>USASpending.gov</u> is the official U.S. Government website

for such purpose. Notwithstanding that the Defense in this case has made several oral and written requests of the prosecutors in this case and FOIA requests of the U.S. Government for all "official" Aventura contracts as reflected on USASpending.gov to corroborate the fact that most of the contracts between Aventura and U.S. Government were services related, the production of which prior contracts between Government and Aventura have been withheld.

If the prosecutors in this case will resort to arguing that Aventura services contracts would not have been obtained but for the woman owned business concept, then we ask them to produce the contracts they referenced between Aventura and U.S. Government where the contract was solicited and awarded by the U.S. Government as a "set-aside" as prescribed by law for Woman-Owned as described in the indictment and complaint. A review of USASpending.gov identifies the contracts were not solicited or awarded on the basis of Woman-Owned.

USASpending.gov list of contracts with Aventura currently in possession of Government and unaccountably not yet produced, should undoubtedly controvert Government's allegations that Aventura obtained contracts with the government, based on woman-owned-business and it would certainly controvert their rather sweeping allegations of an $88,000.000.00 fraud. Moreover, Aventura's physical books, records and other communications also in the possession of the Government, similarly not yet produced without an explanation, should further confirm that the majority of Aventura revenue was services (not sale of goods) and the majority of Aventura revenue was non-U.S. Government. Assertions to the contrary are simply erroneous.

      III.    *U.S. Government Overt, Tacit and "Verbal" Acknowledgment of Purchasing PRC (Peoples Republic of China) Security Equipment annihilates Government's accusation that Aventura sold Chines Made Products to unwary U.S. Government and Compromised National Security*

A. <u>U.S. Government Supported Security Industry Association (SIA), To this Day is Closely Aligned with PRC Hikvision, PRC Dahua, China Security Industry Association & Fortune 500s</u>

The Security Industry Association (SIA), is the closely aligned working public/private partnership between the U.S. Government and industry, regularly conducting joint summits *"SIAGovSummit"* (See Exhibit B –SIAGovSummit – speaker list – note Senior U.S. Government Officials).

However, members of SIA (See Exhibit C) included Hikvision, the world's largest security equipment manufacturer with $85 billion, 40,000+ employees and supplier to the Fortune 500 security companies), Dahua, China Security & Protection Industry Association, and Fortune 500s companies and their dealers historically and currently are in contract with U.S. Government. The U.S. Government's close and undeniable relationship" with Hikvision, Dahua and other Chinese associated organizations disproves the Government's assertions that Aventura compromised national security by selling Chinese made products to unwary U.S. government.

B. <u>The U.S Government "Knowingly" and "Pervasively" Purchased Chinese Hikvision and other PRC Security Camera Equipment, Past and Present – (See Exhibit D & E – recent joint journalistic investigative reports evidencing U.S. Government Hikvision purchases mapped & U.S. Government Agencies Chinese security equipment purchases through a network of American resellers before and after Aventura was "forced" to close its doors)</u>

On May 24, 2021, IPVM a well-known and highly respected security industry publication and Tech Crunch co-reported an investigative article "Exhibit D" titled *"US Government Purchases of Dahua and Hikvision Mapped."* The article identifies 300+ different U.S. Government organizations having knowingly purchased purportedly banned Chinese Dahua and Hikvision products for decades prior to Aventura Indictment and, ironically, in increasing numbers doing the same **2-years after** Aventura was scapegoated and "forced" to close its doors.

Furthermore, it was only ten weeks prior to Mr. Cabasso's arrest that the U.S. Government National Defense Authorization Act (NDAA) banned U.S. companies from dealing with Chinese Dahua and Hikvision products. On that score, why would the U.S. government need to specifically single-out and ban dealing with Chinese Dahua and Hikvision products on or about September of 2019, if it was purportedly illegal for Aventura and others to do deal with any Chinese company prior to that date.

