**ALBERT Y. DAYAN, ESQ.**
**Attorney at Law**
**80-02 Kew Gardens Rd., #902**
**Kew Gardens, N.Y. 11415**
**Tel: (718) 268-9400**
**Fax: (718) 268-9404**

<u>By ECF</u>

April 7, 2022

The Honorable Denis R. Hurley
United States District Court Judge
Alphonse M. D'Amato United States Courthouse
100 Federal Plaza
Central Islip, New York 11722

Re:   *United States v. Aventura Technologies, Inc., et al.*
Dkt.:  19-CR-582 (DRH) (ARL)

> **Compel Government to Respond to Rule 16 and Brady Requests, Grant Defendant Request to Issue Rule 17(c) Subpoenas, Issue Order Pursuant to Due Process Protection Act Order (DPPA), and Grant Request for Modifications of Defendant's Conditions of Release**

Dear Judge Hurley:

**Compel Government to Respond to Rule 16 and Brady Requests**

Numerous requests have been made of the government to comply with its obligations pursuant to Rule 16. The requests delineate documents and facts in *specificity* referenced by the government in the prosecution of this case. The government has failed to meet its obligations for reasons set forth below.  We request the Court Compel the Government to Comply with its Rule 16 and Brady Obligations.

**Grant Defendant Request to Issue Subpoenas**

Defendant has made requests of the Court to permit its issuance of Rule 17(c) Subpoenas ("Subpoenas") to secure documents, information and objects in the case ("Documents"). The Documents referenced in the Subpoenas are *relevant, admissible* and *specific and* in response to the allegations are necessary, reasonable and unoppressive.

**Issue Order Pursuant to Due Process Protection Act Order (DPPA)**

The Due Process Protections Act ("DPPA") requires federal judges to issue an order at the outset of all criminal proceedings that "confirms" the government's Brady disclosure

obligations and the "possible consequences" of Brady violations. No DPPA order has been issued.  We respectfully request the Court issue an order in compliance with the DPPA.

**Grant Request for Modifications of Defendant's Conditions of Release**

On July 8, 2021, Mr. Cabasso submitted a request to Your Honor for modification of the conditions of his release ("Request for Modifications") in order to reasonably provide the ability and timeliness to prepare for trial. The Request for Modification is pending and not calendared. Pretrial Services has indicated their willingness to modify the conditions of Mr. Cabasso's release. To further delay would serve no regulatory purpose and is onerous. We respectfully request Your Honor grant the Request for Modifications.

<u>Background</u>

On November 7, 2019, defendants in the above captioned matter were arrested on a 40-page, 100-paragraph Complaint ("Complaint") referencing in *"specificity"* data and records the government had acquired and reviewed in preparation for this prosecution.

On November 7, 2019, the government seized all Aventura bank accounts and financial assets, leaving all its liabilities remaining, and seized the physical and electronic books and records, "*irreversibly"* and *"pre-indictment"* put the 20-year-old company out of business.

On November 7, 2019, Mr. Cabasso was remanded pursuant to an Order of Detention Pending Trial. <u>See</u> Dkt. 16.

On January 6, 2020, Mr. Cabasso was released to Home Confinement where he remained with the restrictions, (a) avoid contact or association with current and former Aventura employees, (b) avoid contact or association with Aventura customers, and (c) not discuss the matter with his wife or children. Defendant was released into home detention on a $3,000,000 bond secured by property and $200,000.00 cash bail, surrendered his passport and is currently being supervised by the U.S. Pretrial Services while on an ankle bracelet. <u>See</u> Dkt. 76.

**Compel Government's Compliance with its Obligations under Rule 16 Discovery**

On January 14, 2020, the government provided me its initial discovery letter with basic arrest information ("Production 1") stating:

> *"The government is not aware of any exculpatory material* regarding the defendant. The government understands and will comply with its continuing obligation to produce exculpatory material as defined by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny." Further, "Because the discovery in this case is voluminous and includes materials obtained from a variety of sources in different formats, the government expects to make rolling production of discovery to the defendant." The contents of Production 1were basic arrest information. See Dkt. 84 at ¶F.

On January 15, 2020, the government request that this case be designated as a complex case. Your Honor granted the application. designated this a *"Complex Case."* See Dkt. 90.

On March 18, 2020, defendants were advised the government would be drafting a protective order ("Protective Order"). On April 1, 2020, the government stated it would be sending out the proposed Protective Order shortly. A draft Protective Order was sent to the defendants two months later on May 22, 2020. See Dkt. 121. I disagreed, with the Protective Order, concerned with the government's *unilateral ability to determine "sensitivity" of Rule 16 discovery material.*

On May 22, 2020, it was requested of the government by a defendant that they disclose immediately information beyond what was seized by the government. In addition, regardless of what the government is entitled to seize and review, any materials that were seized from the defendants must be disclosed, pursuant to Fed. R. Crim. P 16(a)(1)(E)(iii):

> "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . (iii) the item was obtained from or belongs to the defendant." See Dkt. 122 at 2 and 3.

On May 29, 2020, the government's request for the Protective Order was granted. See Dkt. 125-1 and 127.  The Protective Order stated,

"The government anticipates that its discovery productions will include "**several hundred thousand pages**" of records and communications." See Dkt. 121 at 2.

On June 24, 2020, the government was providing its 2nd of 14 data dumps consisting of *"incomplete"* bank records, bills, payroll records, and de minimis other records ("Production 2"). See Dkt. 129.

> On July 2, 2020, defense counsel Richard Willstatter, submitted a declaration stating, "Defense counsel have conferred with counsel for the government in an effort in good faith to resolve by agreement the issues raised by our July 2, 2020, motion to compel discovery without the intervention of the Court and have been unable to reach agreement." See Dkt. 130-1 at ¶3.

It was also stated by counsel,

> "Since at least March 2020, the defense has been asking for the search warrant applications or affidavits submitted in support of certain search warrants. The government does not dispute that these applications are discoverable pursuant to Rule 16. Yet, the government declines to produce them now, stating that they will be produced in its fourth set of discovery at some unspecified date in the future." See Dkt. 130 at 2.

On July 2, 2020, an *"incomplete"* set of emails from Microsoft and Rackspace obtained pursuant to search warrants were provided, see Dkt. 131. ("Production 3"), which were followed by emails from Microsoft and Rackspace on February 9, 2022 ("Production 14").  See Dkt. 235

On July 2, 2020, the government provided copies of affidavits of search warrants signed May 1, 2019, November 6, 2019, and November 8, 2019 ("Production 4").  See Dkt. 132.

On October 9, 2020, the government advised:

> "On July 10, 2020 and September 17, 2020, Rule 16 discovery was produced to you with Bates numbers that were incorrect and duplicative of earlier Bates numbers in the government's discovery productions."  See Dkt. 157.

The government earlier referenced its belief of discovery of "**several hundred thousand pages**" of records and communications."

On March 16, 2021, the government stated:

> These productions bring to **3.8 million pages** the government's total volume of discovery produced, not counting the government's return of seized data to various defendants who have requested it…." See Dkt. 183 at ¶ 1.

On June 17, 2021, at a status conference before Your Honor, the government stated:

> MR. RICHARDSON: Your Honor, since the last status conference in March, we have been working on discovery. We have made not as much progress as we had hoped, but still some progress. See Exhibit A - Page 2 at 7-10.

> MR. RICHARDSON: So we are making progress in the case. We are still moving forward. There is still some significant discovery to turn over and there is still more to do. See Exhibit B - Page 3 at 3-5.

> MR. RICHARDSON: As I said, I expect that pretty shortly here, within the next 2 to 3 weeks, we will be able to produce a number of forensic copies of computers that were seized in the searches, that will have relevant information that the defendants will probably want to review.

> MR. RICHARDSON: And obviously, there are going to need time to look at that material in addition to the voluminous discovery we have already given them in this case. See Exhibit C Page 3 at 24-25 and 4 at 1.

On July 9, 2021, at the Status Conference before Your Honor the government stated:

> MR. RICHARDSON: And then separately, we also filed a discovery letter earlier today nothing a large quantity of electronic discovery: about **8 million pages of electronic discovery.** I think we talk, in each of our prior status conferences, about the fact that the government continues to make rolling productions of discovery in this case, and we are still doing that.

> MR. RICHARDSON: This is a large chunk of the outstanding discovery but we still have some more to do and that is what we

are going to be working on through the summer. <u>See</u> Exhibit D
Page 5 at 21-25 and 6 at 1-5.

On September 21, 2021, at the status conference the government advised the Court it

would be finished with its Discovery requirements by the end of October 2021.

On September 23, 2021, I wrote to the government a Rule 16 and Brady request

("Discovery Request") in 68 subsections, which included *"specific"* prima facia evidence

referenced in the government's statements in affidavits, warrants, complaint, detention hearing

and the indictment.

> "A review of the complaint and indictment indicate the majority of
> prima facia documents supporting the Government' assertions
> have not been provided although previously requested.
>
> Accordingly, I have identified by paragraph and section from the
> complaint and indictment wherein the Government, in support of
> its written as well as verbal assertions on the record for detention
> and for other reasons, made references to purported documents
> that, inexplicably have not yet been provided.
>
> For efficiency and to minimize the necessity for motions we
> respectfully request the Government provide an index, which it no
> doubt possesses, which shall include responses to the paragraphs
> below along with associated Bates numbers.
>
> If the Government claims it has nothing responsive, it should
> indicate such immediately." <u>See</u> Exhibit E.

There has not communicated the same and has failed its discovery obligations.

On November 3, 2021, at the Status Conference the government reiterated to the Court it

believed it was substantially complete with its obligations under Rule 16 and making a

production the same day <u>See</u> Dkt. 220, no mention of my Discovery Request. The government

after 2 years *partially* produces records from computers at Aventura's office and Mr. Cabasso's

residence. There have been several technical issues with that and other discoveries.

On January 11, 2022, the government emailed me a letter stating:

"While the government has worked diligently to identify and produce to the defendants all material subject to disclosure under applicable law, ***the government is in possession of a large volume of electronic data and other material that it obtained in its investigation*** of the complex and long-running fraudulent schemes charged in this case. Accordingly, in an abundance of caution, the government has determined to make available to the remaining defendants in this case discovery broader than that which is required under applicable law. Specifically, to ensure that the defendants have their own ability to independently search and review the below-listed categories of seized materials for documents and other information that they believe to be material to the preparation of their defense, the government intends to make available to each of the remaining defendants complete copies of the evidentiary materials listed below. Under Federal Rule of Criminal Procedure 16.1(a), the purpose of this letter is to afford the defendants the opportunity to raise any objections to this proposed course of action. Please provide any such objections or requests to the government in writing on or before January 21, 2022, so that we may attempt to confer and resolve any objections and requests before the status conference currently scheduled for January 28, 2022." <u>See</u> Exhibit F.

On January 25, 2022, I emailed the government in response:

"On the subject of your letter dated January 11, 2022, Defendant Cabasso has no objection to the government's production of the additional discovery to all the remaining Defendants in this case. We have not yet received the additional information from Mr. Braverman. ***What are you doing about my Rule 16 Discovery letter, if anything? What are you doing about the contracts and other materials you identify in your accusatory instruments, if anything? At the least, let me know if they are buried in the voluminous discovery you confiscated from Aventura and Mr. Cabasso and in turn provided us with copies of the same, so that I can continue looking for it. I am not trying to interject sarcasm here, but the basis for this case is the Prima Facia discovery Government relied on in their accusatory instruments and in applications for conditions of release.*** Respectfully, Dayan. <u>See</u> Exhibit G.

On January 27, 2022, I again wrote to the government in response to their January 11, 2022, government's plan for further discovery. stating:

"I am in receipt of the Government's letter dated January 11, 2022, with respect to defendants' opportunity to raise any objections to the government's proposed course of action regarding their Federal Rule of Criminal Procedure 16.1(a) information. Please be advised as follows:

The Government advised Judge Hurley at the previous status conference on November 3, 2021, it was wrapping up discovery, and in the absence of anything to the contrary, your letter suggests that you have satisfied Rule 16 by what the Government been provided.

We disagree. Dating back to 2019, Rule 16 discovery requests have been made of the Government from the various defense lawyers. At multiple status conferences the issue has been raised of the Government's non-production of specific demanded discovery.

***With respect to my "specific" discovery requests, to which the Government has been non-responsive, please advise with respect to each: if the Government has provided and its location; if not provided, if it is in the Government's possession; if in the Government possession, provide a date certain we can expect it; and if the Government intends not to provide, offer a brief explanation."*** See Exhibit H.

On January 27, 2022, the government first produces - ***33 Aventura "contracts" and "task orders,"*** of the approximate 100 (in their possession since 2018 or earlier, which are the central focus of the government's case and previously requested). Underlying information associated with the contracts have not been provided and they are "substantial," both in volume and relevancy. See Dkt. 233.

The government references further upcoming discovery stating,

"The government expects to make a production of a **large volume** of electronically stored information identified through searches performed in response to various defense discovery requests and through further government review of the emails in its possession. The government's e-discovery facility has advised that it expects to complete the processing of this production on February 2, 2022…" See Dkt. 233 at ¶ 4.

