

James Miskiewicz, Shareholder
900 Stewart Avenue, Suite 505
Garden City, NY 11530
jim.miskiewicz@gtlaw.com

April 28, 2025

**VIA ECF**

Hon. Joan M. Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

    Re:  <u>United States v. Cabasso et al., 19-CR-582(JMA)(ARL)</u>

Dear Judge Azrack,

    On behalf of the defendant Jack Cabasso, I write in anticipation of the status conference in the above-captioned case that is scheduled for Tuesday, April 29, 2025. Since being engaged to represent Mr. Cabasso, I reviewed the file expecting to submit a sentencing memorandum seeking a non-Guidelines sentence. I have now concluded that there are grounds to permit Mr. Cabasso to withdraw his guilty plea under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure. I shared my concerns with the government hoping for better understanding and/or a clearer explanation of the evidence to support the plea and sentence recommended both in the plea agreement and the Probation Department's Presentence Investigation Report. Despite the government's courtesy in providing me with a reverse proffer, I remain unable to ascertain what evidence the government would have relied on at trial to prove the commission of a crime under what it calls the "Country-of-Origin Scheme" alleged in Count One of the Indictment. More to the point, I see no legal, factual or strategic basis to support prior counsels' insistence that Mr. Cabasso had no choice but to abandon an explicit statutory defense to the charge and stipulate to a U.S. Sentencing Guidelines estimate that exposes him, given his age, to a possible life sentence.

    Given this turn, while I agreed with the government to request a status conference so that the Court could be apprised of these circumstances, I object to the government's request that the Court give warnings to my client about a motion that has yet to be filed, or its demand for a waiver of attorney-client privileged communication.

**Greenberg Traurig, LLP | Attorneys at Law**

900 Stewart Avenue, Suite 505 | Garden City, New York 11530 | T +1 516.629.9600 | F +1 631.204.6808

www.gtlaw.com

The Government's Theory of Criminal Liability

In terms of federal government procurement requirements, a product's country-of-origin is governed by the Trade Agreements Act of 1979 ("TAA"), 19 U.S.C. §§ 2501 et seq. The government has repeatedly said that Mr. Cabasso purchased goods from non-TAA-eligible countries and re-sold them while "falsely represent[ing] to U.S. government agencies that AVENTURA manufactured these products in the United States." (ECF Dkt. 1, ¶27). The government's theory of criminal liability under the Country-of-Origin Scheme of Count One is that Cabasso knowingly and intentionally violated the TAA by selling goods to federal agencies that were not "wholly the growth, product, of manufacture of the United States of a TAA-designated country." (ECF Dkt. 1, ¶ 21 and Dkt. 55, ¶ 11).

The government has excised the second part of the TAA's definition of Country-of-Origin and has maintained it has no relevance here and has stated in court appearances that Aventura Technologies Inc., ("Aventura") manufactured nothing. In the government's telling, Mr. Cabasso and the co-defendants simply imported Chinese security cameras and other products and violated the TAA when they sold them to federal government agencies as American-made.

But Aventura sold made-to-order security systems comprised of many components—some from China, others from the United States and other TAA-compliant countries—and programmed or assembled them into a final product at their facility in Commack, New York. *See* Exhibit A (examples of Aventura's final products) and Exhibit B (products in various states of assembly). Given that many items required by federal agencies—including the ubiquitous iPhone manufactured in China and used by most federal employees—are simply not made in the United States, the second part of the TAA's definition provides what in the industry is referred to commonly as the "substantial transformation" basis for a product's Country-of-Origin. Besides the partial definition relied on by the government requiring a product to be "wholly the growth, product, of manufacture of the United States of a TAA-designated country," the TAA's Country-of-Origin definition continues:

> or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B).

A General Services Administration ("GSA") reference guide offers an even clearer refutation of the government's limited theory of TAA-compliance. The reference guide is published for vendors like Aventura, who participate in that agency's Multiple Award Schedule ("MAS") Program. Section 7.5 of the guide provides the following, which is directly on point regarding Aventura's operations:

> A widget is sold under a GSA Schedule contract; however, the widget is manufactured in a non-TAA approved country. Therefore, the widget is not TAA compliant.