Moreover, on July 20, 2021 a joint investigation by IPVM and The Intercept titled a report "Exhibit E," *"U.S. Military Bought Cameras in Violation of America's Own China Sanctions."* Senior White House Official confirmed the **decades long** accepted procurement practice of U.S. Government agencies purchasing PRC security cameras.

C. <u>Senior White House Official Confirms the U.S. Government "Knowledge" and "Acceptance of Culpability" (See Exhibit F – Interview of U.S. Air Force Brigadier General Robert S. Spalding III – note bracketed text bottom page 2)</u>

Named in the IPVM article were Chinese-made Honeywell, Bosch, GE and others security camera equipment products purchased by the U.S. Government. The same as identified in defendant's Motion, <u>previous to the release of the article.</u> IPVM interviewed "on-camera" Retired U.S. Air Force Brigadier General Robert S. Spalding III, the **Senior Director for Strategic Planning at the White House National Security Council and previous Department of Defense Senior Defense Official & Defense Attaché in China during the previous administration** for the article referenced "Exhibit F." Former Brigadier General Spalding's response to the article was:

> "Well, it's not surprising. I think part of the challenge of moving manufacturing to China, which is essentially what the world has done, is that nearly everything has components from or is entirely manufactured in China. So it's very difficult to source products that aren't manufactured in China." '**The federal government bears some culpability'**..."

The U.S. Government tacitly acknowledged its accepted procurement practice of Chinese made products. Any assertion of a nefarious nature and an "unknowing" U.S. Government is simply false.

D. U.S. Government Agency CISA - Responsible for U.S. National Security Directed Federal Agencies to Chinese-Owned and Operated Website for Guidance & Updates (See Exhibit G – CISA Hikvision Advisory to U.S. Government Agencies May 04, 2017).

Cybersecurity and Infrastructure Security Agency (CISA) is the United States federal agency, under the Department of Homeland Security (DHS), and responsible for "national security" for federal agencies. Upon information and belief CISA never declared Chinese Dahua and Hikvision products as a threat to national security and on the contrary directed on how to continuously patch and use of Hikvision Chinese security cameras on U.S. Department of Defense networks. Specifically, on May 04, 2017, CISA issued Advisory (ICSA-17-124-01) titled, "Hikvision Cameras," Chinese-made and one of the most widely used security cameras by the U.S. Government. CISA didn't reference a national security threat nor to remove Hikvision from U.S. Government networks. Instead, CISA pointed Federal agencies to PRC Hikvision's Chinese owned and operated website to download Chinese updates into the U.S. Government networks for Hikvision cameras. Acknowledging it was "knowingly" being used inside U.S. Government networks, dispelling the Government's inference in this case of a national security threat and ban on Chinese security equipment.

E. Hikvision SIA Board Member - Appointed to Cybersecurity Advisory Board in 2018, While Investigating Aventura & Defendant for Alleged Hikvision Natural Security Threat (See Exhibit H – press release announcement of Hikvision appointment)

In 2017, SIA endorsed Aventura as having, *"a strong history as an innovative manufacturer of hardware and software products and peripheral solutions…"* (See Exhibit I) In April 2018, The SIA appointed Hikvision to its Cybersecurity Advisory Board and, two business days after Mr. Cabasso's was scapegoated and the shutdown of Aventura; Hikvision and the other Fortune 500s members of SIA continued to do business with the Chinese manufactured products.

F. Just "Weeks" Ago, Hikvision SIA Cybersecurity Advisory Board Member (Who 2-Years Ago Was a Purported National Security Threat) to Lecture U.S. Government on Cyber Security. (See Exhibit J – SIA Webinar announcement with Hikvision as Presenter)

On July 8, 2021, Hikvision's Senior Director of Cybersecurity and SIA Cybersecurity Board Executive was to give a lecture on behalf of SIA to U.S. Government Officials and industry personnel on cybersecurity and participate in the referenced upcoming joint SIA & U.S. Government Summit *"SIAGovSummit."* Hikvision has been participating with the U.S. Government on Cybersecurity long before and for years after the defendant's arrest.