8

While the government stated it expects to make a production of a **large volume** of electronically stored information in Dkt. 233 on **ECF,** they ***"tactically"*** omit my written response to Dkt. 233, which renewed my request for a response to the Discovery Requests.

On January 30, 2022, Counsel for Frances Cabasso, Kenneth Kaplan emailed the government stating:

> "With all due respect, I am deeply troubled by your response. The government has alleged that AVENTURA "was awarded multiple WOSB set aside contracts by U. S. government agencies " (para. 27 of the indictment). As you now must surely know, AVENTURA never received nor was awarded any WOSB "set asides" for even one contract. Accordingly, the 1449 forms are exculpatory evidence which should have been provided to me in 2019. I have made numerous requests beginning with my December 23, 2019 discovery letter, followed be emails and telephone conversations for this evidence. While we were fortuitously able to retrieve some 1449 forms from the mountain of evidence already provided to us, the majority of such forms have either been withheld or "buried". We now learn that there are 33 additional contracts which are going to be provided to us presently, two years after the government's Brady obligation commenced.
>
> In view of the sanctions recently imposed in the SDNY for withholding/burying Brady material (U.S. v. Nejad, 521 F. Supp 3d 438 (SDNY, 2021), we just don't understand how this is even possible. We also commend your attention to Rule 5 (f)(1) of the FRCP regarding the "consequences" of such a violation. The government's discovery letter to me of January 14, 2020 stated that no Brady material existed.
>
> It seems that the government would now want to make a proper record to rectify any of the foregoing. Accordingly, in order to insure that the government has discharged it's Brady obligations in providing this significant exculpatory information to me, I ask you provide me all 1449 forms as a distinct group in either hard copy, pdf in email, or drive dedicated specifically to these items alone." See "Exhibit I".

On February 9, 2022, the government first produces Aventura's centralized corporate email server and states:

> "The materials produced today are subject to the protective order entered in this case on May 29, 2020. They consist of electronically stored information (such as emails and attachments) seized pursuant to search warrant from Microsoft Corporation, Rackspace US, Inc. and Aventura's internal corporate email server. These materials are produced under Bates numbers in the following range:  AVTESI_0005244127-AVTESI_0005547554." <u>See</u> Dkt. 235.

On March 8, 2022, I filed an ex-parte Freedom of Information (FOIA) request for specific and contemporaneous Aventura "contracts" information regarding the approximately 100 contracts at FOIAonline.gov. ("FOIA Request") <u>See</u> Exhibit J. The same as requested pursuant to Rule 16 by defendants of the government since "***2019",*** and not provided.

On March 25, 2022, ***17 days later***. I was granted and received the requested information.

> "GSA-2022-000709 has been processed with the following final disposition: ***Full Grant."*** <u>See</u> Exhibit K.

Early on the government estimated discovery of approximately six months.

The government's production is in year 3 with 10+ million documents. Many of the "Defendants" documents and "public" documents are inexplicably marked "sensitive. Many other voluminous documents appear to have no relevance to the case.  Mr. Cabasso encounters several hindrances with respect to discovery in preparation for trial:

(a)     sensitive productions may only be viewed in my presence, on my schedule
(b)      Mr. Cabasso requires pre-approval for any meetings,
(c)     sensitive productions must be reviewed on my changing schedule as the nature of criminal defense,
(d)     sensitive productions do not permit the Defendant to make copies to organize and review in his home or elsewhere,
(e)     productions of similar marked "sensitive" categories are spread over different productions with large gap in between,
(f)     documents provided on USAFx require internet access to which Mr. Cabasso is not entitled,
(g)     while the government has the ability to review the computer records in their Microsoft Office and other program native formats, Mr. Cabasso and myself must

review each and every document independently in forensic tools with limited functionality,

(h)    disparate data dumps totaling in excess of 5 million,

(i)    documents most critical provided last and incomplete,

(j)    challenges of the government with the production technology,

(k)    "chain of custody" issues,

(l)    With the lack of communication by the government, Defendant can only guess,

(m)    Defendant without third-party confirmation has no way of knowing the truthfulness of the government's production claim and "completeness,"

(n)    No practical means of reviewing the millions of documents received in any meaningful way to make the determination for use the documents for the preparation of its defense,

(p)    No knowledge if a record has been produced,

(q)    No knowledge if the records have been produced if the "series" of records are complete,

(r)    No knowledge If the records have not been produced, if and when they will be provided and to what extent as solely determined by the government,

(s)    No knowledge of a record requested in the possession of the government is not being produced, why,

(t)    large amounts of production appear to have no value to either the government or the Defendant,

(u)    Because of the methods used by the government to produce documents only after perseverance, concerns regarding Brady Violations.

(v)    overall logistics as the government has had 5+ years and it is unknown in light of the situation how long it will take the defense prepare as was experienced by the unexpected numerous delays of the government,

(w)    Productions have been delayed with the least or irrelevant first and the most critical produced at the end and incomplete,

(x)    Evidence that has been compromised and access to follow the trail

(y)    Vendors and customers were advised by the government not to communicate with the defendant.

(z)    Mr. Cabasso is not a young man, has several health issues, is blind in one eye, with vision issues in his other eye, surgeries upcoming later in the year and unable to view and focus well on computer screens and written documents.

The government has also advised a defendant's counsel, that it has no intentions of identifying from the millions of records that it intends to use at trial, until a much later date before trial.

It is not disputed that Defendants (as well as other co-defendants) have made the appropriate demand for discovery in this case and neither is it disputed that such demands were made years ago. What is disputed and the core of this Motion to Compel is the extent to which

the Government has complied with such discovery demands. At issue here is the nature of the Government's response or more aptly put lack of meaningful response to Aventura's request for what is without questions its mandated entitlement under Rule 16(a)(1)(E)(i), (ii), and (iii).

It is not here contended that the Government has not provided Defendants with millions of documents scanned onto various mediums, which were seized from Aventura. The Government claims it has been providing such documents in periodic discovery 'dumps' on Defendants as it perceives its obligation under Rule 16. Aventura's problem is it is unable to determine if it has indeed received the required production in its entirety searching through 5+ million documents.

Defendant has made its Discovery Requests for what is most relevant and Brady material and what is essential to the preparation of its defense.

The government "references" and provides portions of documents among literally millions of documents loaded onto removable drives, and websites furnished to counsel, with documents unnecessarily marked "sensitive," from its unilateral determination as referenced in the Protective Order.

The Court should take care to ensure that the protection afforded to discovery information is no broader than is necessary to accomplish the proffered goals. United States v. Tao, No. 19-20052-JAR-JPO, 2020 U.S. Dist. LEXIS 46625, at *2 (D. Kan. Mar. 18, 2020). "[T]he Court should consider how burdensome a protective order would be on them, being particularly sensitive to the extent to which a protective order would hinder their efforts to defend themselves at trial." Smith, 985 F. Supp. 2d at 544. In determining what degree of protection is appropriate, courts should ensure that a protective order is no broader than is

necessary to serve the intended purposes. United States v. Lindh, 198 F. Supp. 2d 739, 741 (E.D. Va. 2002); Tao, 2020 U.S. Dist. LEXIS 46625, at *2 n.4.

The government apparently believes its discovery attempt is compliant with its obligations to Defendant. The problem is such conduct does not properly comply with their obligation but instead is an avoidance of it. It is Defendant's assertion that the government's tactical method and means of discovery in such a complex case is the outright deprivation of Defendant's rights to adequate and fair discovery is not a coincidental result in an extremely complex case with extensive allegations and going to require numerous subject matter experts.

Each revision and amendment to the Federal Rules of Criminal Procedure is accompanied by various Committee and Advisory Notes. The Notes of the Advisory Committee of 1974 reflect the purpose of expanding criminal discovery in stating:

> The Committee believes that it is desirable to promote greater pretrial discovery. As stated in the Advisory Committee Note, broader discovery by both the defense and the prosecution will contribute to the fair and efficient administration of criminal justice by aiding in informed plea negotiations, by minimizing the undesirable effect of surprise at trial, and by otherwise contributing to an accurate determination of the issue of guilt or innocence. . . . [Emphasis added] See. Federal Rules of Criminal Procedure, Rule 16, Notes of the Advisory Committee 1974.

In *United States v. Turkish,* 458 F. Supp. 874 (S.D.N.Y. 1978) the court considered a similar complaint by the defendant. There defendant Turkish sought an order to the government "to the government to indicate which of the approximately 25,000 documents relating to this case in the government's possession it intends to use at trial, rather than 'bury(ing) the defendant in paper' by merely generally making all of the documents available to defendants." (*Id*. at 882) The court went on to order that "the government must afford the defendants an opportunity to inspect and copy all documents under the control of the government which 'are intended for use

by the government as evidence in chief at the trial.'" (*Id.*) The court then ordered the Government to "identify to the defendants those documents which it intends to offer, or to use or to refer to in connection with the testimony of any witness, on its case in chief." (*Id.*)

Similarly in *United States v. Poindexter,* 727 F. Supp. 1470 (D.D.C. 1989) the court, citing *Turkish, id.* stated:

> The government has produced documents that it intends to use in its case-in-chief, but defendant contends that, with respect to financial information and various calendar and diary pages, **it has done no more than to identify several thousand pages, any of which it "may" rely on at trial. This broad brush approach, defendant contends, is not sufficient to meet its obligations. The Court agrees.**
>
> While the government's case or strategy may change in advance of trial or even during trial, **there is no reason why it cannot be more specific as to which documents it currently intends to use, and there are many reasons, grounded in fairness to the defendant, the protection of his rights, and not least Rule 16(a)(1)(C), why it should be.**
>
> Within thirty days of the issuance of this Order, the government shall **identify with greater specificity those among these thousands of documents** in the financial, calendar, and diary areas that **it intends to use at trial**. This notification will not prevent the government from later introducing other documents from these materials on a limited scale, but it **will give the defendant some notice as to which among the thousands of documents are likely to be part of the government's case-in-chief.** *United States v. Turkish,* 458 F.Supp. 874, 882 (S.D.N.Y.1978), aff'd, 623 F.2d 769 (2nd Cir.1980). (Emphasis added)

*Poindexter, supra*. at 1484. [Note: Rule 16(a)(1)(C) referenced above is the forerunner of what is today's Rule 16(a)(1)(E)]

In *United States v. Upton,* the court again orders the government to be more specific in its discovery compliance as it regards the defendant's rights to inspect items intended to be used at trial in the government's case in chief.  The *Upton* court noted that it was uncontroverted that

the government had produced "thousands of pieces of paper" only a handful of which were identified in the Indictment as being fraudulent. Similarly, here in the instant case but even more egregious the Government has produced millions of documents and the Indictment references the 60 or so fraudulent contracts, none of which are specifically identified or provided to Defendants for their use. Citing and relying upon *Turkish, supra.* and *Poindexter, supra.* the U*pton* court, in granting defendant's motion for additional discovery and instructing the government to identify the specific documents it intended to rely upon at trial stated:

> The purpose of requiring the government to identify which documents it will rely upon at trial in a situation such as this— where there are thousands of documents—is to allow the defendant to adequately prepare his or her defense. General familiarity with the nature of the documents, as in this case, will not allow defendants to do that if they are not informed which documents include the allegedly falsified maintenance information and which documents the government witnesses will refer to or rely upon.

*United States v. Upton*, 856 F. Supp. 727, 748 (E.D.N.Y. 1994).

Finally, defendants faced a similar plight of voluminous electronic discovery of millions of documents in *United States v. Cadden*. The defendants sought discovery of at least the 'search terms' used by the government in identifying the specific documents and images on the electronic storage media so as to allow defendants to at least locate specific documents for their use. In granting defendants request and ordering the government to disclose all search terms for the use by the defendants, the court stated: "I also find that the dual showings of need and hardship have been made. As defendants aptly, if slightly, overstate in their supporting Memorandum, **"[w]hat will take five minutes to accomplish if the government produced the search terms will take hundreds of hours and tens of thousands of dollars to complete if [it does] not**." (Emphasis added) *United Stated v. Cadden*, 2015 WL 5737144 (D. Mass. 2015).

Defendants face such a plight here. Forcing the Defendants to literally view millions of

documents and images without adequate means of searching the voluminous electronic media for specific items is tantamount to no discovery and fails to comply with not only the intent but the spirit of the Rule.

I would reiterate to the government not only search their records but contact the 13 federal agencies as mentioned by the government in the Complaint involved in the investigation.

> "As detailed below, an investigation by the FBI, U.S. General Services Administration Office of the Inspector General ("GSA OIG"), U.S. Department of Defense, Defense Criminal Investigative Service ("DCIS?), U.S. Customs and Border Protection ("CBP"), U.S. Navy Naval Criminal Investigative Service ("NCIS"), U.S. Army Criminal Investigation Command ("Army CID"), U.S. Air Force Office of Special Investigations ("AFOSI"), Internal Revenue Service-Criminal Investigation ("IRS-CI"), Treasury Inspector General for Tax Administration ("TIGTA"), Treasury Inspector General ("TIG") and Department of Energy Office of Inspector General ("DOE OIG") has revealed that, beginning on at least August 1, 2006, and continuing until the present, within the Eastern District of New York and elsewhere…" See Dkt. 1 ¶ 11.