> A more complex version of this example includes computers. Many of the parts used in computers are manufactured in non-TAA approved countries, but the parts alone cannot be a computer. Those parts need to be assembled to create the computer that is available for sale under the MAS contract. The country the component parts are assembled into the final product (e.g., the computer) serves as the Country Of Origin (COO) and that COO information is used to make determinations regarding TAA compliance.

General Services Administration, *Multiple Award Schedule Contractor Assessment Reference Guide,* Multiple Award Schedule ("MAS") Program Management Office, October 2020, at 13, https://vsc.gsa.gov/drupal/files/MAS-CAR-Guide-v1.0.pdf.

Prior counsel, and co-counsel for Mr. Cabasso's wife, co-defendant Frances Cabasso, ignored or abandoned the "substantial transformation" basis of determining a final product's country-of-origin and presented the government's plea offer as the only option available to Mr. Cabasso. Despite protests from Mr. Cabasso, for whom substantial transformation is commonly used in the government procurement industry, prior counsel even agreed to the government's demands that Cabasso withdraw Rule 17 subpoenas for records, and abort statutorily-permitted inquiries to the very federal agency unit delegated by Congress to make Country-of-Origin determinations that had generated exculpatory evidence revealing the government's theory of liability is flawed.

Compounding this abandonment, counsel also failed to object to the government's motion to authorize it to comply with the Crime Victims' Rights Act of 2004, 18 U.S.C. § 3771(a) by using alternative measures to estimate financial loss to victims. (ECF Dkt. No 294). The resulting estimate in the plea agreement appears to include the government's view of Aventura's total sales. By doing so, the estimated loss includes sales involving services and maintenance that did not involve the importation or sale of physical equipment. It may also include transactions involving private customers whose purchases were not governed by the TAA. Yet again, counsel insisted Mr. Cabasso had no choice other than to plead and even stipulate to the government's total offense level estimate knowing full well the number was: (a) not legally defensible given "substantial transformation" and (b) grossly inflated by service contracts for which no foreign or domestic physical products were involved.

Missing Exculpatory Evidence [1]

Among the items seized by the government from Aventura's facilities in Commack, New York, were video and documentary systems and files that would have shown the programming and assembly of final products at Aventura's facility in Commack, New York, consistent with the "substantial transformation" definition of a U.S. Country of Origin product under the TAA. The evidence seized but not located or produced in the government's discovery include:

---

[1] We assume for purposes of this submission that any failure by the government to disclose favorable evidence within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963), was unintentional. *Kyles v. Whitley*, 514 U.S. 419 (1995).

- Video footage on computer servers from dozens of closed-circuit television cameras ("CCTV") inside Aventura's production facility, which would have been the best evidence to show what programming, and production took place in Commack. Counsel for another defendant in this case requested the footage before Mr. Cabasso entered his guilty plea. He was told by the case agent that the video footage had no evidentiary value and was thus not produced.

- More recently, I was advised by the government, first, that it would investigate whether the video footage had been returned to the defendants, and later that no CCTV footage was ever in the government's possession. These statements contradict the case agent's claimed review of footage.

- Aventura's Customer Relations Management ("CRM") system is also missing. The CRM tracked thousands of transactions from sales lead to unique product specifications, project plans, internal notes among Aventura employees, quotes, and if approved purchase orders, sales order information, order processing, order fulfillment, QuickBooks integration, and production details from tracking components used to build assemblies, serial number tracking for warranty and support, a manufacturing checklist and the technician(s) who built the system in Commack as well as the supervisor overseeing the manufacture.

- The government recently asserted, "the government has never identified that program and, to the contrary, believes that it was hosted on a third-party server and was never available to the government." The government had previously subpoenaed and secured access to Aventura's cloud servers, which were hosted by third-party providers. Moreover, during an innocence proffer session with the government in early 2020, Mr. Cabasso explicitly discussed the contents of the Customer Relationship Management ("CRM") system and requesting access to his laptop, which the government refused. A former employee further confirmed that, on the day of the arrests, attempts to access the CRM were unsuccessful, as the system failed to connect—indicating that the CRM server was, in fact, located within Aventura's facility. Additionally, Mr. Cabasso maintained backup copies of all company data, including CRM information, on computers physically stored at Aventura's premises. The CRM is a critical piece of defense evidence from which to show that Aventura did in fact sell products whose components were imported from TAA and non-TAA compliant countries and substantially transformed into final products compliant with the TAA pursuant to 19 U.S.C. § 2518(4)(B).