G. U.S. Department of Defense Soliciting and Sole Sourcing Hikvision as a Mandatory Requirement as *"the Only Thing That Will Work on U.S. Department of Defense Networks"* – (See Exhibit K – sole source solicitation of Hikvision - note bracketed areas pages 1 and 2)

As example, in "Exhibit K," dated January 30, 2018, the Department of Defense, while investigating defendant for its alleged ties to PRC Hikvision, solicited on Solicitation

Number M6700118Q1083 Hikvision on a **sole source basis**. The Hikvision security cameras and recorders, were specified by the DoD to the exclusion of all others. The basis stated for the sole source justification by Department of Defense and U.S. Government procurement officials was, "the brand name camera (Hikvision) and all other parts attached are the only ones that will work in network with other cameras."

While investigating defendant and insisting the nature of the case were "National Security Threats," the U.S. Government years **before the defendant's arrest and through the present** (a) participated with the purported National Security Threat Hikvision in government summits and security committees, (b) sent U.S. Government Agencies to Hikvision's Chinese owned and operated websites for installation of product updates directly onto U.S. Government networks, (c) referenced the Hikvision products by model number and contact for support, (d) insisted "Hikvision Chinese Product Only," in procurements, (e) stated Hikvision is the only product that would work on their U.S. Government networks, and (f) signed waivers to deviate from standard, open to all U.S. Government procurement practices and created exceptions for Hikvision as a sole source, authorized by DoD and U.S. Government Procurement officials.

The allegations of Mr. Cabasso creating "National Security Risks" were inaccurate and vastly exaggerated at his initial presentation.

H. U.S. Government Chief Counsel Agrees to a Buy America Act Exemption Waiver for Security Cameras – (See Exhibit L – note last paragraph)

As evidenced on "Exhibit L," on December 21, 2016, from application of the Security Industry Association, aligned with the U.S. Government, Chief Government Counsel Ellen Partridge granted a **Buy America Waiver for network security cameras.**

IV. **"AVENTURA MANUFACTURES NOTHING"**

Government is in Possession of Irrefutable Evidence of Aventura U.S. Manufacturing Facility and Operations – (See Exhibit M – Photos of Aventura manufacturing facility since 2015, Exhibit N - Photos of Aventura manufacturing facility prior to 2015, & Exhibit O – Photos when Agents disconnected and removed Aventura video recorders evidencing the Aventura 20,000 square foot manufacturing facility and operations)

The Government executed search warrants on the purportedly "non-existent" Aventura manufacturing facility and operations at 48 Mall Drive, Commack, New York on the morning of November 7, 2019. The Government is in possession of Aventura manufacturing facility photos, months of video recordings of the more than 100 cameras in the Aventura manufacturing facility stored on video recorders, showing its "active" manufacturing operations, by Aventura manufacturing employees. None of which has been turned over to the defendant as requested. Attached, as "Exhibit M", are photographs of the 20,000 square foot U.S. based Aventura manufacturing facility taken by third parties after the search warrants were executed showing the manufacturing operations. Attached as "Exhibit N" are photographs of Aventura's manufacturing operations located at 180 Adams Avenue, Hauppauge, New York 11788, the facility occupied prior to the acquisition of the recent manufacturing facility in Commack prior to 2015.

When Agents arrived on the morning of November 7, 2019, to execute the search warrants, they observed the "active" Aventura manufacturing facilities. Attached, as "Exhibit O" is the image frozen in time from a security monitor in the Aventura facility, when the agents executing the search warrant unplugged the recorders. The same video recorders which provided "real-time" evidence at the time of the search and stored months of historical video footage of the Aventura manufacturing facilities with Aventura manufacturing employees, manufacturing Aventura products.

The Government in the Complaint "infer" there was no Aventura manufacturing facility, referencing they reviewed an Aventura insurance policy with no category for manufacturing employees. But, now that they have all the discovery and should have no reason to delay in its production, the controverting information to their "inference" is the Aventura's payroll records, bank records, emails, electronic records and other records and evidence acknowledging each and every Aventura employee and their employment responsibilities, including manufacturing.