> "Information possessed by other branches of the federal government, including investigating officers, is typically imputed to the prosecutors of the case." Beers, 189 F.3d at 1304 (emphasis added). A duty to search files maintained by governmental agencies closely aligned with the prosecution may be triggered when there is a reasonable prospect or notice of finding exculpatory evidence. See United States v. Brooks, 966 F.2d 1500, 1502-04 (D.C. Cir. 1992). It is the Government duty to "learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." United States v. Combs, 267 F.3d 1167, 1174-75 (10th Cir. 2001) (quoting Kyles v. Whitley, 514 U.S. at 433) (emphasis in original).

> "Pursuant to Rule 3.8(b) of the New York State Bar (Duties of Public Prosecutors), requires a prosecutor to "make timely disclosure . . . of the existence of evidence or information known to the prosecutor or other government lawyer that tends to negate the guilt of the accused, mitigate the degree of the offense."

> Unlike the federal constitutional duty of disclosure in Brady v. Maryland, 373 U.S. 83 (1963), and decisions that followed, Rule

> 3.8(b) obligates a prosecutor to disclose to the accused any relevant information known to the prosecutor that tends to negate the defendant's guilt or mitigate the charges regardless of the extent of its significance. Once favorable information becomes known, its disclosure under Rule 3.8(b) must be "timely."

Pretrial disclosure is required if advance disclosure is necessary for the evidence to be used effectively. Thus, if the exculpatory material requires defense development before it can be introduced, a constitutionally based discovery requirement is thereby created. The right of defendants under most rules to obtain discovery of information material to the preparation of the defense involves a statutory right to discovery of evidence that is substantially broader than the constitutional right.

Accordingly, I respectfully ask Your Honor to Compel the government comply with my Discovery Requests and its obligations under Brady. Further compel the government to identify if the requested discovery, has been provided, in their possession, if in their possession a date certain it will be provided and "complete," if the government does not intend to produce requested discovery state such and reasoning. We are not asking the government to help prepare our case but follow the Rules as they were intended.

I respectfully request Your Honor compel the government to make a statement here for the record, that the government is not aware of any exculpatory evidence that tends to negate the guilt of Mr. Cabasso or mitigate the degree of the offense or possess any exculpatory material regarding the Defendant today the same as it was stated by the government on January 20, 2020. See Dkt. 84 ¶ F.

**Grant Defendant Request to Issue Subpoenas**

The government in their pleadings both written and oral before this Court references a *"complex, disparate and often self-contradictory pattern"* and chain of events connecting Mr.

Cabasso and Aventura with *financial institutions, real estate transactions, "businesses unrelated to Aventura's principal business, suppliers, private and government customers, logistic providers and other government identified relevant third parties.* With the omission of Documents yet to be provided supporting an indisputable adverse conclusion. Mr. Cabasso needs to defend each and every allegation, in the absence of which may result in a guilty verdict. In light of the history of discovery there is no confidence of compliance or compliance in a timely manner.

The Defendant in its request to the Court for Subpoenas, states:

> "The Subpoenas as referenced on Schedule A hereto, are necessary in order to secure evidence, for completeness, accuracy, reliability chain of custody, and prepare a proper defense for Defendant in the above captioned matter.
>
> The Subpoenas consist of Defendant related records from *financial institutions, suppliers, private and government customers, logistic provider and other relevant third parties.*
>
> Further, the Subpoenas will provide essential assistance to the defense to search through continuous disparate rolling data dumps provided by the government in this case. To date, 5,000,000+ disjointed documents produced have created logistical impossibilities for me a sole law practitioner with many documents inexplicably marked sensitive, while others self-conflicting in content." See Dkt. 243.

Documents which have gone from *hundreds of thousands* in number to *3.8 million* to *5 million* to over *10 million*.

As one of many concerns elicited herein, on January 27, 2022, the government first produces - *33 Aventura "contracts" and "task orders,"* of the approximate 100 (in their possession since 2018 or earlier, which are the central focus of the government's case and previously requested). Underlying information associated with the contracts have not been

provided and they are "substantial," both in volume and relevancy. The government inexplicably stated:

> 2. Contracts    The government had previously produced in discovery approximately 71 contracts and task orders between Aventura and the U.S. government agencies. Under cover of this letter, the government is producing via USAfx approximately 33 more contracts and task orders, Bates numbered AVENTURA_0000094831 – AVENTURA_0000095396.   These items are designated Sensitive Discovery Material pursuant to the protective order in this case. See Dkt. 233.

The Contracts were requested since 2019. The Contracts were only turned over in 2022 due to Defendant's efforts in identifying the missing Contracts by Contract and U.S. Government identifiers. Contracts which would never have been turned over otherwise. Further "concerns" were the designation of Sensitive Discovery Material. The government *sensitive* title for Documents of **public** awards of **public** contracts required by law to be **publicly** disclosed pursuant to **public** law is inconceivable. To assert in a large data dump of Documents that (possibly, and none we have located) a few may be sensitive and designate the entire dump sensitive is simply not in the spirit of the Rule and use of a Protective Order.

The Federal Funding Accountability and Transparency Act of 2006 (FFATA) Pub. L. 109-282, was signed into law on September 26, 2006. The legislation requires that federal contract, grant, loan, and other financial assistance awards of more than $25,000 must be displayed on a publicly accessible and searchable website to give the American public access to information on how their tax dollars are being spent.

In 2008, FFATA was amended by Pub. L. 110-252, the Government Funding Transparency Act (GFTA), which required prime recipients to report details on their first-tier sub-recipients for awards made as of October 1, 2010.

The transparency efforts of FFATA were expanded with the enactment of the Digital Accountability and Transparency Act (DATA Act) Pub. L. 113-101 on May 9, 2014.

The required mandatory "contemporaneous" reporting by government agencies pursuant to FFATA, GFTA and the DATA Act is received and managed by the General Services Administration (GSA), a significant participant in the prosecution of this case.

Similar situations with unknown locations of central corporate computer servers have not been identified and central to the case. Emails sent in one production in 2020 and another in 2022 with additional still not provided.

The government conflates the Discovery Request sub-paragraphs responses by their continued misuse of the word **"example.,"** Omitting qualification, quantification or reconciliation, which impute an inverse conclusion*.* As part of the government's "overreach" in the Complaint they similarly use the word *"example"* 16 times both inaccurately and contorted and conflated to egregiously arrive at the $88 million, one big fraud narrative.

In the Complaint alone; ¶ **34** *"For example;"* ¶ **36** *"to take only a few examples,"* ¶ **38**, *"As another example;"* ¶ *40*, "For example;" ¶ *41*, *"As another example;"* ¶ **46**, "For example;" ¶ **48** *"For example;"* ¶ *52*, "For example;" ¶ *52*(f), *"Examples of;"* ¶ **64** *"For example;"* ¶ **69**, *"As another example;"* ¶ *72*, "For example;" ¶ **78**, *"For example;"* ¶ **80**, *"For example;"* ¶ **87**, *"For example;"* and ¶ *90*, *"For example."*

On March 24, 2022, in the government's first acknowledgment and response to my Discovery Requests, the government wrote me not with further production but a letter stating,

> "we were surprised, as a result, when you filed a letter with the Court on March 14, 2022, seeking permission to issue dozens of subpoenas.  Many of these would appear to duplicate subpoenas that have been issued by the Grand Jury, and the relevant records have been produced to you in discovery.  To take only a few examples, your letter to the Court seeks permission to send subpoenas to Bank of America, Citibank, and JPMorgan for Aventura's account records.  The relevant records were produced to you on June 24, 2020, and the cover letter (available on ECF at

docket No. 129) clearly indicates at what Bates ranges they can be found…" ("Exhibit L")

The government omitting the disorganization and completeness of the banking and other records.

On March 24, 2022, I emailed the government,

> "… I am not just yet going to respond about the procedural history of this case you outlined in your letter.  Suffice it to say at this point, however, your mode of production up to this point seems to me as totally out of order, disjointed, ***self-contradictory and at times conflicting with the theory of the case you continue to propound in your pleadings and statements in court.***   Based on the reasons stated above, my Client is not at ease to rely on your choice and mode of production for his defense in this case.  Moreover, my client is not at ease to sit with you to discuss our concerns and inquiries about the mode and substance of your production, since it will surely have you glean at our strategy of defense…"   See Exhibit M.

With 13 agencies, 3 prosecutors and cadres of investigators it has taken the government 5+ years of preparing discovery under the government's unfettered conditions with unlimited resources. We confidently believe there are additional 100,000s if not millions of exculpatory, mitigating and "clarifying" records outstanding remaining, which may only be obtained by subpoena from third parties and for completeness. There is no plausible explanation why prima facia evidence used for pleadings in 2019, have not been produced or are first being produced in incomplete forms in 2022.

In 2017, the Trump Administration proposed the John McCain National Defense Authorization Act (NDAA), which was debated in Congress in 2017, passed by Congress in

August 2018, and went into effect *August 1, 2019* (warrants predating the NDAA effective date and weeks before the 100-page complaint and arrests). The NDAA contained a section called Section 889: *Prohibition on Certain Telecommunications and Video Surveillance Services or Equipment.* Section 889 has three core parts and references only five (5) PRC companies Huawei Technologies Company, ZTE Corporation, Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, and Dahua Technology Company and no other PRC companies: (i) the 'procurement ban', which bans federal procurement of covered equipment/service and went into effect *August 1, 2019*, (ii) the 'blacklist clause', which bans federal agencies from doing business with those who "use" covered equipment/services and went into effect *August 1, 2020,* and (iii) the 'funding ban', which prohibits federal dollars from being spent on covered goods/services and went into effect *August 1, 2020.*

One of the five, Hangzhou Hikvision Digital Technology Company, is one of the five mentioned in the NDAA ("Hikvision," the world's largest security company) (PRC Manufacturer-1 as referenced throughout the government pleadings such as the Complaint). See Dkt. 1 ¶ 14, 26, 29, 37, 41, 43, 46, 47, 48, 55, 64, 66 and 70. Similarly, Dahua Technology Company another of the five referenced in the NDAA ("Dahua", is the world's third largest security company, PRC Manufacturer-2) and mentioned by the government throughout its pleadings. See Dkt. 1 ¶ 14, 15, 26, 43, 45, 47, 65, 66, 67 and 68.  PRC Manufacturer-1 and PRC Manufacturer-2 the only Complaint referenced companies.

The NDAA Section 889 has been opposed by:

      Aerospace Industries Association (AIA)
      Airlines for America (A4A)
      Alliance for Automotive Innovation (Auto Innovators)
      American Automotive Policy Council (AAPC)
      Alliance for Digital Innovation (ADI)
      American Bankers Association (ABA)

American Council of Engineering Companies (ACEC)
American Fuel & Petrochemical Manufacturers (AFPM)
American Moving and Storage Association (AMSA)
American Trucking Associations (ATA)
Associated General Contractors of America (AGC)
Cargo Airline Association
The Center for Procurement Advocacy (CPA)
Computing Technology Industry Association (CompTIA)
Global Business Alliance (GBA)
Information Technology Industry Council (ITI)
International Association of Movers (IAM)
Motor & Equipment Manufacturers Association (MEMA)
National Air Carrier Association (NACA)
National Defense Industrial Association (NDIA)
National Electrical Manufacturers Association (NEMA)
National Motor Freight Traffic Association (NMFTA)
Professional Services Council (PSC)
Security Industry Association (SIA)

(Collectively the entities above the "Organizations") (See Organizations Letter to Congress the Organizations representation of *"nearly every industry segment critical to America's economic recovery."*) See Exhibit N.

The NDAA, in its drafts, debates or otherwise, did not prohibit U.S. Federal Agencies from purchasing from PRC Manufacturer-1 or PRC Manufacturer-2 **prior to August 1, 2019**. Nor does the NDAA address any immediacy to cease and desist for any security reasons let alone national security threats. Nor are any pre-dating or overriding statutes or laws to the NDAA cited.

The government makes no mention in any of its pleadings of **"examples"** of **"any"** orders **"post"** NDAA **"effective date,"** or otherwise purchased by the U.S. Government from Aventura. The government by investigation and **"inference"** represent Aventura non-existent NDAA violations of law, which serves no purpose other than to erroneously contort, conflate and mislead.

23

"…certain PRC manufacturers, including PRC Manufacturer-1 and PRC Manufacturer-2, produce firmware with known cybersecurity vulnerabilities. On August 13, 2018, President Trump signed into law the National Defense Authorization Act for Fiscal Year 2019 (the "NDAA"). The NDAA contains a provision prohibiting government agencies, effective August 13, 2019, from procuring PRC Manufacturer-1's video surveillance and telecommunications equipment "[f]for the purpose of public safety, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes." See Pub. L. No. 115-232 § 889(a)." See Dkt. 1 ¶26.