- Aventura's hardware and software engineering, testing, and production computers are also unaccounted for. These computers contain critical evidence identifying Aventura's U.S.-based authors of the source code responsible for controlling the functionality of the network surveillance cameras, as well as all application software developed for Aventura's Video Management and Surveillance Systems ("Aventura VMS"). Though the hardware components were fully assembled into network surveillance cameras in China, among other foreign countries Aventura's

    U.S.-origin and programmed operating software enabled the network surveillance cameras to interact with Aventura VMS and route within the network and to be monitored, secured and accessed by the Aventura software, and were therefore substantially transformed and TAA compliant pursuant to 19 U.S.C. § 2518(4)(B). Substantial transformation does require that an item undergoes physical assembly or fabrication in a particular country to determine the country of origin. The TAA requires only that the item be substantially transformed in a TAA-designated country.

- The government at Mr. Cabasso's plea when asked by the Court of the government proof in this case, spoke of "Mr. Cabasso paying China-based programmers to write his computer code." On the day of the raid, the government prepared a detailed Floor Plan of the Aventura facility. This Floor Plan specifically identifies, among other areas, Office "U" (occupied by a software developer directly reporting to the Chief Technology Officer) and Office "W" (occupied by the Chief Technology Officer, who also served as the Lead Hardware and Software Developer). Photographic evidence taken during the raid shows whiteboards in these offices displaying diagrams and notes on their active software development projects, as well as testing equipment situated on their desks, underscoring the technical work conducted by Aventura's U.S.-based engineering team.

<u>Threats to Induce Mr. Cabasso to Plead Guilty Involuntarily</u>

    I have learned that in the run-up to pleading guilty, counsel for co-defendant Frances Cabasso threatened Mr. Cabasso, in the presence of his lawyer. Specifically, the threat involved a demand that Cabasso agree to plead to a Country-of-Origin offense while Ms. Cabasso would plead to the "Women-Owned Small Business ("WOSB") procurement scheme alleged as the second object of the conspiracy charged in Count One. In support of that plea, the government relied on 17 contracts that it claimed proved Ms. Cabasso's guilty of fraudulently securing WOSB contracts from the government.

    There are significant discrepancies within those contracts. Certain pages reveal information that contradicts the government's claim that the contracts were awarded under WOSB procurement set-asides. These discrepancies were pointed out by Mr. Cabasso in joint defendant and attorney meetings. Yet counsel for Ms. Cabasso threatened Mr. Cabasso if he refused to accept the government's global plea offer despite acknowledging that the contracts proffered by the government did not in fact support of the WOSB scheme allegations.

<u>Conclusion</u>

    The facts summarized above are not meant as a substitute for a fully briefed and legally-supported motion. Its purpose is simply to advise the Court that genuine issues of voluntariness regarding the plea exist. On the other hand, the defense objects to the government's request that Mr. Cabasso be warned of repercussions if a motion is filed. The government's demand that Mr.

Cabasso waive all attorney-client privileged communication because co-counsel threatened him in front of others during an un-privileged meeting, is without legal or factual basis.

Alternatively, we ask that the Court Order the following at the conclusion of the status conference:

1. That the government conduct a diligent search of the evidence in its possession for the CCTV footage, CRM system, computers, and documentation referenced above, produce such evidence in its natural format so that the defense may make actual use of the material and in any event to report to the Court as to the results of its search by a date certain to be determined by the Court.

2. That the Court thereafter set a deadline by which to file a motion to withdraw, (or notice that no motion is forthcoming), and briefing schedule.

Respectfully submitted,

*James Miskiewicz*
James Miskiewicz

cc: All Counsel of Record via ECF