We submit, on the subject of "manufacturing nothing", the Government must have prepared its Bail Detention Memorandum prior to executing the search warrants. However, since it obtained the evidence pursuant to the Warrant, and now had a few years to examine it, the allegations in the Bail Detention Memorandum should be corrected by them to reflect Aventura's manufacturing facility and the fact that Aventura did have significant manufacturing operations.

V. <u>Legal Standard</u>

A defendant who has been released pending trial may file "a motion for amendment of the conditions of release." 18 U.S.C. § 3145(a)(2). A court may at any time amend its order to impose "different conditions of release." 18 U.S.C. § 3142(c)(3). The conditions of release imposed must be "the least restrictive [] condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(c)(1)(B); see <u>United States v. Reiner</u>, 468 F.Supp.2d 393, 395 (E.D.N.Y. 2006).

The authorization to modify the conditions of release "is based on the possibility that a changed situation or new information may warrant altered release conditions." <u>Id.</u> (citation omitted). "Accordingly, '[c]onditions of bail should properly be modified if a substantial change in circumstances as they existed at the time bail was fixed is clearly shown.'" <u>Id.</u> (quoting <u>United States v. Falcetti</u>, No. 02 CR 140(ILG), 2002 WL 31921179, at *1 (E.D.N.Y. Oct. 31, 2002).

Changed circumstances warranting a modification of a defendant's conditions of release exist where: (1) the evidence relied upon by the government to establish that the defendant poses a risk of flight and/or a danger to the community has been undermined by new information not available previously; or (2) new information indicates that the government's case is weaker than it was thought to be. See <u>United States v. Stephens</u>, 447 F.Supp.3d 63, 64-65 (S.D.N.Y. 2020) (ordering defendant's release in light of changed circumstances where, among other things, "the strength of the primary evidence relied upon by the Government to demonstrate the danger the defendant poses to the community has been undermined by new information not available to either party at the time of the March 6 hearing" and "this new

information [] indicates that the Government's case is weaker than it believed it to be at the March 6 hearing").

Courts have recognized that while the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, "by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." Martir, 782 F.2d at 1147 (emphasis omitted) (quoting Acevedo-Ramos, 755 F.2d at 207). In Martir, a case where the government argued that defendant posed a risk of flight and proceeded solely by proffer, we stated that "[i]n the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved." Id. at 1147.

Unanticipated delays in the case may be a basis for modifying condition of release if it "constitutes 'information . . . that was not known to the movant at the time of the [bail] hearing'" and "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required." United States v. Esposito, 354 F.Supp.3d 354, 359 (S.D.N.Y. 2019) (quoting 18 U.S.C. § 3142(f)(2)(B)).

III. <u>Argument</u>

A. <u>Modification of Mr. Cabasso's Conditions of Release Is Warranted in Light Of Newly Discovered Evidence or -Lack Thereof-, Initially Relied on by the Magistrate to Establish Bail Conditions</u>

*"Ties to Communist China with No Extradition Treaty"* Asserted Without Basis

In its Bail Detention Memo, the Government without basis asserted Mr. Cabasso's ties to Communist China (PRC) with whom the U.S. Government does not have an extradition treaty. Evidence of such ties has not and cannot be produced. Mr. Cabasso is a U.S. born citizen with century long ties to the United States, is not of Asian descent in any lineage and was an infrequent traveler to PRC for business purposes and had not been there in many years. All supported by defendant's passport and visas in the possession of the Government at the time the assertions were made to the Magistrate.

*"Offshore Funds"* - *the Government Yet to Identify Any*

For purposes of determining bail conditions of the defendant, the Government in oral statements to the Magistrate asked to consider by proffer what it "believed" were offshore funds controlled the defendant have yet to be identified and without evidence. With more than 4 years of investigation, 13 agencies, cadres of investigators and 3 prosecutors no such funds were identified or ever existed.