The NDAA at section 889 (a)(1)(B) states the head of an agency shall:

"submits to the head of the executive agency, who shall not later than 30 days thereafter submit to the appropriate congressional committees, a full and complete laydown of the presences of covered telecommunications or video surveillance equipment or services in the entity's supply chain and a phase-out plan to eliminate such covered telecommunications or video surveillance equipment or services from the entity's systems."

The government references in the Complaint *Aventura received shipments* from ***January 8, 2010, to April 19, 2018,*** from *PRC Manufacturer-1.*  See Dkt. 1 ¶ 45.

The government references in the Complaint Aventura paid for shipments from ***August 10, 2017, to September 20, 2018,*** from *PRC Manufacturer-2*.  See Dkt. 1 ¶ 47.

Aventura's last purported transactions with PRC Manufacturer-1 or PRC Manufacturer-2 as acknowledged by the government were in 2018, **a year before the NDAA went into effect**. See Dkt. 1 ¶ 45.

The U.S. General Services Administration ("GSA"), hosts, manages, and controls a website called GSA Advantage ("GSA Advantage") (https://www.gsaadvantage.gov). GSA Advantage is a "publicly" displayed online shopping and ordering system providing access to thousands of contractors and millions of products and services.

Any product or services published on GSA Advantage and procured by U.S. Government Agencies receive *extensive* and multiple layers of due diligence checks at multiple levels of government.

GSA Contracting Officers ("GSA Contracting Officers") are ***"specialists"*** in a particular category of products and services offered to the U.S. Government by suppliers known as GSA Schedule Holders ("GSA Schedule Holders"). Product and service "categories" are referred to as "Schedules." "GSA Schedule 84" serves the federal buyer relating to ***Total Solutions for Law Enforcement, Security, Facility Management Systems, Fire, Rescue, Special Purpose Clothing, Marine Craft, and Emergency/Disaster Response Schedule.***" See Exhibit O.

Prior to any product being published by the GSA to the GSA Advantage website, the GSA Contracting Officers' conduct an extensive due diligence of GSA Schedule Holders submissions to the GSA for products and services to be offered for sale by GSA Schedule Holders to the U.S. Government and published on GSA Advantage by the GSA.   GSA Contracting Officers analyzes all GSA Schedule Holder submissions. The GSA Contracting Officers (a) use previous experience, (b) compare with similar products offered by other Federal Contractors, (c) available public information including website links often provided by the Federal Contractors (d) review product details, specifications, accuracy and pricing, (e) communicate with the GSA Schedule Holder for clarifications, and (f) confirm the acceptance of the product for sale. All before it is published on GSA Advantage by the GSA for federal agencies to purchase from.

The GSA ***"unilaterally"*** determines and controls what products and services gets ***"added"*** to GSA Advantage and what gets ***"removed."*** ***The only one with access to make changes to the website is the U.S. Government.***

Additionally, GSA Schedule Holders, are routinely visited by a GSA Industrial Operations Analyst ("IOA") who conduct a *"comprehensive"* Contractor Assistance Visit ("CAV"). Aventura received such *"numerous"* visits over the 13-year period alleged, which included *"walkthroughs"* of Aventura's manufacturing facilities.

U.S. Government Agencies ***"independent of the GSA,"*** have "technical specialists," ("Agency Technical Specialists") conduct their own due diligence by (a) preparation of technical requirements, (b) conduct market research, (c) conduct market surveys, (d) write statements of work, (e) determine a procurement plan, (f) identify sources, and (g) obtain specifications and supporting product literature, (h) provide requirements. Once the Agency Technical Specialists' work is complete the information is provided to the "agency procurement specialists," ("Agency Contracting Officer"). The Agency Contracting Officer conducts their own due diligence in conjunction with the assistance of the Agency Technical Specialists. They (a) review the technical specialists work for potential errors and disputes, (b) prepare Sources Sought, (c) Requests for Information ("RFI"), (d) Requests for Proposals ("RFP"), (e) Requests for Quotes ("RFQ"), (f) Solicitations, (g) Bids, (h) Terms & Conditions, (i) Solicitation Procedure, (j) Extent Competed, (k) Set-Aside Type, (l) Evaluated Preference, (m) Amendments, (n) Awards, (o) Contracts, (p) Purchase Orders, (q) Task Order, and more. If any GSA Schedule Holder has an issue with any of the particulars of products, services, contracting methods, basis for awards or otherwise have the right to protest to the GSA, Agency, and U.S. General Accountability Office ("GAO").

The Office of Federal Procurement Policy, as amended, 41 U.S.C. 401 et seq. and (FAR Subpart 4.6) requires the Administrator for Federal Procurement Policy to establish a computer-based Federal Procurement Data System for collecting, developing and disseminating

procurement data to the Congress, Executive Branch and private sector. The Federal Procurement Data System Program Management Office ("FPDS PMO") within the Office of the Integrated Acquisition Environment ("IAE") oversees the operation of the Federal Procurement Data System Next Generation ("FPDS"). GSA "manages" and controls" the receipt of FPDS real-time information provided by a U.S. Government Agency as required by law.

FPDS, also known as FPDS NG, is the central "***real-time***" database for government contracting transactions. The system is meant to ensure trust and transparency in federal spending. ***FPDS is the most comprehensive and definitive source for government contracting transparency data***.

Executive departments and agencies are responsible for collecting and reporting data to FPDS as required by the Federal Acquisition Regulation (FAR). FAR 4.604 states:

> (a) The Senior Procurement Executive in coordination with the head of the contracting activity is responsible for developing and monitoring a process to ensure timely and accurate reporting of contractual actions to FPDS.

> (b) (1) The responsibility for the completion and accuracy of the individual contract action report (CAR) resides with the contracting officer who awarded the contract action. CARs in a draft or error status in FPDS are not considered complete.

> (2) The CAR must be confirmed for accuracy by the contracting officer prior to release of the contract award. **The CAR must then be completed in FPDS within three business days after contract award.**

FPDS NG required information is ***"concurrent"*** and ***"comprehensive"*** and consists of: (a) awards, (b) transaction information, (c) document information, (d) award ID, (e) agency, (f) PIID, (g) modification number, (h) transaction number, (i) referenced IDV, (j) reason for modification, (k) solicitation ID, (l) treasury account system, (m) dates and amounts, (n) reporting dollar amounts, (o) fee for use of IDV, (p) purchaser's information, (q) contractor

information, (r) duns number, (s) contract data, (t) principal place of performance, (u) product or service code information, (v) competition information, (w) preference programs/other data, (x) basic indefinite delivery vehicles, (y) transaction information, (z) document information, (aa) dates and amounts, (bb) set-asides, (cc) purchasers information, (dd) contractor information, (ee) SAM exception, (ff) duns number, cage code, (gg) business category- obtained from SAM, (hh) contract data, (ii) legislative mandates and inter agency contracting authority, (jj) contract marketing data, (kk) product or service information, (ll) competition information, (mm) preference programs/other data, and (nn) transaction/modifications.

The FPDS is electronically delivered from the U.S. Government Agency to the GSA for the required "public" website access of the FPDS information, which resides at USASPENDING.gov pursuant to Public Law.

Upon a GSA Schedule Holders' completion of delivery to the U.S. Government of products and/or services pursuant to a U.S. Government issued award, contract, task order or purchase orders, the Agency Technical Specialist and Agency Contracting Officer inspect the requirements both technical and administrative and prepares a Contractor Performance Assessment Reporting System (CPARS). CPARS are a U.S. Government maintained and controlled web-enabled application that collects and manages the library of automated GSA Schedule Holder assessment data. CPARS assesses a contractor's performance and contract compliance and provides a record, both positive and negative, on a given contract during a specific period of time.   Data points include requirements compliance, meeting deadlines, reporting processes, integrity and business ethics, pricing and invoicing, and customer-service processes. Each assessment is based on objective facts and supported by program and contract management data. A review of Aventura's CPARS demonstrate their excellence in all aspects

including *"compliance," "business ethics"* and *integrity"*.   Integrity consisting of Integrity records contain federal contractor criminal, civil, and administrative proceedings in connection with federal awards; suspensions and debarments; administrative agreements issued in lieu of suspension or debarment; non-responsibility determinations; terminations for cause or default; defective pricing determinations; and termination for material failure to comply. The CPARS referencing Aventura's performance for the 13-year period have not been provided by the government to the Defendant in Discovery Requests.

The multiple layers of due diligence and accountability as the government states in the Complaint, the government want to,

> "…ensure that products purchased by the U.S. government for public use are not used by foreign-state actors considered adversaries of the United States to compromise the security of the U.S. government's information technology infrastructure…" See Dkt. 1 ¶ 19.

On January 14, 2020, the government provided its initial discovery consisting of post-Miranda statements of the Defendant and Defendant's Criminal History. The government requesting ***reciprocal discovery***, stating,

> "The government hereby requests reciprocal discovery under Rule 16(b) of the Federal Rules of Criminal Procedure.   The government requests that the defendant allow inspection and copying of (1) any books, papers, documents, data, photographs, tapes, tangible objects, or copies of portions thereof, that are in the defendant's possession, custody or control, and that the defendant intend to introduce as evidence or otherwise rely on at trial…" See Dkt. 84 at ¶ III.

Mr. Cabasso was released from prison to home detention on January 6, 2020.  On January 7, 2020, Mr. Cabasso began preparation for trial and immediately began compiling five (5) binders in total; (3) three-inches thick, (1) one-inch thick, and (1) one half-inch thick.  Evidence central to the case, which was organized and hand-delivered to the government On January 14,

2020. After multiple requests the five (5) binders were returned on October 1, 2021. Upon its return was a CD provided by the government with a handwritten note on the CD sleeve, *"Jack Cabasso Provided Documents 1-14-2020.* See Exhibit P.

The binders contain exhibit indexes, lists, web page printouts and documents. **Binder 1** titled *"Hikvision Brand on GSA,"* **Binder 2** titled, *"Hikvision OEM on GSA,"* **Binder 3** titled *"Dahua OEM on GSA,"* **Binder 4** *"Other PRC OEM on GSA,"* **Binder 5** contained an index referencing the contents: GSA Orders, Fedex/CBP Correspondence re Labeling and Substantial Transformation, GSA eMail re Substantial Information, CBP Determination, RaySharp eMail re Labeling, General Catalog, GSA Sales Report for Last 12 Months, Production Facility Photographs, NDAA eMail to Government Customer, SIA eMail to Committee re NDAA, SIA Hikvision Board Member, Certification & Accreditation – Information Assurance. and (Collectively, Binder 1, 2, 3, 4, 5, the "Binders"). Binders 1-4, were "U.S. Government Agency" "public" documents, as displayed on U.S. Government "controlled" and "public" facing websites, which by Public Law required their display for the public and Government. Binders 1-4 printed by Mr. Cabasso on January 7, 2020 ("post" NDAA) refer to *"all"* Hikvision and Dahua products, published by the GSA on their GSA Advantage "government controlled" website indicating, Hikvision and Dahua as ***Made in USA*** as their ***"Country of Origin."***

The government references throughout the Complaint and Indictment references the Trade Agreements Act of 1979 ("TAA"). See Dkt. 1 ¶ 33, 34, 45. The TAA states all products listed on the GSA Schedule Holders contracts must be manufactured or ***"substantially transformed"*** in the United States or a TAA "designated country". The designated TAA compliant countries are composed of: World Trade Organization Government Procurement Agreement Countries; Free Trade Agreement Countries; Least Developed Countries; and

Caribbean Basin Countries. *"On paper,"* PRC is not a TAA-designated country pursuant to the

*__43-year-old Act,__* (absent "*substantial transformation"*). The government omits their knowledge

of Aventura hardware and software *"substantial transformations"* or what reasonable and

customary steps as referenced in their policies to confirm otherwise

> "If the article in question is not wholly manufactured, produced, or grown within a single country, then we must consider the source or origin of any component or material that is used in the manufacture, production, or assembly of the good, and whether the further work or material added to an article in a subsequent country effected a "substantial transformation" on that part, component or material, so as to render such other country the "country of origin" of the end product." (19 CFR Part 134.1)

After the government's receipt of the Binders from Mr. Cabasso, the government

discovery was halted for 6 months.

On May 27, 2020, counsel for defendant Alan Schwartz wrote to Your Honor:

> "…We received an initial discovery letter dated January 14, 2020 with very few documents-those that relate to our client's arrest and processing. (Dkt. 81). Similar letters were sent to the other defendants. (Dkts. 82-87.) The government wrote that it intended to produce discovery on a rolling basis.

> Mr. Schwartz engaged in efforts to obtain the discovery materials. The *"hold up"* was said to be twofold: the government's need for a protective order and the "processing" of seized materials to determine which items were covered by the terms of search warrants. It was pointed out that the government had obtained and should disclose immediately a great deal of information beyond what was seized by warrant. In addition, regardless of what the government is entitled to seize and review, any materials that were seized from the defendants must be disclosed pursuant to Fed. R. Crim. P 16(a)(1)(E)(iii) which says "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . (iii) the item was obtained from or belongs to the defendant…"

On March 18, 2020, defendants were advised the government would be drafting the Protective Order. On April 1, 2020, the government again stated it would be sending out the proposed protective order. A draft proposal was sent to the defendants on May 22, 2020. See Dkt. 121 at 1-2.  As previously stated, the lack of production originated after January 14, 2020, and then only resumed on July 2, 2020. See Dkt. 131.