*"Siphoning and Obfuscation of Funds"- the Government Failing to Account for "Both Sides of Lawful Transactions"*

In its Bail Detention Memo, the Government alleged the use of shell companies in the "obfuscation" of millions of dollars referencing monies for a yacht, real estate and other transactions as to infer "consciousness of defendant's guilt and flight of money offshore." The Government, certainly now since they are in possession of Aventura and defendant's financial

8

records for the last four years, should inform this Court that they failed to recognize and inform the Magistrate about corresponding return and lawfully accounted every dollar that had been spent by Aventura for strictly business purposes. These omitted incoming transactions are confirmed by seized attorneys' contracts, closing documents, books and records in the possession of the Government.

As an example, on point, when the Government seized a Yacht in 2019, it erroneously informed the Magistrate that it was a current corporate asset, which was purchased in 2013 with Aventura "outbound" corporate funds. The Government failed to examine and advise the Magistrate that the company sold the Yacht and reflected the "inbound monies," back in 2015, a transaction upon which this Court has specific familiarity. Similarly, <u>all</u> referenced financial transactions proffered to the Magistrate follow the same erroneous pattern of one-sided ledger accounting.

Thirteen federal agencies, cadres of Agents and investigators, 3 prosecutors and years of investigation <u>"prior"</u> to the arrest of the defendant, the Government asked the Magistrate to determine defendant's bail conditions on that which it <u>"intended"</u> to prove but could not identify and still hasn't and there was not a sufficient basis to allege.

> B. <u>Modification of Defendant's Conditions of Release Is Now Warranted in Light of Newly Discovered Evidence Demonstrating Governments Over Reach at The Initial Presentation</u>

The Government purportedly based upon an "anonymous" tip, a competitor no doubt, initiated an investigation and upon arrest of Mr. Cabasso and other Aventura employees. But, as is demonstrated by discovery provided and not provided up to date, the Government proffered a litany of inaccuracies to the Magistrate at the initial presentation. Despite the now blatantly exposed inaccuracies and contradictions to the initial case they made to the Magistrate, they unexplainably continue to make sweeping statements of one big $88 million fraud, Aventura manufactured nothing, and defendant siphoned the assets, yet they fail to offer a scintilla of the documentary and Rule 16 prima-facia evidence they used in support of the allegations in the Complaint and Indictment, which should have been the nippiest to produce.

While U.S. Government Agencies, FBI, DHS and IRS were conducting a multi-year investigation into defendant and Aventura; in those same years as reflected on USASpending.org Aventura possessed 7-figure and 8-figure multi-year security "consulting & services" (not the sale of goods) programs with those same Agencies, unrelated to the allegations. Defendant met <u>*"weekly"*</u> with and advised and consulted the FBI, DHS and IRS over the same period and had relationships for a decade. The programs and associated Aventura staff, 13 of which were <u>"full-time onsite"</u> at U.S. Government facilities, were managed by Mark Peterson Aventura's Director of Program Management, and formerly U.S. Pentagon Security management and military. The government Agencies were not blindsided by Cabasso's alleged fraud, as is alleged by the Government. They were blindsided when Mr. Cabasso was arrested because no one from the prosecution inquired of their counterparts about the nature of Aventura's legitimate and lawful business dealings with them, which undermine their case. (See Exhibit P) – FBI/DHS emailing Peterson and defendant who was already in jail, expecting things normal.

9

C.  Modification of Mr. Cabasso's Conditions of Release Is Warranted In Light of Unexpected, Excessive Delays In The Case Due To its Complexities

*Protracted Discovery Delays with No End in Sight at No Fault of Defendant*

The Government with 13-agencies, cadres of investigators and 3 prosecutors began investigating this matter at a minimum 4 years ago. The Government fastidiously prepared a 100-paragraph complaint, 40-page indictment with specific allegations, which it would require indexed and catalogued supporting documentation for presentation for warrants, affidavit for warrants, complaint and presentation to the grand jury for indictment. But, as stated above, as of the current date defendant is still not in possession of the prima-facia evidence supporting the allegations. Instead, the Government has provided a rolling discovery of millions of "randomized" documents causing the undersigned to search for *"needles in a haystack"* at prohibitive financial costs and protracted human effort by a single practitioner. The randomization creates logistical challenges in preparing a proper defense requiring preliminary monumental organizational tasks.