Other "*omissions"* from the government's include PRC Manufacturer-1 and PRC Manufacturer-2 products were *"pervasively"* being purchased by the U.S. Government from GSA Schedule Holders as reflected on GSA Advantage **both before and AFTER** the NDAA went into effect on August 1, 2019, and sold through the current date. The products and GSA Federal Contractors including but not limited to are:

> Honeywell, GE, Panasonic, Sharp, Stanley Toshiba, Motorola/Pelco, Bosch, Johnson Controls, United Technologies, Flir, Grundig, Linksys, Accu-Tech Federal, Advidia, A&E Supply, Alarm.com, American Telecom Solutions, Argon Office Supplies, Inc., Artistry LLC, Avue, Axiscore LLC, Bahfed Corp., Basler, Bolide Technology Group, Inc., Brickcom, Business Express, Caprice Electronics, Christy Industries Inc., CP Technologies, Computech International, Component Sourcing Group, Computer Sykes, Cornerstone Communications, CTS, Digimerge, Digital Watchdog, Discover Group Inc., Divine Imaging, DMP, Document Imaging Dimensions, DSC, Dunlop, DV-Tel, Ecamsecure, Ekoam Systems, Everfocus, EZVIZ, Focus Camera, GC&E Systems Group, Global Data Center, Homeland Safety Systems, Horizon Office, IC Realtime, InAxsys, Indigovision, International Commerce & Marketing, ITC Electronics, JLogistics, JLWS Enterprises, JMSOnline.net, Johnstone Supply, Knight Security, Keltner Group, KPaul Properties LLC, KT&C, LTS, Lorex, MHSG, Night Owl, Nitek, Nomar Enterprises, LLC, Northern Video, Office Ink Pros, Inc., On-Qlegra, Pelican Sales, Platinum Networks, Premier, Red Hill Supply, Revo, SAI Systems International, Say Security, SEVA Technical Services, Southeastern Security Professionals, Speco Tech, SPS Industrial Inc., Supercircuits, Supply Chimp, Swann, Synnex Corporation, Tektrotronics, Tera Consulting Inc., The Office Group, TKH, Ubiquiti Networks, Unistar Sparco, United Security & Communications, USMilcom Inc., Vision Security, Vitek, Walter

Klein, Watchnet, WECsys LLC, West Carb Enterprises, Wrigglesworth, Zyxel, and Zee Technologies.

The Security Industry Association ("SIA"), the world's largest security organization, is the closely aligned working public/private partnership between the U.S. Government and industry, regularly conducting joint summits "SIAGovSummit" (See Dkt. 212-2 – SIAGovSummit – speaker list – note Senior U.S. Government Officials). The Joint Summit on September 21, 2021. On September 28, 2021, (2 years after the NDAA went into effect)

Both PRC Manufacturer-1 and PRC Manufacturer-2 were members of the SIA along with China Security & Protection Industry Association, Honeywell, GE, Panasonic, Bosch, and others named above. Aventura belonged to the SIA and Mr. Cabasso was an "Executive Council Member." See Dkt. 212-9.

IPVM (Internet Protocol Video Management) (which the government references in its Complaint) are a respected publisher and the world's leading source of video surveillance information, online security training, and testing with its members in over 100 countries. See https://ipvm.com/

As referenced by IPVM in 2019:

> "SIA Endorsed Aventura. Moreover, just 2 years ago, amidst the crime spree the US government alleges, **SIA firmly endorsed Aventura** as having a "strong history as an innovative manufacturer:"
>
> "Headquarted in Commack, New York Aventura Technologies Inc. has a strong history as an innovative manufacturer of hardware and software products and peripheral solutions for government, military and enterprise."
>
> And, yet, hours after the US government announced the criminal charges against Aventura, SIA cowardly deleted their endorsement of Aventura."

33

Hikvision, PRC Manufacturer-1 while in the process of being banned by the Department of Defense in 2019, pursuant to the NDAA has its Cybersecurity Director being appointed to the SIA Cybersecurity Advisory Board in 2018 and. See Dkt. 212-8 at 2.

On May 24, 2021, IPVM published an article, **_US Government Purchases of Dahua and Hikvision Mapped." The first paragraph stating,_**

> **_"300+ different government organizations have purchased Dahua and Hikvision products since the NDAA went into effect in August 2019…"_** See Dkt. 212-4 at 2.

On July 8, 2021, Hikvision's Senior Director of Cybersecurity and Senior Member on the SIA Cybersecurity Committee was to conduct a webinar on cybersecurity initiatives to the U.S. Government and security industry, titled _"Getting Started With Zero Trust"_.  See Dkt. 210-10 at 2.

On July 20, 2021, the publisher The Intercept released an article titled, **_"U.S. Military Bought Cameras in Violation of America's Own China Sanctions."_**

> "Numerous federal agencies, including several branches of the military, buy video surveillance equipment that can't be legally used in U.S. government system and that is made by Chinese companies sanctioned…"
>
> "…Public records show that since the sanctions were put in place, the Air Force, Army, Navy, Veterans Affairs, and the Office of the Secretary of Defense (who implemented the NDAA) all purchased camera systems containing or consisting of hardware that IPVM determined was in fact originally manufactured by Dahua or Hikvision and sold under another brand…"
>
> "…Listings posted to the GSA Advantage, a marketplace for federal vendors to sell their wares to the government online, show that rebranded Dahua and Hikvision cameras are still freely available for purchase under different brand names." See Dkt. 212-5 at 2.

On July 21, 2021, IPVM published an article titled, **"*Retired USAF General on China Video Surveillance Risks.*"** Retired USAF Brigadier General Robert Spalding was the Senior Director for Strategic Planning at the White House National Security Council. Prior to that, he was the DoD's Senior Defense Official & Defense Attache in China. Brigadier General Spalding was interviewed by IPVM. IPVM asked,

> "Q. The Federal government What is your reaction to these revelations? And how should the government respond? Answer, *"Well, it's not surprising. I think part of the challenge of moving manufacturing to China, which is essentially what the world has done, is that nearly everything has components from or is entirely manufactured in China. So it's very difficult to source products that aren't manufactured in China. **The federal government bears some culpability here because it's allowed this process to happen…"** <u>See</u> Dkt. 212-6 at 3.*

The Cybersecurity and Infrastructure Security Agency ("CISA") is a United States federal agency, an operational component under Department of Homeland Security oversight. Its activities are a continuation of the National Protection and Programs Directorate. CISA identifies its mission,

> "CISA Plays Two Key Roles. We Are the Operational Lead for Federal Cybersecurity, or the Federal "dot gov"
>
> CISA acts as the quarterback for the federal cybersecurity team, protecting and defending the home front—our federal civilian government networks—in close partnership with the Office of Management and Budget, which is responsible federal cyber security overall. CISA also coordinates the execution of our national cyber defense, leading asset response for significant cyber incidents and ensures that timely and actionable information is shared across federal and non-federal and private sector partners.
>
> We Are the National Coordinator for Critical Infrastructure Security and Resilience
>
> We look at the entire threat picture and work with partners across government and industry to defend against today's threats while

securing the nation's critical infrastructure against threats that are
just over the horizon."

On September 28, 2021, the U.S. Cybersecurity & Infrastructure Security Agency ("CISA") released a Hikvision advisory, titled **_RCE Vulnerability in Hikvision Cameras (CVE-2021-36260)._** CISA does not advise the U.S. Government to remove all Hikvision products from their networks as a national security threat or violation of NDAA, rather CISA **_"encourages"_** users and administrators to "review Hikvision's Security Advisory HSRC-202109-01 and apply the latest firmware updates from the Hikvision website, located in the PRC. See Exhibit Q.

The contents of Binders 1-4 were compromised by the government, and pages deleted at the same time the government halted discovery for the 6-month gap period. Printed before and after page samples reflect the original GSA Advantage webpages and its current omission.  In the attached exhibit, take notice to each unique URL both at the time of the Binders provided to the government and subsequently. See Exhibit Q2.

While the GSA Advantage website pages no longer **_"overtly"_** appear having been deleted, **_"covertly"_** the government continues to solicit and purchase the same as indicated above and referenced in IPVM and other publications as following.

Most recently, on December 1, 2021, IPVM, titled an article, **_"US Military & Gov't Break Law, Buy Banned Dahua/Lorex, Congressional Committee Calls for Investigation."_** The first paragraph of the article,

"The House Armed Services Committee has called for an investigation after IPVM provided evidence that multiple federal agencies, including four military branches, illegally purchased relabeled Dahua surveillance equipment in 2021, even as Congress and the FCC were expanding the NDAA ban." See Exhibit R.

The article references the U.S. Department of Defense, U.S. Navy, U.S. Army, U.S. Coast Guard, Drug Enforcement Agency, Norfolk Naval Shipyard, Fort Hood, Crane Army Ammunition Activity, among others. When IPVM contacted the agencies among the answers were total denial, blaming other agencies and vendors. All occurring 2 years *after* the NDAA went into effect. Among the U.S. Military responses to the articles were:

**U.S. Coast Guard Denial of Illegal Purchases**

According to IPVM,

> "The US Coast Guard purchased Lorex products 3 times in 2021, according to records obtained by IPVM which explicitly named Lorex in the product descriptions and manufacturer field. *A Coast Guard spokesperson, Lt. Commander Brittany Panetta, denied that the Coast Guard purchased any Lorex equipment*, saying the purchases we identified were, in fact, Nikon camera lenses: *"According to our purchasing records and the contract numbers provided, the items purchased were not associated with Lorex Surveillance equipment. They were various Nikon brand camera lenses purchased to support public affairs. There is no evidence these camera lenses are associated with Lorex surveillance equipment."* IPVM replied with detailed information on the contracts, including delivery details, and the name, email, and phone number of the USCG contracting officers. Lt. Commander Panetta responded: I am working to get information on your new contract details provided this morning. *No further information was provided, and Lt. Commander Panetta has not responded to follow-up emails..."*

**U.S. Navy Denial of Illegal Purchases**

IPVM stated,

> "Purchasing records obtained by IPVM showed the US Navy purchased Lorex products once in *2021*, and twice in *2020*. *A spokesperson from the Office of the Secretary of Defense (OSD), responding for the US Navy, denied that the purchases occurred. After IPVM provided additional information, the OSD stopped responding."*

**US Army Blames Seller**

The US Army bought Lorex surveillance in January and February 2021, for Fort Hood and the Crane Army Ammunition Activity. A statement from Lt. Col. Brandon Kelley blamed contractors while ignoring the Army complicity as the buyers.

Any network device before being attached to a U.S. Government network must go through a rigorous "Certification and Accreditation" ("C&A") process, Aventura has been through such extensive processes.

In addition to the "device" testing U.S. Government security networks are *"physically isolated"* from unsecured networks like the internet and local area networks and the devices sit behind firewalls.  Accordingly, the government *exaggerates* what technically could happens under the most highly improbable circumstances which has never occurred.

At the press conference on the day of the arrests the government in overreaching, *vilified* and *demonized* Mr. Cabasso and Aventura, contorted and conflated inaccurate facts presented to the media for its own purposes. The "previously" prepared press releases were circulated to the worldwide television, radio, internet and print media with similar derogatory statements. See Exhibit S.  The prosecution's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Berger v. United States,* 295 U.S. 78, 88 (1935).

The U.S. Government Agencies in the Press Release made the following pre-indictment comments.

**IRS Comments**

> As referenced in the press release…"In today's global economy, 'Made in the USA' is too sacred of a mark to fraudulently use for one's self interest," stated IRS-CI Special Agent-in-Charge Larsen. "IRS-Criminal Investigation works diligently with our law enforcement partners to **uncover con artists devising elaborate schemes to become independently wealthy. These allegations have serious national security implications that go beyond shameless attempts at personal enrichment."**

**U.S. Navy Comments**

"Product substitution is a serious crime that puts our men and women in uniform at greater risk," stated NCIS Special Agent-in-Charge Lamont. "*Our Sailors, Marines, and other armed services personnel deserve to have equipment that meets the highest standards for safety and performance, which will not fail them when it matters most.* Substandard and counterfeit parts simply cannot be depended upon. Investigating product substitution and mitigating risks to the Department of the Navy supply chain is a top priority for the Naval Criminal Investigative Service. NCIS has a cadre of Special Agents trained in all aspects of economic crime, tirelessly fighting fraud in the procurement process."