The Government has cited on numerous occasions the continuing problems and challenges of gathering what is over 400GB of information, which spans 2 decades. Discovery is still in its infancy by no fault of the defendant. The recently uncovered evidence and its legal nuances will undoubtedly protract discovery even further.

Defendant and the undersigned are further disadvantaged approaching two years into the case with (a) the Government having not returned defendant's electronic devices or copies thereof to begin preparation, (b) the Government seized 20-years of Aventura and defendant's physical records and have not returned or provided copies, and (c) the logistics of a non-mobile defendant adds further delays.

*Defendant Needs to Gainfully Work*

The Government has seized all of Mr. Cabasso's assets 2 years ago, while leaving him with all the liabilities, crippling him financially. The unavoidable delays have exacerbated the financial issues, and there is no further ability to borrow monies from friends and family who have provided for Mr. Cabasso's bail, ongoing legal costs and living expenses.

The preparation for this trial is going to require frequent meetings with attorneys, professionals, subject matter experts, investigators, and others on an unscheduled basis, all the while trying to earn a living. Due to stigma this case has created Mr. Cabasso is pursuing consulting and other work non-related security industry work, which can accommodate the challenges of schedules. Mr. Cabasso cannot financially survive or defend this matter without reasonable limited flexibility as sought in the Motion.

*Delays as a Result of the Initial Covid Pandemic and its Apparent Return and Unknown Length and Affects*

The once in a century global pandemic (Covid-19) and now apparent escalated return with unknown consequences could never have been predicted. The associated delays have caused and will cause indeterminate delays in proceedings.

The request sought would make for due process and judicial expediency. The Government has a 4-year disproportionate advantage with unlimited human and financial resources, while Mr. Cabasso and the undersigned as a sole practitioner has been limited in just about every aspect necessary to mount a vigorous defense, which is exacerbated by the restrictions imposed.

D. Request for Local Travel is Dissimilar to a Request for Foreign Travel to Country Without Extradition

The Government in its cross-motion references United States v. Fishman, No. 20-CR-160 (MKV), 2020 WL 6365353 at *1 (S.D.N.Y. Oct. 29, 2020). In considering the motion, the Court is guided by the same factors that govern an initial determination to impose conditions of release.

Defendant Fishman was requesting to travel internationally to the United Arab Emirates. As the Government notes and Magistrate Judge Parker ruled, waivers of extradition like the one Fishman has signed largely are meaningless, especially as applied against a country with which the United States has no operative extradition treaty, like the UAE. See Initial Request Order at 10-13.

Local travel in and around Metro NYC is dissimilar to requesting travel to a foreign country with no operative extradition treaty. The Government allegations as defendant being a flight risk to Communist China with no extradition treaty and offshore funds at defendant's disposal were baseless and unsupported when made.

Mr. Cabasso is requesting limited travel locally in the E.D.N.Y and S.D.N.Y where he has been traveling to and from court, work, doctors' appointments, legal appointments, and so forth for the last 19 months, after serving 2 months in jail demonstrating from "experience" the antithesis of a flight risk.

While the Bail Reform Act directs the conditions of release imposed must be "the least restrictive [] condition, or combination of conditions, (of which there are many) that [the court] determines will reasonably assure the appearance of the person as required, the Government request the Court to impose the maximum restrictive short of incarceration (which is just an issue of "geography"), without basis.

E. Home Detention is a Punitive Form of "Incarceration" and Unreasonable Restrictions are a Due Process Violation

The Government inference is Home Detention is not punitive. The Government states, "But the defendant is not in jail. He was subject to pretrial detention for two months and was released on January 6, 2020."