**U.S. Air Force Comments**

"*Ensuring the integrity of the US Air Force procurement process and the quality of the products provided to our warfighters is a top investigative priority of the Air Force Office of Special Investigations,*" stated AFOSI Special Agent-in-Charge Hein. "Those who seek to conduct business with the Air Force must be candid and truthful. AFOSI will aggressively investigate those who attempt to defraud the Air Force, and will work with our law enforcement partners to identify and prosecute those who would take advantage of the USAF and its interests. *The victims are not just our men and women in uniform, but every American taxpayer.*"

**Department of Justice Comments**

"As a result, Aventura not only defrauded its customers, but also *exposed them to serious, known cybersecurity risks, and created a channel by which hostile foreign governments could have accessed some of the government's most sensitive facilities.*"

Original Equipment Manufacturer ("OEM") is the common business term referring to companies that buys products and then incorporate or rebrand them into a product under its own name. Generally removing any identification of the supplier and replacing with and promoting their own brand.

PRC Manufacturers' 1 and 2, are the largest OEM providers in the world and rank numbers 1 and 3 overall in the security industry. PRC Manufacturers' 1 and 2, have OEM/Private Labeled PRC manufactured network cameras and other security products to Honeywell, GE, Panasonic, Sharp, Stanley, Toshiba, Motorola/Pelco, Bosch, Johnson Controls, United Technologies, Flir, Linksys, Grundig all made in PRC.

The government *"infers"* Aventura's violation of the Buy American Act stating:

> "On or about September 21, 2018, the U.S. Department of Energy ("DOE") awarded AVENTURA a contract worth $156,872 for six automated network-linked turnstiles and a glass partition wall, to be installed at a DOE facility in Tennessee (the "DOE Contract"). AVENTURA'S GSA price list represented that the turnstiles were made in the United States, and LAVONNE LAZARUS certified AVENTURA's compliance with the Buy American Act in connection with the purchase. In AVENTURA'S bid for the DOE Contract, LAVONNE LAZARUS described AVENTURA as "the industry's only 'single-source' manufacturer" and proclaimed that "we proudly manufacture in the U.S.A.": See Dkt. 1 ¶ 56.

On March 25, 2022, the ***"ex-parte"*** FOIA Request were reviewed. The ***"contemporaneous"*** "real-time" FPDS U.S. Government records and associated USASPENDING.gov records indicate Aventura requirements and any "set-asides."

The government inaccurately states Aventura's contract with the DOE has a requirement under the Buy American Act and was a violation of law. The Department of Energy (DOE) contract 89243118FSC400095 being the only Aventura contract referenced in any pleading made by the government with a Buy American Act requirement.  See Dkt. 1 ¶ 56. The recently received FOIA, FPDS and associated USASPENDING.gov website page "contemporaneous" records indicate there were no such Buy American Act requirement.   Rather the FPDS identify it was a *"Full and Open Competition"* and *"No Evaluation Preference" – and "Small Business"*

*Aside.* <u>See</u> Exhibit T, (see arrows bottom of page 2) from FPDS and USASPENDING.gov.  <u>See</u>

Exhibit U, (see arrows bottom of page 2) both indicate:

> Procurement Identifier: 89243118FSC400095
> Legal Name:   Aventura Technologies, Inc.
> Prepared Date: September 21, 2018, at 08:27:44
> Prepared by: Aaron Fehl
> Description Of Requirement: Turnstiles and installation for the FB lobby
> upgrade
> Type of Set Aside:     No Set Aside Used

Similarly, a further review of ***"all"*** Aventura FPDS and USASPENDING.gov indicates

the absence of ***<u>any</u>*** Aventura Buy American requirements for the Aventura awarded contracts as

listed on both FPDS and USASPENDING.gov.

In referencing the alleged ***"WOSB scheme"*** The government erroneously states at ¶ 27 of

the indictment*:*

> …AVENTURA was awarded multiple WOSB set-aside contracts
> by U.S. Government Agencies.

A review of ALL 100 Aventura contracts many only received in 2022, are

"contemporaneously" reported by U.S. Government Agencies at the time of award, indicate **no**

***"set-asides."* for WOSB's**, on both FPDS and USASPENDING.gov. See referenced filters

circled from USASPENDING.gov with the various filters applied. <u>See</u> Exhibit V, (2 Active

Filters" applied to the USASPENDING.gov database with the resulting number of Aventura U.S.

Government Contracts) (note 2 arrows top of page).

**KEYWORD:**          ***Aventura Technologies***

**TIME PERIOD:**     ***All Fiscal Years***

**Contracts:**              ***100***

See referenced filters circled from USASPENDING.gov with the various filters applied. See Exhibit W, (3 Active Filters" applied to the USASPENDING.gov database with the resulting number of Aventura U.S. Government WOSB "set-aside" Contracts) (note 3 arrows top of page).

**KEYWORD:**              *Aventura Technologies*

**TIME PERIOD:**          *All Fiscal Years*

**TYPE OF SET ASIDE:**    *Woman-Owned Small Business*

**Contracts:**           *0*

On November 7, 2019, the FBI and other government agents ("Agents") arrived early morning at the Aventura facilities in Commack, New York, executing the search warrants. The Agents observed the Aventura manufacturing facilities and seized Aventura's video surveillance recorders ("Recorders"). See Exhibit X, the floor plan and "sketch" referencing, "the layout of the interior of the Aventura facility as was sketched and verified by by IRS CI Special Agent David Darjania Search Warrant 11/07/2019." Handwritten by IRS CI Special Agent David Darjania on the sketch are Room S – ("Production"), Room T – ("R&D") and Quality Control among others.

Attached, see Exhibit Y, (Dkt. 212-15) is the frozen image from an Aventura security monitor in the Aventura manufacturing facility on November 7, 2019, when the Agents unplugged the attached devices at 9:09AM. The Recorders had approximately 100 surveillance cameras attached to them covering the entire Aventura Commack, New York facility both inside and outside. The Recordings stored months of historical video footage of the Aventura manufacturing facilities.  The Recordings reflect the products and systems manufacturing by Aventura in its Commack, New York facility.

The Recorders, (yet to be returned or produced in forensic images by the government and in their possession since 2019), shows "real-time" recorded footage of Aventura manufacturing DVRs at the Commack, New York location prior to the arrests.

On June 17, 2021, at the Status Conference before Your Honor, I stated:

> MR. DAYAN: The reason I want Your Honor to hear this case is because we believe that the trier of fact in this case, the Court that is going to hear this case ultimately, should start becoming more and more aware of our position of the government's rather sweeping statement that this was one big fraud. See "Exhibit Z" Pg. 13 at 14-19.

> MR. DAYAN: We believe that now the government should be put up to the task to solidify or justify the rather sweeping statement they made at arraignment, at every court appearance they made, that this was one big fraud, lasting over 20 years.

> MR. DAYAN…Nothing could be further from the truth…

> MR. DAYAN: We are not acknowledging that there was any type of fraud, but to them, now that they have had years of discovery, multiple discoveries, I believe now would be the time to put them to the test. See Exhibit Z Pg. 14 at 4-17.

> MR. RICHARDSON: Your Honor, I'm not sure I fully understand all of the things that Mr. Dayan plans to raise in this motion, but I think typically we could have something put together in two weeks. See Exhibit Z Pg. 16 at 22-25.

> THE COURT: All right. That would be fine. Ms. Lundy?

> MR. DAYAN: I think you understand, Mr. Richardson, my argument is very simple, that the government overreached here. See Exhibit Z Pg. 17 at 1-5.

Trimble Inc., a public company with 10,000+ employees and $3.7 billion in revenues is an Aventura major customer as referenced in the Aventura books and records. Aventura in conjunction with Trimble and its employees designed, engineered and custom-built solutions

exclusively to Trimble and their specifications, which included Trimble products, and are viewable being assembled on the Recordings.

On November 7, 2019, November 21, 2019, and December 5, 2019, **AFTER** Trimble was aware of the government charges against Aventura, they issued 3 checks ("Checks") totaling $245, 114.72 and referencing the underlying Aventura invoices. The total sum of the Checks was for payment of monies lawfully due and owing from Trimble to Aventura for goods and services, unrelated to the allegations. See Dkt. 232-3 at 2 – 4.

Trimble Inc. is represented by Boies Schiller Flexner's Managing Partner and a former lead prosecutor in the SDNY, Matthew L. Schwartz ("Boies") Matthew L. Schwartz Bio – see Exhibit AA.

On June 8, 2020, Boies sent a letter to Aventura counsel James Branden stating, "Please be advised that following the filing of criminal charges against your client, Trimble was advised to stop payment on the outstanding checks by federal authorities. Trimble followed, and intends to continue following, the guidance of those authorities." Dkt. 232-3 at 6.  Boies in written and/or verbal communications with James Branden, previous counsel for Aventura, Sam Braverman of Fasulo Braverman DiMaggio criminal counsel for Aventura, and Jason Berland of Lewis Baach Kaufmann Middlemiss civil corporate counsel were all advised, by Boies, on numerous occasions the only reason Trimble was not paying their Aventura bills was because Lipcic instructed them to do so and would continue to follow such guidance.

On June 9, 2021, Aventura filed suit against Trimble Inc. to recover the monies owed on the Checks ("Trimble Lawsuit"), of which the government and Lipcic are aware. Aventura vs. Trimble Inc. Summons and Motion for Summary Judgment - See Exhibit BB.

On September 9, 2021, Boies in response to the Trimble Lawsuit stated, by sworn affidavit under penalty of perjury pursuant to CPLR §2106(a), stated:

> "In 2018, Trimble agreed to acquire from Aventura certain gate entry systems, which Trimble intended to augment with its own technology and use at construction sites. In furtherance of this relationship, between November and December 2019, Trimble issued three checks to Aventura in the aggregate amount of $245,114.72 (together, the "Checks")." See Exhibit CC at ¶4.

Boies further references,

> "On or about December 12, 2019, Special Agent Lipcic, called Trimble's accounts payable department and left a voicemail message (which I have heard) concerning "next steps with regard to" the Checks.
>
> On or about December 16 and again on December 20, 2019, I spoke to Special Agent Lipcic about the Checks. In sum and substance, Special Agent Lipcic "**advised**" (but did not order) that Trimble should stop payment on the Checks, which would otherwise be subject to administrative forfeiture. **Agent Lipcic also "advised" that other companies in similar situations were doing the same.** Shortly thereafter, Trimble stopped payment on the Checks." See "Exhibit CC" at ¶11-13. Supreme Court of the State of New York County of Suffolk INDEX NO. 610948/2021 Dkt. #12.

Lipcic approached Trimble and its employees who are potential defense witnesses for Defendant and Aventura. Lipcic tortiously interfered with the business of Aventura and its customers. Lipcic providing defense witnesses with ***"legal advice"*** and ***"communications"*** Lipcic had with other potential defense witnesses.

In response to Braverman affirmation the government on "March 2, 2022," writes a letter to Boies, referencing *"multiple verbal communications,"* with Boies dating back to 2019. The government stating,

> "Counsel for Aventura Technologies, Inc. ("Aventura") has brought to our attention that you may be under the **"mistaken"** impression that certain funds held by Trimble and claimed by

Aventura are under restraint. That is not the case. As a government agent told you on or about December 20, 2019, and the government reaffirmed on August 5, 2021, the funds claimed by Aventura have not been restrained in connection with the government's criminal case, and has expressed no opinion as to whether Trimble should pay those funds to Aventura." See Dkt. 241 at 7.

The government and Lipcic "illuding" to on September 9, 2021, that **AFTER** Boies received the government's purported reaffirmation, Boies ignored such and committed perjury.

In the Complaint, Lipcic uses the words ***"concealment," "obfuscation," "conduit," "shell companies," "Cabasso Pay Off," "extract cash"*** as something unlawful and nefarious. See Dkt. ¶92-100.

At ¶94, Lipcic states,

"Frances Cabasso owns both LLC-1 and a second New York limited liability company ("LLC-4"). LLC-4 has served as a conduit for round-trip payments from and to Aventura that "**appear" to lack any legitimate business purpose**. LLC-1 has been used to **extract cash** from Aventura and send it to Frances Cabasso and Cabasso family investments **without any relationship to Aventura corporate business."**

Aventura's corporate bylaws which the government has provided to Defendants and accordingly are in possession thereof state,

"The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware. See Exhibit DD ¶ 3.

The government *"acknowledges" "round trip payments"* which they infer without a factual basis state they "**appear" to lack any legitimate business purpose**. What the

government "omits" are the lawful purchase and sale ("round trip payments") of 3 real estate properties, see Closing Statements – See Exhibit EE.

Lipcic at ¶92 states,

> "Specifically, between May 24, 2016, and August 21, 2018, Aventura transferred approximately $2.8 million to an attorney escrow account belonging to a Long Island, New York-based law firm ("Law Firm-1")."

Discovery indicates *"prior"* to the Complaint the government was in possession of the financial records and documents of Law Firm-1, Law Firm-1 clients, Aventura, the Cabasso's and related company.   The "voluminous" records document the lawful real estate loan transactions. See Law Firm-1  loan closing documents on a transaction –  See Exhibit FF.

¶98 of the Complaint Lipcic states,

> "Since 2013, AVENTURA has paid approximately $1,000,000 in yacht-related fees, including a $744,043 payment to a Florida-based yacht company in 2013, and payments to marinas and yacht servicing companies in New York, Aruba and Florida. However, AVENTURA's public facing websites do not advertise yacht chartering services, or any other line of business requiring a watercraft.