Where there is to be a presumption of innocence, Mr. Cabasso has already served pretrial detention consisting of 2 months in jail, 8 months of home incarceration without the ability to leave the house (unless medical or legal), 11 months of home detention where he is only permitted to travel to and from his place of work.

Home confinement is undoubtedly "punitive," and a form of punishment as previous draft versions federal sentencing guidelines never disputed such and acknowledged it as

11

punishment on a one-for-one basis for jail time. What will become at minimum 4 years of such conditions is a due process violation.

Officials at one of the largest and oldest monitoring services, (Pride, Inc.) of West Palm Beach, Florida, believe that 90 to 120 days is the most reasonable duration for electronically enforced confinement. "Probation officers we interviewed generally agree with the six-month limit on the duration of home incarceration. Some feel that this is ordinarily the maximum tolerable length even for home detention. They note that the difficulty of serving such a sentence is underestimated when the isolation is not taken into account. Remaining at home for long periods can be excruciatingly boring-a form of solitary confinement." See Schmidt, Electronic Monitors, 50 Fed. Probation 56 (1986).

There is no doubt that the longer the pretrial detention the more likely the denial of due process. Typically, this factor weighs in favor of the moving defendant. See, e.g., United States v. Gonzales-Claudio, 806 F.2d 334, 341 (2d Cir. 1986)("detention that has lasted for fourteen months and, without speculation, is scheduled to last considerably longer, points strongly to a denial of due process"). When considering discovery challenges coupled with Covid nothing could be more speculative than attempting to calculate the indeterminate.

F. <u>Request for Evidentiary Hearing for Due Process, if Necessary</u>

The Government in its Bail Detention Memorandum to Magistrate Reyes remanding Mr. Cabasso pending trial cites, "Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross examination." Such for judicial expediency not as a substitute.

Because a magistrate judge is not required to permit the Government to proceed by proffer and may instead require live testimony, the procedure which permits the Government to proceed by proffer is a courtesy, which is provided to the Government in order to streamline the proceeding. See Cooper, 2008 WL 2331051, at *1 (noting that Case 1:13-cr-20850-UU Document 43 Entered on FLSD Docket 01/14/14 11:43:07 Page 6 of 10 7 allowing the Government to proceed by proffer conserves public resources and the time of law enforcement). However, Courts have recognized that while the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, "by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." Martir, 782 F.2d at 1147. In that case, we criticized the government's proffer for simply stating in "general and conclusory terms what it hoped to prove."

In this case there was no evidentiary support provided to the Magistrate of the defendant as a flight risk. The Government stated what they "intended" to prove which has not transpired. More specifically defendant's ties to Communist China, offshore assets upon which to rely, $88,000.000.00 fraud, national security threat, etc.

If the Court is persuaded to deny defendant's limited travel request based on Government proffered statements made at Arraignment, which we provide evidence were grossly inaccurate and "unsupported by evidence" through the current day and relied upon by the

Magistrate, we would respectfully request of the Court an Evidentiary Hearing. The Government in its cross-motion makes no attempt to refute defendant's assertions and has yet to produce the prima facia evidence underlying the indictment 4 years into the investigation. Therefore, a hearing may be the only recourse to resolve the matter. For the Court to summarily accept the Government's position in the absence of evidence for the basis of the assertions would be prejudicial to the defendant.

IV. <u>Conclusion</u>

There are "significant" changes in circumstances warranting a modification of defendant's conditions of release. For the reasons set forth above, the undersigned respectfully submits that the Court approve Mr. Cabasso's Motion to modify the limited conditions of his release and deny the Government's cross-motion to reimpose the bond conditions that were in place before September 22, 2020, in its entirety, which serve no regulatory purpose. The Government should correct the record as to all blatant inaccuracies.

Respectfully submitted,

_____/s/_____
Albert Y. Dayan, Esq.
Attorney at Law