The government *"omits"* an innocent owner purchased a 50% share of the yacht back in 2015, while the government "infers" its owned by Aventura. The Court is aware of the ex parte motion of the innocent owner who paid to AVENTURA in 2015 $475,000. See Dkt. 129 1 and 2.

Defendant pursuant to Rule 17(c) may file ex parte subpoenas without notification to the government, which otherwise provides insight into the defense strategy. To minimize litigation on March 14, 2022, pursuant to Rule 17(c) Defendant requested of the Court permission to issue Subpoenas and filed on ECF. See Dkt. 243.

The Subpoena Documents are of consequence to the determination of the actions being more probable or less probable than it would be without the evidence and of consequence in

47

determining the action. The Documents are admissible at trial as they support the Defendant's contrary position to the allegations and inferences of the government as they reference and the absence of which would be prejudicial. The Documents requested by Defendant are specific and the existence of which is known to the Defendant and been described. The Subpoenas are requested of sophisticated public and private companies and U.S. Government agencies and not unreasonable or oppressive.  The relevancy, admissibility and specificity are discussed herein.

Most importantly, significant amounts of exculpatory evidence known to be in the possession of the government central to the case have been withheld or portions produced after lengthy requests and the totality suspect. After multiple requests and specifying precise government reference numbers were they eventually produced with underlying supporting document requests outstanding.  Defendant has no timely and reasonable method to know of completeness and accuracy of the government considering the history. We request the Court grant our request to issue the Subpoenas as previously provided. See Dkt. 243.

The Subpoenas are Mr. Cabasso's only means of compelling the production of evidence from anyone other than the prosecutor in a timely and useable manner. Rule 17(c) authorizes the district court to order the production of evidence prior to trial so a defendant has sufficient time to review it and decide whether to use it.

Accordingly, we respectfully request the Court grant our request to issues subpoenas required for "accuracy," "completeness," and "timeliness" for judicial expediency.

**Oral and Written Order Pursuant to The Due Process Protection Act ("DPPA")**

DPPA was enacted on Oct. 21, 2020. The DPPA inserts a new Rule 5(f) within Federal Rule of Criminal Procedure 5, which governs a defendant's initial court appearance:

> "In all criminal proceedings, on the first scheduled court date when
> both prosecutor and defense counsel are present, the judge shall

> issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law."

The DPPA does not purport to change federal prosecutors' substantive obligations under Brady, Giglio, or related governing law.  It simply highlights the matter at the start of all criminal proceedings by crystallizing the government's obligations into an order on every federal criminal docket.  Issuance of a "Brady order" at the outset of every criminal proceeding may also expand the district court's flexibility to address Brady issues with remedies short of dismissal or vacatur of a jury verdict.

> The Government must disclose such evidence to the defense promptly after its existence becomes known to the Government, so as to enable the defense to have an opportunity to make effective use of the evidence in preparing its case and at trial, including a reasonable opportunity to investigate the information. U.S. v. Coppa, 267 F.3d 132, 135 (2d. Cir. 2001); Grant v. Alldredge, 498 F.2d 376, 382 & n.7 (2d Cir. 1974). This is a continuing obligation and applies to materials that become known to the Government in the future. Additionally, if information is otherwise subject to disclosure, it must be disclosed regardless of whether the Government credits it. See U.S. v. Rittweger, 524 F.3d 171, 181 (2d Cir. 2008). As used here, the term "Government" includes all federal state, and local law enforcement officers and other officials who have participated in the investigation and prosecution of the offense or offenses with which the defendant is charged. *United States v. Kim*, No. 18 CR 882-LTS, 2 (S.D.N.Y. Mar. 18, 2021)

The week following the DPPA was signed into law judges in the Southern District of New York (SDNY) began issuing written orders directing the government to make the Brady disclosures and warning of the potential consequences for failing to comply with the orders.

The SDNY orders define "the government" to include "all federal state, and local law enforcement officers and other officials who have participated in the investigation and prosecution of the offense or offenses with which the defendant is charged."

By imposing an obligation on the government to:

> "Disclose all Brady material known to any "officers and other officials who have participated in the investigation and prosecution," the SDNY Brady orders extend the duty to identify and collect potential Brady and Giglio material beyond just "members of the prosecution team."

The SDNY acknowledged being "responsible for substantial failures" in its handling of exculpatory evidence and has publicly "committed" to making "improvements to [its] policies, staffing, training, and technology."  United States v. Nejad, No. 18 Cr. 224 (AJN), ECF No. 390 at 1, 4–5 (S.D.N.Y. Oct. 30, 2020). the prosecution's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."  Berger v. United States, 295 U.S. 78, 88 (1935).

In a letter from the government to myself dated January 14, 2020, Document 84, PageID #: 219 at Paragraph F, the Government stated: "The government is not aware of any exculpatory material regarding the defendant."

In view of the sanctions recently imposed in the SDNY for withholding/burying Brady material (U.S. v. Nejad, 521 F. Supp 3d 438 (SDNY, 2021), I would respectfully request the Court put the government on notice and issue an oral and written order in accordance with DPPA.

As the initial appearance was before October 21, 2020, there has been no oral and written order of the Court that I am aware of as it was not required at the time.

50

Pretrial Services indicated they have no opposition to expanding the conditions of a Request for Modification.

The government "unilaterally" determined the "rolling" productions, their contents and the order in which they would be produced. On June 24, 2020, July 2, 2020, July 10, 2020, July 31, 2020, September 17, 2020, October 16, 2020, November 24, 2020, December 17, 2020, February 11, 2021, February 19, 2021, July 9, 2021, July 23, 2021, August 17, 2021, November 3, 2021, and January 27, 2022, productions were furnished by the government.

Aside from the disparity within the productions, the *"prima facia"* evidence most important to prepare a defense have either not been produced or partially received most recently with exculpatory documents omitted. Many of the productions include exponential numbers of documents that appear to have no relevance to the case.

Due to the government's production methods and communications, it has been the proverbial looking for needles in multiple haystacks in a forest.  Further, when the government references it has produced a requested item it I refer to it as a jigsaw puzzle with the pieces in a box, and while all the pieces "may" be there one would first need to assemble and never know what is or isn't until its completion.

Defendants have made their discovery requests pursuant to Rule 16(a)(1)(E)(i), (ii), and (iii). Defendant Aventura in particular has made its formal requests for such discovery, in particular requesting items within the Government's possession, custody or control where: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant, collectively, the 'subject discovery'.

Over the course of the discovery process and in response to the multitude of requests from Defendant for the production of the "subject discovery', the government has tendered to the Defendant virtually millions of documents uploaded onto USAfx to which Mr. Cabasso has no permitted access, external storage drives, which the Government claims it has scanned and loaded millions of documents and marked many unnecessarily "sensitive". At present, however, Defendant has no way knowing the truthfulness of the Government's claim as it has no practical means of reviewing the millions of documents received in any meaningful way to make the determination and to actually use the documents for the preparation of its defense as was the intention of the discovery rules. It is Defendant's contention that as delivered, the Government is not in compliance with its mandatory discovery requirements and has ignored requests for the same as outlined herein. This request is to Compel to address the Government's discovery failures.

On January 27, 2022, the government stated: "The government expects to make a production of a large volume of electronically stored information identified through searches performed in response to various discovery requests and through further government review of the email in its possession." See Dkt. 233 at 3 ¶4. The government also stated, "the government believes that these forthcoming productions of discovery will '*substantially'* complete the government's production of material discoverable under Rule 16 and applicable law." While the government provided Dkt. 233 on **ECF,** they **"*tactically"*** omitted my written response to Dkt. 233, which again renewed my request for a response to my Rule 16 discovery requests.

On **January 27, 2022**, the government first produced 33 Aventura contracts and task orders, which were in the government's possession since 2018 or earlier and were the central

focus of the case. The information is still incomplete with missing associated and "relevant" documentation.  See Dkt. 233 at 2 and 3.

Additionally, the government designated Aventura's "public" contracts and "public" task orders, from the January 27, 2022, production as "Sensitive Discovery Material," See Dkt. 233 at 2. Even though they belonged to Aventura and Mr. Cabasso and are required by "public" law to be "publicly" disclosed within days of their issuance.

On January 28, 2022, hours before the status conference I received a call from the government regarding a proposed discovery conference to *"identify items of interest."*

On February 8, 2022, I sent the government an email regarding necessity to prepare for such a meeting for efficiencies in the absence of having my discovery requests addressed.  It became clear after my internal review and discussions with Mr. Cabasso that such a meeting would be non-productive at this stage and highly prejudicial.  See Exhibit G.

After further review of the government's *"questionable"* production patterns or lack thereof and for the purpose of judicial expediency, "completeness" and other concerns, I determined subpoenas are the only effective method to secure the records I require to provide a defense in a timely manner. Further, identifying the *"items of interest"* and providing the government a roadmap to the defense in unacceptable.

To date, 10,000,000+ disjointed documents produced have created logistical impossibilities for me, a sole law practitioner, or even teams of lawyers with many documents inexplicably marked sensitive, while others self-conflicting and others simply missing or incomplete in their content.

On March 14, 2022, I requested the Court grant permission for Defendant to issue Subpoenas. The Subpoenas referenced their necessity, "in order to secure evidence, for

completeness, accuracy, reliability, chain of custody, and prepare a proper defense..." "Further, the Subpoenas will provide essential assistance to the defense to search through continuous disparate rolling data dumps provided by the government up to this point in the case.

On Oct. 21, 2020, Rule 5 of the Federal Rules of Criminal Procedure was amended by adding subsection (f) requiring for the record all federal district court judges, during the initial appearance in every criminal case, issue an oral and written order to prosecution and defense counsel that confirms the disclosure obligation of the prosecutor under Brady and the possible consequences of violating such order under applicable law.

As the initial appearance was before October 21, 2020, there has been no oral and written order of the Court that I am aware of as it was not required at the time.

In view of the sanctions recently imposed in the SDNY for withholding/burying Brady material (U.S. v. Nejad, 521 F. Supp 3d 438 (SDNY, 2021) and what has transpired, I would respectfully request the Court put the government on notice and issue an oral and written order in accordance with DPPA, Compel Government to Respond to Rule 16 and Brady Requests and Approve Defendant's Request to Issue Subpoenas pursuant to Rule 17(c).

In light of the aforementioned and the history of the production or lack thereof, in the interests of justice I would request the Court

**Modification of Conditions of Release for Mr. Cabasso**

I am respectfully requesting of the Court to grant Mr. Cabasso's requested for the limited modifications of the conditions of release on an expedited basis preferably here today. The initial request was made of Your Honor on July 8, 2021, has not calendared, due to protracted backlogs of no one's fault in the system.   Further, Covid's next waves are unknown. Without Mr. Cabasso's request for modifications approved it is making it impossible to defend him in

preparation for trial effectively and timely when taking into consideration all other underlying motions and issues.

Pretrial Officer Amanda Sanchez, who supervises Mr. Cabasso has indicated Pretrial Services willingness to modify Mr. Cabasso's conditions of release and is available, if necessary. We are in the third year of Mr. Cabasso's supervision and he has fully complied with his conditions of release as were granted on January 6, 2020, and further expanded on September 20, 2020, both with the government's consent. There is no regulatory purpose for denying Mr. Cabasso's limited modification to his conditions of release.

On November 7, 2019, Mr. Cabasso was remanded pursuant to an Order of Detention Pending Trial. See Dkt. 16.

On January 6, 2020, Mr. Cabasso was released to Home Confinement where he remained with the restrictions, (a) avoid contact or association with current and former Aventura employees, (b) avoid contact or association with Aventura customers, and (c) not discuss the matter with his wife or children. Defendant was released into home detention on a $3,000,000 bond secured by property and $200,000.00 cash bail, surrendered his passport and is currently being supervised by the U.S. Pretrial Services while on an ankle bracelet. See Dkt. 76.

On September 4, 2020, a request was made of the Court by Defendant and **consented to by the government** to expand the pretrial conditions of Home Confinement to permit Mr. Cabasso to: (a) travel to and from his office from 8am – 6pm, (b) communicate with Aventura's former customers, (c) communicate with Aventura former unindicted employees, and (d) set up a new company and provide services, maintenance and sustainment to Aventura former customers. See Dkt. 150.

On September 22, 2020, the Court granted the request for expansion of the pretrial conditions of Home Confinement. See Dkt 155.

On July 8, 2021, Mr. Cabasso's submitted a request for modification of the conditions of his release pending trial for *"several critical and constitutionally required aims…"* The request for modification has not been scheduled, and Pretrial Services advised me it would not object to some modifications. In my submission, I stated,

> "Based upon a change of circumstances in this case as a result of the information gleaned from the voluminous and protracted discovery gradually - *- but we suggest tactically* - - produced by the government up to this date, the ***complexities brought about by hundreds of governmental administrative regulations that will demonstrate the government's own complicity on the subject of the Indictment,*** the complex motion practice anticipated in this case that will clearly and undoubtedly refute the government's premature, echoed and unsubstantiated allegations of "one big fraud…" See Dkt. 199 at ¶ 2.

> At the initial finding of pretrial detention and the subsequent modification of conditions for Defendant's release on consent by the parties, no one could have anticipated at the time the extent of Covid-19's effect on our professional and personal lives, the extraordinary complexity and the voluminous project of this case, and that the government's initial - - *but now clearly controverted -* -overreach in their spew allegations of  "one big fraud" would further affect the complexity of defending this case and would cause such an extraordinary delay still for years to come." See Dkt 199 at 2.

On July 29, 2021, the government responded of its' opposition to Mr. Cabasso's request for modification of the conditions of release and impose the strictest of detention conditions short of returning to prison, stating:

> "the government respectfully submits this letter brief in opposition to defendant Jack Cabasso's July 8, 2021 motion to modify the condition of his pretrial release (the "Motion" or "Mot.," Dkt. No. 199), and as a cross-motion to return the defendant to home confinement and revoke his permission to communicate with Aventura's former customers and employees.

The government additionally state:

> "The defendant devotes most of his brief to attacking the government's case and, gratuitously, the integrity of the prosecutors in this matter. Those attacks are ***unfounded*** and ***irrelevant.*** Nowhere does the Motion identify a relevant change of circumstance or otherwise offer a reason that the defendant's application should be granted. Rather, the defendant's noncompliance with existing conditions of release means that his application should be denied.
>
> In addition, the defendant's claim that his current bond conditions violate the Due Process Clause is legally and factually unsupported. Finally, because the defendant has failed to report his contacts as required – which was a condition of Judge Lindsay's decision permitting him to travel to Aventura's offices and communicate with former work contacts – the defendant should be returned to home confinement and barred, once again, from communicating with former associates…
>
> The government consented with certain conditions, notably that the defendant report his professional contacts on a biweekly basis…
>
> On September 22, 2020, the parties appeared before Judge Lindsay to discuss the proposed modifications…
>
> Counsel provided a single list of contacts to the government, on November 25, 2020. See Exh. C.2 Counsel has not provided any further information about the defendant's contacts either to the government or to Pretrial Services. The government nonetheless understands from Pretrial Services that the defendant said as recently as June 2021 that he continues to call potential customers, and affirmed this week that he was still in communication with them. As such, the defendant has failed to comply with the conditions of release imposed by the Court on September 22, 2020. See Dkt. 207.

18 USC Ch. 207: RELEASE AND DETENTION PENDING JUDICIAL PROCEEDINGS

> The judicial officer must impose the least restrictive condition or combination of conditions necessary to "reasonably assure" the defendant's appearance as required and to "reasonably assure" the safety of any person and the community". 18 U.S.C. § 3142(c)(1)(B). An illustrative list of conditions is set forth in §

3142(c)(1)(B)(i through xiv) which gives the judicial officer authority to impose conditions not specifically enumerated so long as the same serve the purposes set out in § 3142(c)(1)(B). It is important to note that "Section 3142 speaks only of conditions that will "reasonably" assure appearance, not guarantee it". United States v. Xulum, 84 F.3d 441, 443 (D.C. Cir. 1996)(per curiam). (18 U.S.C. 3141 ET SEQ.)

On September 22, 2020, Mr. Cabasso appeared before the Magistrate in reference to the granting of Mr. Cabasso's request to modify the conditions of his release:

"THE COURT: …Mr. Cabasso, I take it maybe you already understood it but the Court didn't, that to the extent that you're going to be operating this new enterprise, that you have an obligation to keep the government informed in a listing**, you could do it through counsel or directly, that will be worked out with you and your lawyer** but every 14 days, a comprehensive list of any individual and persons that you might have contacted as a vendor or client of the new company or any contact with the company which is named in the indictment and the individuals who are associated with that business." See Dkt. 204 Pg. 6 at 20-25 and Pg. 7 at 1-6.

The Government referenced they received a single list of contacts on November 25, 2020, from myself as Counsel for Mr. Cabasso, **which was the established protocol** as I understood upon request but should be maintained contemporaneously for request by the government to follow up if desired, he Court requested us to work out the matter.

I had "several" communications with the government and was never mentioned "prior" to its request for revocation, even though I was the conduit not Mr. Cabasso. Nothing further beyond the first list of contacts was ever requested from myself by the Government or Pretrial Services of myself or Mr. Cabasso. In fact, when previously offered to Pretrial Services by Mr. Cabasso they indicated this was not for them and should be directed to myself.

The government "omits" Since the initial request for the contact lists, in the 10-month period in question: (a) the government never mentioned directly or indirectly they were

58

expecting the contact lists from me, rather it was assumed if the government or Pretrial Services requested of myself or Mr. Cabasso it would be provided and was, (b) Pretrial services, who received defendant's monthly submitted reports, regular documentation regarding other matters and made numerous personal visits, never referenced or requested the contact lists (c) when it was offered by Mr. Cabasso to Pretrial Services they advised that should be directed to myself, (d) in Court status conferences in December 2020, March 2021, June 2021, neither the Government and Pretrial Services made any mention of contact list or compliance issues, and (e) from November 25, 2020 and well into 2021 the Government participated in numerous communications with the undersigned on "various matters" and no mention of contact lists. It was only after the government took *offense* to the Request for Modification did the subject of contact lists ***"curiously"*** arise.

On July 28, 2021, (the day prior to the Government's cross-motion to revoke Mr. Cabasso's conditions of release,) Pretrial Services Officer Moore, telephonically contacted Mr. Cabasso. Due to Covid concerns, Mr. Moore respectfully requested a virtual tour and walk around of Mr. Cabasso's home and office. Mr. Cabasso complied. First giving a virtual tour of his home and subsequently Mr. Cabasso traveling to his office and doing the same. In the same series of communications, clearly at the prompting of the Government, Mr. Moore stated, *"can you get any copies of your unemployment records and also any customer contact information for people who you communicated with about the business."*, Mr. Cabasso responded, *"yes I will email them to you."* Mr. Cabasso immediately furnished when requested the unemployment records and contact lists for all periods since inception.  Just a cordial conversation with Mr. Moore and no mention of why he was asking for the contact lists now, the same which had been

offered by Mr. Cabasso to Pretrial Services at the beginning of the period in question. See Dkt. 212-1 Pgs. 1-23.

Clearly the government has already prepared "prior" to contacting Mr. Moore its request to revoke Mr. Cabasso's conditions of release for violation of failure to provide contact lists.

The further concern Your Honor is the government taking the extreme adversarial position will Mr. Cabasso wants to call witnesses and present evidence. We intend to call representatives of the government which will require advance notice and potential litigation before even an evidentiary hearing.

The undertaking of a case with 10,000,000 documents and contested discovery, by no fault of Mr. Cabasso, will indefinitely extend the pretrial length.

What at best was an *"administrative"* miscommunication among myself and the government, unreasonably resulted in the government's request to impose the strictest pretrial conditions on Mr. Cabasso with the exception of returning to prison.

Four months ago, on December 9, 2021, I wrote to the government proposing a reasonable resolution without the need for protracted court intervention. The request addressed any concerns the government might have. There has been no response. It stated:

> "Dear Prosecutors: It is coming up on half a year since we filed Motions for funds and bail modification. In speaking with chambers last week there still is no schedule. Based upon my other caseload and speaking with other attorneys trying matters in EDNY and SDNY this is going to be backed up for some time.
>
> Due to all the publicity from the case the Aventura business has proven to be rendered unfeasible no matter the efforts of Mr. Cabasso. Even necessary administrative tasks requiring documentation have encountered roadblocks for various reasons stemming from Mr. Cabasso's arrest and prosecution. The current status of Mr. Cabasso is unsustainable from both a practical defense perspective and financial matter as we are going into 2022 on a case that began in 2019 without sufficient resources

60

I am a sole practitioner as are the other defense counsels in this case. There is the need to meet on unscheduled basis and work with other professionals in this matter that the current restrictions for Mr. Cabasso do not and will not facilitate.

We would consent to Mr. Cabasso completely leaving the security industry which would allay concerns the Government may have and in exchange he be permitted limited to travel in the EDNY and SDNY so we are able to function in preparation for trial. Should you request any other additional reporting requirements in association with this we would consider the same." <u>See</u> Exhibit GG.

On November 7, 2019, at Mr. Cabasso's initial appearance Magistrate Reyes asked of

Mr. Richardson representing the government two questions before incarcerating Mr. Cabasso.

THE COURT: During its investigation did the Government find out whether Adventura conducts business that's outside of the alleged fraudulent activity?

MR. RICHARDSON: No, Your Honor. In fact the allegation essentially in the complaint is Aventura's business is fraudulent entirely.

MR. BRANDEN: And I think it also indicates in this detention memo that it is no longer a going concern. <u>See</u> Exhibit HH. Pg. 5 at 14-25.

As referenced by the government in its Bail Detention Memorandum,

"Because of Cabasso's use of **shell companies**, real estate transactions on behalf of **third-party beneficiaries, and other money laundering techniques aimed at obfuscation and concealment**, the government does not have a comprehensive understanding of the nature and location of all Cabasso's financial assets. Indeed, and despite authorities having seized as of this morning more than $3 million along with Cabasso's 70-foot luxury yacht, there is good cause to believe that Cabasso has significant offshore assets, as well as ties to jurisdictions from which extradition is practically impossible, including the People's Republic of China ("PRC"). See Dkt. 12 at 1 ¶2.

The government referencing unsustainable sweeping statements of the non-existence of a legitimate 20-year-old business, and "unknown" monies the government "intended to prove in the future exist, which it hasn't. it intended to prove in the future and hasn't. With the government seizure of all electronic and physical records of Mr. Cabasso and Aventura there was no possibility accurately and indisputably provide the erroneous nature of the accusations. Much of the necessary evidence first becoming made available in 2022.

Mr. Cabasso is not of Asian descent or a citizen of the PRC, had not been to the PRC in years and previously was an infrequent business traveler over the years. Mr. Cabasso's roots are here in New York going back generations for over a century. Defendant has demonstrated the inaccuracy herein of the sweeping statements.

In its bail detention memorandum at Mr. Cabasso's initial appearance before Magistrate Reyes it was stated The Government in its Bail Detention Memorandum to Magistrate Reyes remanding Mr. Cabasso pending trial cites,

> "Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). Such does not permit the government to proffer unsubstantiated and known inaccuracies as indicated above.

> A defendant who has been released pending trial may file "a motion for amendment of the conditions of release." 18 U.S.C. § 3145(a)(2). A court may at any time amend its order to impose "different conditions of release." 18 U.S.C. § 3142(c)(3). The conditions of release imposed must be "the least restrictive [] condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(c)(1)(B); see United States v. Reiner, 468 F.Supp.2d 393, 395 (E.D.N.Y. 2006).

> The authorization to modify the conditions of release "is based on the possibility that a changed situation or new information may warrant altered release conditions." Id. (citation omitted).

"Accordingly, '[c]onditions of bail should properly be modified if a substantial change in circumstances as they existed at the time bail was fixed is clearly shown.'" Id. (quoting United States v. Falcetti, No. 02 CR 140(ILG), 2002 WL 31921179, at *1 (E.D.N.Y. Oct. 31, 2002).

Changed circumstances warranting a modification of a defendant's conditions of release exist where: (1) the evidence relied upon by the government to establish that the defendant poses a risk of flight and/or a danger to the community has been undermined by new information not available previously; or (2) new information indicates that the government's case is weaker than it was thought to be. See United States v. Stephens, 447 F.Supp.3d 63, 64-65 (S.D.N.Y. 2020) (ordering defendant's release in light of changed circumstances where, among other things, "the strength of the primary evidence relied upon by the Government to demonstrate the danger the defendant poses to the community has been undermined by new information not available to either party at the time of the March 6 hearing" and "this new information [] indicates that the Government's case is weaker than it believed it to be at the March 6 hearing").

Courts have recognized that while the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, "by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." Martir, 782 F.2d at 1147 (emphasis omitted) (quoting Acevedo-Ramos, 755 F.2d at 207). In Martir, a case where the government argued that defendant posed a risk of flight and proceeded solely by proffer, we stated that "[i]n the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved." Id. at 1147.

Unanticipated delays in the case may be a basis for modifying condition of release if it "constitutes 'information . . . that was not known to the movant at the time of the [bail] hearing'" and "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required." United States v. Esposito, 354 F.Supp.3d 354, 359 (S.D.N.Y. 2019) (quoting 18 U.S.C. § 3142(f)(2)(B)).

I respectfully request of the Court the following relief:

a.  compel Government to Respond to Defendant's Rule 16 and Brady Requests;

b.  grant Defendant's Request to Issue Subpoenas;

c.  pursuant to the Due Process Protection Act issue an oral and written order to prosecution that confirms the disclosure obligation of the prosecutor under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny, and the possible consequences of violating such order under applicable law;

d.  grant Request for Modifications of Defendant's Conditions of Release on an Expedited Basis; and

e.  compel the government to correct the record from inaccurate statements it has erroneously offered in pleadings to the Court.

Respectfully submitted,

/s/ Albert Dayan
    Albert Dayan, Esq.

/s/ Jack Cabasso, Pro se