UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

FILED
CLERK
8/19/2026 12:07 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

----------------------------------------------------------------------X

UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**
19-cr-582 (JMA) (ARL)

-against-

JACK CABASSO,

Defendant.

----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Presently before the Court is the motion of Defendant Jack Cabasso ("Defendant") to withdraw his guilty plea. (ECF No. 444.) On December 9, 2019, Defendant was charged in a four-count Indictment arising out of his activities as the head of Aventura Technologies, Inc. ("Aventura"). (Indictment, ECF No. 55.) The Indictment charged Defendant with two Counts of Conspiracy to Commit Mail and Wire Fraud pursuant to 18 U.S.C. § 1349; one Count of Unlawful Importation under 18 U.S.C. § 545; and one Count of Conspiracy to commit Money Laundering pursuant to 18 U.S.C. § 1956(h). (Id.) On December 20, 2023, Defendant pled guilty before Magistrate Judge Arlene Lindsay to Count One of the Indictment. (ECF No. 314.) On July 25, 2025, nearly 19 months after his guilty plea, Defendant made the instant motion to withdraw his plea, claiming that he is actually innocent, his plea was coerced, his counsel was ineffective, and the Government suppressed Brady material. (ECF No. 444; ECF No. 470-3.) The Court DENIES Defendant's motion to withdraw his guilty plea for the reasons set out below.

Defendant also brings related claims concerning a sentencing stipulation in his plea agreement in which he stipulated that the loss amount at issue exceeded 9.5 million. Defendant contends that he received ineffective assistance of counsel in connection with this aspect of his plea agreement because, inter alia, this sentencing stipulation allegedly lacked a factual basis and the sentencing stipulation now precludes him from litigating the loss amount for sentencing purposes. Defendant also contends that the Court, which is not bound by the sentencing stipulation, should independently inquire into whether there is a factual basis for the loss amount. As explained below, the Court must still resolve the claims of four victims seeking restitution who claim more than $14 million in losses—claims that Defendant contests. If the Court were to find that these victims did, in fact, suffer more than $14 million in losses, that determination would moot Defendant's challenges concerning the sentencing stipulation.[1] Accordingly, the Court directs the parties to submit briefing and evidence concerning these restitution claims in advance of Defendant's sentencing hearing.

## I. BACKGROUND

### A. Aventura Technologies, Inc.

Aventura was a closely held company based in Commack, New York that marketed itself as a manufacturer of security equipment, including network-linked security cameras and walkthrough metal detectors. (Indictment ¶ 1.) Aventura sold its equipment to U.S. government agencies, including the U.S. Army, U.S. Navy, and U.S. Air Force, as well as to private customers, contractors for U.S. agencies, and foreign governments. (Id.)

[1] Defendant also contends that he has recently obtained previously undisclosed documents concerning two restitution claimants that are agencies/departments of the federal government. Defendant characterizes these documents as Brady material. The Court will consider those documents in determining restitution.

In total, Aventura was paid approximately $88 million by all its customers since approximately November 2010. (Id. ¶ 2.) Aventura directly contracted with federal government agencies, foreign governments, and private customers. (Id.) Since August 2006, Aventura also held U.S. General Services Administration ("GSA") Multiple Award Schedule ("GSA Schedule") contracts, which permitted federal government agencies to obtain volume discount pricing for equipment sold by Aventura. (Id.) According to the indictment, through December 2018, Aventura had sold approximately $20.7 million of security equipment to U.S. government agencies through its GSA Schedule contracts. (Id.)

Defendant Jack Cabasso founded Aventura and identified himself as its "Managing Director," but was, in all but name, the chief executive officer and final decision maker at the company. (Id. ¶ 3.) Co-defendant Frances Cabasso, Jack Cabasso's wife, was Aventura's purported 97 percent owner, president, chief executive officer and highest-paid employee. (Id. ¶ 4.) In reality, Frances Cabasso worked part-time at a Long Island accounting firm and served as Aventura's nominee owner on its bank accounts and corporate records, concealing Jack Cabasso's control over the company. (Id.)

## B. The Indictment

On December 9, 2019, Defendant Jack Cabasso, Frances Cabasso, five Aventura employees, and Aventura (the corporate defendant) were all charged in the Indictment based on their activities from August 2006 until November 2019 while at the company. (Indictment.)

Defendant Christine Lavonne Lazarus ("Lazarus") worked at Aventura since approximately December 2006 and held the title of "Director of Business Development." (Id. ¶ 5.) Defendant Jonathan Lasker worked at Aventura since at least January 2004 and held the title of "Director of Operations." (Id. ¶ 6.) Defendant Alan Schwartz was employed at Aventura with

the title "Systems Engineering Manager" from in or about May 2018 to June 2019, when he retired. (Id. ¶ 7.) Defendant Eduard Matulik worked at Aventura since approximately October 2002 and held the title of "Director of International Sales." (Id. ¶ 8.) Defendant Wayne Marino worked at Aventura since approximately March 2005 and held the title of "Network Specialist." (Id. ¶ 9.)

The Indictment charged Defendant with two mail and wire fraud conspiracies—the so-called "Country-of-Origin Scheme and the so-called "Women-Owned Small Business Scheme" ("WOSB Scheme") in Count Two—in addition to a conspiracy to commit money laundering and a charge of unlawful importation.[2] Defendant would ultimately plead guilty to Count One, which concerned the Country-of-Origin Scheme.

The Country-of-Origin Scheme in Count One alleges that the defendants, while working at Aventura, engaged in a scheme to defraud Aventura's customers by lying about the origin of Aventura's products. Aventura would claim that its products were made in the United States, while they were in fact imported from, among other countries, the People's Republic of China ("PRC"). (Id. ¶¶ 19-25, 34.) The County-of-Origin Scheme also charged defendants with falsely stating that merchandise was made by Aventura. (Id. ¶ 34.) Defendants allegedly "conspired to portray AVENTURA in its promotional materials and at trade shows as a company that manufactured its products in the United States, and sold tens of millions of dollars of surveillance equipment and other products to AVENTURA's U.S. government and private-sector customers on the strength of AVENTURA's assertions." (Id. ¶ 20.) According to the Indictment, Defendants "conspired to make and made oral and written statements to U.S. government procurement officers that misled U.S. government agencies into believing that AVENTURA's products were manufactured in the United States" and also "conspired to make and made similar false and

[2] Only Defendant and Frances Cabasso were charged with the Money Laundering Scheme.

misleading claims to private-sector customers to whom the country of origin of AVENTURA's products was material" to their purchasing decisions. (Id. ¶ 21.) The Indictment alleges that a product's country of origin was an important factor for procurement and contracting offices in deciding whether to purchase products. (Id. ¶ 10.)

According to the Indictment, the products that the defendants imported from the PRC and then resold as Aventura's own products included networked security cameras and related equipment manufactured and sold by PRC manufacturers of surveillance equipment with known cybersecurity flaws, including vulnerabilities that could allow a hacker to remotely assume control of a networked camera and obtain sensitive data. (Id. ¶ 23.)

The Indictment also alleges, in Count Two, that Defendants engaged in the WOSB Scheme, in which Aventura falsely held itself out to the U.S. Government as a Women-Owned Small Business controlled by Frances Cabasso in order to obtain set-aside contracts for such businesses, when in fact the company was controlled by Jack Cabasso. (Id. ¶ 26.)

## C. Procedural History

### 1. Co-Defendants' Guilty Pleas

On November 7, 2019, the Government executed search warrants at Aventura's premises and the Cabassos' home and arrested Defendant.

On January 15, 2020—the same day that Aventura first appeared before Judge Denis Hurley[3] and pled not guilty—Defendant Jonathan Lasker pled guilty before Magistrate Judge Arlene Lindsay to Counts One, Two and Three of the Indictment. (ECF Nos. 90, 100.) Thereafter, discovery commenced. (See ECF Nos. 92–99.)

[3] This case was initially assigned to District Judge Denis R. Hurley. On July 7, 2022, the case was reassigned to the undersigned.

Subsequently, each of Jack Cabasso's co-defendants pled guilty to some or all the charges. On March 24, 2021, Marino pled guilty to Count One of the Indictment. (ECF No. 197.) On July 29, 2021, Lazarus pled guilty to Counts One and Two of the Indictment. (ECF No. 210.) On December 6, 2021, Matulik pled guilty to Count One of the Indictment. (ECF No. 225.) On July 22, 2022, Schwartz pled guilty to Count One of a superseding information. (ECF No. 265.)

As discussed further infra, Defendant, Frances Cabasso, and Aventura eventually pled guilty pursuant to a global plea deal. On December 11, 2023, Frances Cabasso pled guilty to Count Two of the Indictment and Defendant pled guilty to Count One of the Indictment on December 20, 2023. (ECF Nos. 308, 314.) In March 2024, Aventura pled guilty to Counts One, Two, and Three.

**2. Defendant's Proffers and Eventual Guilty Plea**

Prior to pleading guilty in December 2023, Defendant met with the Government in January 2020 and March 2020, pursuant to a proffer agreement. (ECF No. 446 at 7.) At these sessions, Defendant broadly defended his conduct, claiming that: Aventura actually manufactured most of its products in the United States and derived most of its revenue from services contracts; Aventura's products were TAA-compliant due to their "substantial transformation"; and Aventura's foreign customers were actually indifferent to whether Aventura's products were made in the United States.[4] (Id. at 7–8; ECF No. 470-4 at 16.) Defendant, however, also made various inculpatory admissions when confronted with specific documents by the Government. (ECF No. 446 at 7–8.) Defendant's proffer agreements with the Government provided that the Government could offer Defendant's statements to rebut any evidence offered, or factual assertions made, by

[4] Discussed infra are relevant provisions of the Trade Agreements Act of 1979 ("TAA"), 19 U.S.C. §§ 2501–2581, the Buy American Act ("BAA"), 41 U.S.C. §§ 8301–8305, related regulations, and the "substantial transformation" standard set out in the TAA, which features prominently in Defendant's motions.

or on behalf of Defendant at any stage of a criminal prosecution. (Id. at 7 n.1.) Some of the devastating admissions made by Defendant are described in further detail below.

After these proffer sessions, Defendant litigated the case for three years. Discovery was substantial and complex, involving millions of documents. Defendant was primarily represented by attorney Albert Dayan until Dayan withdrew as counsel in September 2023. (ECF No. 301 (Aug. 24, 2023 Mot. to Withdraw); Sept. 5, 2023 Order.) On July 26, 2023, Defendant's new counsel, Barry Zone, filed his notice of appearance. (ECF No. 299.)

Subsequently, on December 20, 2023, Defendant, while represented by Zone, pled guilty before Judge Lindsay to Count One of the Indictment pursuant to a plea agreement. (ECF No. 314.) Defendant's plea agreement contained the following provisions:

(1) In exchange for pleading guilty to Count One, the Government would not pursue the other criminal charges in the Indictment or bring any additional charges for tax evasion;[5]

(2) Defendant stipulated to certain Guidelines enhancements, including a loss greater than $9.5 million (a 20-point increase) and an offense level of 33, which results in a Guidelines range of 168 to 210 months;

(3) Defendant would receive a two-point reduction for acceptance of responsibility and an additional one-point reduction if he pled before December 20, 2023. Accounting for those reductions, Defendant would have an offense level of 30 and a Guidelines range of 121-151 months;

(4) The Government agreed it would not advocate for a sentence of greater than 121 months;

(5) Defendant waived "any right to additional disclosure from the government in connection with the guilty plea"; and

[5] In connection with the preparation of the Pre-Sentence Investigation Report ("PSR"), the Government submitted objections, which were ultimately incorporated into an addendum to the PSR, detailing that Defendant engaged in tax evasion and intended to defraud the United States Government out of $1.15 million in taxes. (ECF No. 401.)

(6) While Defendant agreed to forfeit various items, the home he and Frances Cabasso shared was excluded from forfeiture.[6]

Finally, with respect to restitution, the plea agreement states:

> The defendant will pay restitution to the United States Treasury . . . (the "U.S. Government Restitution") in an amount to be determined at sentencing. This payment shall reflect losses incurred by agencies and departments of the United States Government as a result of the defendant's conduct. The defendant's agreement to pay the U.S. Government Restitution does not prejudice or limit the ability of other victims to seek and obtain restitution from the defendant.

(Plea Agreement ¶ 21.) For restitution, Defendant did not agree to pay any specific amount to the Government or agree that any particular agencies or departments were defrauded or were victims.

Defendant's plea agreement was part of a global disposition along with the pleas of his wife Frances Cabasso and the corporate defendant, Aventura Technologies, Inc. (Id. ¶ 17.) The plea agreement provides that, if any of the three defendants failed to plead guilty or sought to withdraw their pleas, the Government could: (1) void their plea agreements; (2) void the sentencing advocacy cap; or (3) or elect not to recommend a reduction under the Guidelines for a global disposition, which the plea agreement otherwise contemplated.

Defendant also executed a written plea form, which, inter alia, listed the elements of the wire fraud in Count One. (ECF No. 315 at 6.) On the form, Defendant also affirmed that he:

(1) was aware of the elements of this crime;

(2) understood the charges and had discussed them with counsel;

(3) discussed the Sentencing Guidelines with counsel;

(4) was satisfied with counsel's representation and believed that counsel did a good job; and

(5) was pleading voluntarily, had not been threatened or forced to plead, and had not been made any promises concerning his sentence.

---

[6] According to the Government, Defendant's counsel represented that this carve-out for the Cabassos' home was a "deal breaker" for Defendant. (ECF No. 463.)

(Id.)

Then, during the change of plea hearing before Judge Lindsay, Defendant was again advised of his rights and confirmed that he understood what he was doing, and the rights he was giving up, by pleading guilty. (Plea Tr. 4–8, ECF No. 316.) Judge Lindsay then described the elements of Count One, and Defendant responded that he intended to plead guilty to this Count, which he admitted he had discussed with his attorney. (Id. at 12-13.) Defendant pled guilty as follows:

> THE COURT: Do you need to ask me any questions before we take the next step of actually entering a plea?
>
> THE DEFENDANT: No, your Honor.
>
> THE COURT: So you're ready to plead to Count 1 of the indictment?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Mr. Zone, do you know of any reason or are you aware of any reason why the defendant should not plead guilty?
>
> MR. ZONE: No, your Honor.
>
> THE COURT: Mr. Cabasso, are you satisfied with your lawyer up to this point?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Yes?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you feel he's doing a good job for you?
>
> THE DEFENDANT: Yes.
>
> THE COURT: So with respect to Count 1 of the indictment, which charges as follows, that in or about and between August 1st, 2006 and November 7th of 2019, within the Eastern District of New York, you along with others knowingly and intentionally conspired to devise a scheme to defraud United States government agencies and contractors and private sector customers and to obtain money and property from them by means of one or more materially false and fraudulent

> representations and promises. That is that you falsely stated merchandise was made in the United States and falsely stated merchandise was made by Aventura Technologies, and that in connection with executing this scheme and artifice to defraud, you caused mail matter to be placed in the post office and to be delivered by the U.S. Postal Service, also using private commercial carriers to which shipments of merchandise were transmitted, that you also transmitted and caused to be transmitted wire communications in interstate and foreign commerce in the form of electronic funds transfers, electronic messages and telephone communications, all done with the intent to implement this scheme to defraud.
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: With respect to that count, how do you plead?
>
> THE DEFENDANT: Guilty, your Honor.
>
> THE COURT: Are you entering the plea of guilty freely, voluntarily, and of your own free will?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Has anyone threatened or forced you to plead guilty in any way?
>
> THE DEFENDANT: No.
>
> THE COURT: Other than the agreement with the government as we've described on the record, has anyone made any promises to you that caused you to plead guilty?
>
> THE DEFENDANT: No.
>
> THE COURT: Has anyone promised you what your sentence will be in this case?
>
> THE DEFENDANT: No.

(Id. at 17-19.)

Judge Linsday then asked the Defendant to describe, in his own words, what he had done in connection with Count One:

> THE DEFENDANT: I was the de facto owner and chief executive officer of Aventura Technologies, Inc., a company that was located in Commack, New York, here in the Eastern District of New York. Although my wife Frances Cabasso controlled Aventura on paper, I was the person who in fact controlled the company and was the decision maker. From December of 2000 to November, 2019, I represented to some of Aventura's clients that some of the products we were selling

> were American made but we were all aware that they were imported from China. The victims of the fraud included buyers of the private sector, agency of the U.S., and foreign governments. In furtherance of the fraud, I not only made these representations to Aventura customers but I directed employees to do so as well. These representations were made by phone and over email, and the goods in question were supplied through the mail and via interstate carriers.
>
> THE COURT: With respect to some of these products, it suggests that some of these products were actually made -- that you represented that some of these products were made by the company but that was not in fact true, is that right, by Aventura?
>
> THE DEFENDANT: Sorry, I didn't follow the question, your Honor.
>
> THE COURT: Did you at some point – because one of the elements of this -- not an element but one of the allegations in this count is that you would tell our customers that Aventura made the product that you were selling.
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Okay, when you knew that was not true, is that right?
>
> THE DEFENDANT: Yes, your Honor.

(Id. at 19–21.) Finally, the Government also explained that it would present the following proof at trial:

> We would present extensive records of undercover interceptions by Customs and Border Protection at the border, showing that items were shipped from China with America[n] flags already on the boxes to Aventura coupled with evidence that they arrived at their ultimate destinations unaltered, including infrared markings that CBP had placed on those packages. We would put into evidence extensive communications by the defendant lying to customers about the origin of the good and lying about the reason for, for example, Chinese language markings on the goods and directing his employees to similarly lie, as well as communications by the defendant with his suppliers in China about hiding evidence of Chinese manufacture, going so far as to demand that suppliers' circuit boards be scrubbed of any indicative markings. We would put in communications from the defendant sending customers fake pictures of Aventura's supposed U.S. manufacturing facilities, which were in fact pictures of a supplier's manufacturing facility in China. We would show the defendant operating off the books, satellite facilities in Hang Xiao and Chien Jen (ph) in China and paying China-based programmers to write his computer code. We would put into evidence communications by the defendant directing that Aventura's trade show booths be marked as -- be covered in American flags and depict Aventura as a U.S. manufacturer, and we would put

> into evidence undercover calls by special agents of the government in which Aventura employees at the defendant's direction falsely explained away Chinese markings on goods that in fact came from China, suggesting that the goods were U.S. made and that those markings were in some way incidental.

(Id. at 21–23.) Defendant's allocution was not equivocal in any fashion and he did not dispute any of the representations made by the Government concerning what its proof would demonstrate at trial.

**3. Defendant's Motion to Withdraw His Guilty Plea**

After the Court accepted Defendant's guilty plea, more than a year passed in waiting for his sentencing submission as well as the presentence investigation report ("PSR") from the United States Probation Office ("Probation"). Part of this delay was waiting for Aventura, the sole remaining Defendant, to change its plea, which occurred in March 2024. (ECF No. 337.) Subsequently, the Court granted several motions to continue Defendant's sentencing date for various reasons. (See, e.g., ECF No. 375; ECF No. 384; ECF No. 400.)

In September 2024, Probation issued Defendant's PSR, which states that:

> The Government has determined that the loss cannot be accurately determined. This is because the company conducted legitimate business with some of the victims, in addition to the fraud, and it is not possible to parse out the legitimate transactions versus the fraudulent ones. As a result, the Government instead is basing the loss on the company's gain resulting from the instant conspiracy. The Government estimates that the profits gleaned by Aventura as a result of the instant conspiracy is between $9.5 million and $25 million.

(ECF No. 382 at 6.)

On October 29, 2024, the Court sentenced Frances Cabasso to time served. (ECF No. 394.) As noted above, the plea agreements of her, Defendant, and Aventura were pursuant to global plea agreement that entitled her to a Guidelines reduction that was conditioned on guilty pleas entered by Jack Cabasso and Aventura.

On January 22, 2025, an addendum to the PSR was issued, which cited, for the first time, four victims seeking restitution: (1) the United States Bureau of Engraving and Printing ("BEP") in the amount of $14,307,091; (2) the United States Naval Criminal Investigative Service ("NCIS") in the amount of $197,588[7]; (3) the United States Military Academy at West Point in the amount of $188,000; and (4) SecurityHunter, a private company, in the amount of $26,665. (ECF No. 401 at 5.)

On February 10, 2025, attorney James Miskiewicz filed a notice of appearance on behalf of Defendant. (ECF No. 406.) Defendant then requested two further adjournments of his sentencing date, which the Court granted, and sentencing was rescheduled for June 24, 2025. (See ECF No. 408; ECF No. 412.) However, on April 22, 2025—the day of Alan Schwartz's sentencing—the Government filed a letter with the Court requesting a status conference after learning of Defendant's "apparent intention to move for withdrawal of his guilty plea." (ECF No. 419.) The prospect that Defendant might seek to withdraw his plea was raised with the Court, for the first time, in this letter filed by the Government. The Court proceeded to sentence Alan Schwartz later that day to time served.

The Court then scheduled a status conference for April 29, 2025. On April 28, 2025, Defendant responded with a letter indicating that he had "now concluded that there are grounds to permit [him] to withdraw his guilty plea under Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure." (ECF No. 423.) Defendant also claimed that there was discovery missing from the Government and previewed a potential motion to compel these materials. (Id.)

[7] The Government subsequently informed the Court that NCIS is not the correctly identified victim and that it will correct this error with Probation.

At the April 29, 2025 status conference, the parties asked the Court to set a briefing schedule for the motion to compel discovery and the anticipated motion to withdraw Defendant's guilty plea. The Court first set briefing for the motion to compel discovery. (ECF No. 425.) After receiving briefing from the parties, the Court held oral argument on the motion to compel on July 1, 2025. (ECF No. 436.) The next day, the Court denied Defendant's motion to compel and directed Defendant to file his motion to withdraw his plea. (ECF No. 437.) The Court denied the motion to compel because: (1) Defendant had waived his right to additional discovery in his plea agreement; and (2) while Defendant asserted that he needed the requested discovery to show that Aventura's products had, in fact, been "substantially transformed," for purposes of the TAA, by Aventura in the United States, the Government did not allege that Defendant violated the TAA and the "TAA's provisions are at most ancillary to this fraud." (ECF No. 437.)

On July 22, 2025, over 19 months after Defendant pled guilty to Count One of the Indictment, he filed the instant motion to withdraw his plea. (ECF No. 445.[8]) On August 8, 2025, the Government filed its opposition. (ECF No. 446.) Defendant was set to file his reply brief on August 20, 2025. On August 19, however, one day before his deadline to reply and nearly 50 days after the July 2, 2025 Order denying the motion to compel, Defendant filed a motion for reconsideration of the July 2, 2025 Order. (ECF No. 447.) The Court ordered the Government to respond and held Defendant's deadline to reply to the motion to withdraw his plea in abeyance while it decided the motion for reconsideration. (Aug. 20, 2025 Order.) On September 6, 2025, the Government responded to this motion. (ECF No. 450.) On September 10, 2025, Defendant then submitted a reply brief for the motion for reconsideration. (ECF No. 453.) On October 7,

[8] Defendant has subsequently filed corrected versions of this and other filings, all of which the Court has considered.

2025, the Court summarily denied Defendant's motion for reconsideration,[9] and directed him to file his reply brief on the motion to withdraw his plea. On October 15, 2025, Defendant filed his reply brief to the motion to withdraw. (ECF No. 464.) Attached to this reply brief is an affidavit from William Brabson, a former "Procurement Analyst/Contract Specialist" at the BEP from 2000 until December 2020, who "was responsible for managing the BEP contract with Aventura from [his] initial introduction on or about 2010 . . . until [his] retirement in 2020."[10] (ECF No. 464-2.)

Ordinarily, the filing of Defendant's reply brief would end substantive briefing. On October 16, 2025, however, Defendant filed another letter notifying the Court of his "continuing objection" and request for materials already discussed at length in his prior motion to compel, his motion for reconsideration, and his Reply Brief. (ECF No. 465.) On October 17, 2025, Defendant then filed another letter, this time requesting an additional "evidentiary hearing on his motion to withdraw his guilty plea[.]" (ECF No. 466.) The Court directed the Government to respond to this request and further ordered that "Defendant shall refrain from filing any reply unless the Court so directs." (October 20, 2025 Order.) On October 23, 2025, the Government responded to Defendant's request. (ECF No. 467.)

Since that filing, Defendant has continued to file additional submissions requesting leave to raise further arguments and to submit additional evidence. The Court has considered all those submissions along with the Government's May 18, 2026 submission. (See ECF Nos. 468, 469, 470, 471, 474, 475, 477, 478, 484, 485, 486, 487, 488, 490, 491, 492, 493, 494, 495, 496.)

---

[9] The Court sets forth its reasoning for denying Defendant's motion for reconsideration herein.

[10] Neither Brabson's affidavit nor Defendant's reply explain how Defendant obtained the Brabson affidavit or why Defendant waited until the filing of the reply brief to submit this affidavit.

## II. DISCUSSION

### A. Standard for Motion to Withdraw a Guilty Plea

"A defendant may withdraw an accepted guilty plea before sentencing only after showing a 'fair and just reason' for doing so." United States v. Rampersant, 704 F. Supp. 3d 373, 376–77 (E.D.N.Y. 2023) (quoting FED. R. CRIM. P. 11(d)(2)(B)). However, the standard to withdraw a guilty plea is "stringent" due to society's "strong interest in the finality of guilty pleas" and the risk that withdrawal "undermines confidence in the integrity of our judicial procedures," "increases the volume of judicial work," and "delays and impairs the orderly administration of justice." Id. (citing United States v. Albarran, 943 F.3d 106, 118 (2d Cir. 2019) (then citing United States v. Rose, 891 F.3d 82, 85 (2d Cir. 2018)). Ultimately, "[i]n ruling on a plea withdrawal motion, courts consider whether the defendant '"has raised a significant question about the voluntariness of the original plea."' Albarran, 943 F.3d at 117 (quoting United States v. Schmidt, 373 F.3d 100, 103 (2d Cir. 2004)). In deciding this question, the Court may consider several factors, including: "(1) the amount of time between the guilty plea and motion to withdraw; (2) whether the defendant asserted legal innocence in the motion to withdraw; and (3) whether the withdrawal would prejudice the Government." United States v. Overton, 24 F.4th 870, 879 (2d Cir. 2022).

Additionally, the Court accords due weight to the Defendant's allocution during his guilty plea. The Second Circuit has repeatedly held that a "defendant's statements during the plea colloquy are not to be taken lightly because '[s]olemn declarations in open court carry a strong presumption of verity."' United States v. Cabrera, 563 F. App'x 861, 863 (2d Cir. 2014) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)). Essentially, "[a] criminal defendant's self-inculpatory statements made under oath at his plea allocution . . . are generally treated as conclusive in the face of the defendant's later attempt to contradict them." Adames v. United

States, 171 F.3d 728, 732 (2d Cir. 1999); accord United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").

Ultimately, "[t]he defendant 'bears the burden of showing . . . valid grounds for withdrawal [and] . . . a defendant's 'reevaluation of the government's case against him' does not justify withdrawal of a plea." Albarran, 943 F.3d at 118 (quoting Schmidt, 373 F.3d at 103).

**B. Overview of Defendant's Arguments**

Defendant contends that the three plea withdrawal factors weigh in his favor and contends that his plea was not knowing and voluntary. Defendant maintains: (1) he is actually innocent; (2) relatedly, his plea allocution was insufficient to establish his guilt; (3) the Government has allegedly suppressed exculpatory evidence that led him to plead guilty; (4) the Government, his attorney, and his wife's attorney coerced him into pleading guilty, rendering his plea involuntary; and (5) Defendant's second attorney, Zone, was ineffective in various ways, including for purportedly not sufficiently investigating the case. According to Defendant, when all these factors are considered cumulatively, he should be permitted to withdraw his plea. Defendant also seeks a hearing in connection with all these claims. For the following reasons, the Court rejects Defendant's arguments, denies his motion to withdraw his plea, and denies his request for a hearing on the motion to withdraw his plea.

The Court begins by assessing the three plea withdrawal factors described above and then addresses Defendant's other arguments in support of his motion.

### C. Plea Withdrawal Factors

#### 1. Time Elapsed

As a preliminary matter, the extraordinary length of time between Defendant's December 20, 2023 guilty plea and his July 25, 2025 motion to withdraw militates heavily against granting the instant motion.[11] Courts in the Second Circuit routinely find that "delays of several months between the entry of a guilty plea and a motion to withdraw that plea weigh against granting the motion." United States v. Kalichenko, No. 14-cr-95, 2019 WL 3287976, at *4 (E.D.N.Y. July 22, 2019) (collecting cases). Indeed, "letting [] months pass and then making such an application on the eve of sentencing, when the prospect of punishment becomes more real, undercuts the credibility of claims of pressure, coercion, or actual innocence." United States v. Eisenberg, No. 01-cr- 210, 2002 WL 483468, at *16 (S.D.N.Y. Mar. 8, 2002).

The excessive delay here, of at least sixteen months, is far beyond what other courts have found sufficient to weigh against granting a motion to withdraw. See, e.g., United States v. Gil-Guerrero, 759 F. App'x 12, 17 (2d Cir. 2018) (concluding that the district court did not abuse its discretion by denying a motion to withdraw a guilty plea because it was filed four months after the guilty plea); United States v. Obiorah, 536 F. App'x 53, 55 (2d Cir. 2013) (affirming the rejection of a motion to withdraw as untimely after it was submitted eight months after the defendant pled guilty); United States v. Deacon, 413 F. App'x 347, 350 (2d Cir. 2011) (affirming the rejection of a withdrawal motion submitted after a five-month delay).

Moreover, Defendant puts forth no persuasive argument to justify his delay in filing the instant motion. Defendant's motion contends that "he acted as soon as he realized that Mr. Zone's assurances about mitigation and avoidance of incarceration was illusory." (Def's Br. at 10.) That

[11] Even if the Court were to credit Defendant's April 28, 2025 letter as the first incarnation of his motion to withdraw his plea, (see ECF No. 423), it would still represent a 16-month delay from his plea to his request to withdraw.

claim, however, is not supported by the record.[12] While a viable ineffective assistance claim that a defendant only learns about after obtaining new counsel could excuse a delay, here, Defendant cannot establish ineffective assistance, as discussed infra. Relatedly, while a viable Brady claim could also excuse a delay in seeking withdrawal, Defendant also has no viable Brady claims.

Defendant's inordinate delay and decision to only pursue this motion to withdraw shortly before his long-delayed sentencing was scheduled to occur weighs against granting the motion. See United States v. Farooq, No. 19-cr -100, 2020 WL 1083624, at *2 (E.D.N.Y. Mar. 6, 2020), aff'd, 58 F.4th 687 (2d Cir. 2023) (observing, in the context of denying defendant's motion to withdraw after a five-month delay that, "[p]erhaps even more telling than the amount of time that passed is the timing of Defendant's efforts to withdraw his guilty plea"); see also Rampersant, 704 F. Supp. 3d at 378 (finding that the timing of defendant's motion to withdraw his plea weighed against granting where defendant "filed his motion roughly a week after missing his fourth deadline to file a sentencing submission").

Additionally, as discussed infra in the analysis of prejudice, Defendant's delay in seeking withdrawal suggests gamesmanship by him that has prejudiced the Government. Defendant waited until after his wife, Frances Cabasso—who was sentenced to time served pursuant to her global plea with Defendant and Aventura—to try to withdraw his guilty plea. Defendant also did not formally file a motion to withdraw his plea until after Schwartz—a co-defendant who cooperated with the Government—was sentenced.

Defendant's purported justifications for his delay between his guilty plea and his motion to withdraw are not credible, and this extraordinary delay weighs heavily against a finding that his plea was not entered voluntarily and should be withdrawn.

---

[12] As discussed infra, Defendant's argument that Zone made "assurances" about mitigation and "avoidance of incarceration" is not supported by the record.

Defendant's motion to withdraw is largely premised on evidence that Defendant was in possession of when he pled guilty. The crux of Defendant's motion to withdraw is Defendant's own affidavit asserting his alleged innocence along with documents that the defense already possessed prior to his guilty plea. Defendant could have asserted these purported claims of innocence in December 2023, when he decided to plead guilty rather than go to trial.

Finally, as explained infra, none of the newly discovered evidence Defendant cites is material under Brady or warrants granting his motion to withdraw.

**2. Prejudice to the Government**

Given the length of time between the Defendant's guilty plea and the instant motion to withdraw, as well as the fact that two co-defendants (one of whom cooperated) have already been sentenced, the Government would surely be prejudiced if the motion is granted. See United States v. Zheng, No. 21-cr-417-6, 2024 WL 4625295, at *6 (E.D.N.Y. Oct. 30, 2024) (explaining, in the context of six-month delay between guilty plea and motion to withdraw, that withdrawal of plea would "result in prejudice to the government" because "[i]n this time, the memories of potential witnesses have likely faded, and Zheng's co-defendants have been sentenced"); see also Rampersant, 704 F. Supp. 3d at 381 ("The Indictment to which Rampersant pleaded guilty was filed nearly three years ago. . . . Witnesses' memories may fade due to the passage of so long a period of time.") (quoting Vega, 2012 WL 1925876, at *11). The fact that Defendant waited until after Frances Cabasso, who was part of his global plea deal, was sentenced is particularly notable and is further evidence that the Government would be prejudiced if the Court were to grant Defendant's motion. As the Government points out, Frances Cabasso—who might have otherwise become a government witness—was instead been allowed to plead guilty on the strength of this global plea agreement involving Defendant.

**3. Defendant's Claim of Actual Innocence**

*i. Standard for Claims of Actual Innocence and the Elements of Wire Fraud*

A "defendant who has been convicted after pleading guilty, and who contends thereafter that he should be allowed to withdraw his plea because he is innocent" bears a "heavy" "burden." United States v. Maher, 108 F.3d 1513, 1530 (2d Cir. 1997). In deciding a motion to withdraw, a court may consider the defendant's admissions at his allocutions as well as other inculpatory evidence proffered by the Government. Id.; see also United States v. Velissaris, No. 23-cr-6379 , 2024 WL 4502001, at *1 (2d Cir. Oct. 16, 2024) ("We have long recognized a district court's ability to consider evidence in the record beyond a defendant's plea allocution in ruling on a motion to withdraw."). In considering the record before it, the court can "draw permissible inferences in favor of the government and against the defendant." Maher, 108 F.3d at 1530.

"To be guilty of wire fraud, a defendant must (1) "devis[e]" or "inten[d] to devise" a scheme (2) to "obtai[n] money or property" (3) "by means of false or fraudulent pretenses, representations, or promises." Kousisis v. United States, 605 U.S. 114, 123 (2025) (quoting 18 U.S.C. § 1343). To establish a scheme to defraud, the Government must prove both "that 'the defendant[s] acted with fraudulent intent' and that any 'misrepresentations were material.'" United States v. Denkberg, 139 F.4th 147, 155 (2d Cir. 2025) (quoting United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017)).

*ii. The Buy American Act, the TAA, and Related Provisions in the FAR*

Certain statutory provisions in the Buy American Act ("BAA"), 41 U.S.C. §§ 8301–8305, prohibit U.S. government agencies from purchasing end products for public use that were manufactured outside of the United States, subject to certain exceptions. The BAA generally requires that the product at issue be "manufactured" in the United States. 41 U.S.C. § 8301.

Federal Acquisition Regulation ("FAR") 25.101 addresses and implements the BAA.[13] FAR 25.001 explains that the BAA "restricts the purchase of supplies that are not domestic end products" and defines what constitutes "a domestic end product." FAR 25.001. Under FAR 25.001, for an article to qualify as a "domestic end product," it must be "manufactured in the United States." Id. (emphasis added); see also FAR 25.003.

Several exceptions to the BAA are set out in in the Trade Agreements Act of 1979 ("TAA"), 19 U.S.C. §§ 2501–2581, which authorizes the President to waive the BAA's requirements and permits federal agencies to purchase products originating from specifically designated countries that entered into trade agreements with the United States. See 19 U.S.C. § 2511. The PRC was not a TAA-designated country during the time period covered by the Indictment and has never been so designated. (Indictment ¶¶ 11– 14.)

The TAA defines "a product of a country" as follows:

> An article is a product of a country . . . only if (i) it is wholly the growth, product, or manufacture of that country . . ., or (ii) in the case of an article which consists in whole or in part of materials from another country . . . , it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed.

19 U.S.C. § 2518(4)(B) (emphasis added).

FAR § 52.225-5 "harmonizes and implements the BAA and TAA in [covered contracts]." Acetris Health, LLC v. United States, 949 F.3d 719, 724 (Fed. Cir. 2020). FAR § 52.225 states, in relevant part, that contractors "shall deliver under this contract only U.S.-made or designated country end products." FAR § 52.225-5. FAR § 250.003—which is similar to the TAA country-of-origin standard—defines a "U.S.-made end product" as a:

> an article that is mined, produced, or manufactured in the United States or that is substantially transformed in the United States into a new and different article of

[13] The FARs are codified in Title 48 of the Code of Federal Regulations. For ease of reference, the Court cites only to the relevant "FAR" provision.

> commerce with a name, character, or use distinct from that of the article or articles from which it.

FAR § 25.003 (emphasis added).

*iii. Overview of Defendant's Claim of Actual Innocence*

Defendant maintains, in his motion and affidavit, that, despite his guilty plea and the copious inculpatory evidence cited by the Government and set out below, he is actually "innocent" of Count One and that he "did not intend to defraud any buyer . . . [and] did not believe at the time of my plea, nor do[es] [he] believe now, that anyone was defrauded into buying Chinese products, specifically security cameras from Aventura through the misrepresentation of where it was made." (Cabasso Aff. ¶ 4, ECF No. 444-1.)

Defendant's recent motions and letters focus on the "substantial transformation" standard set out in the TAA and FAR § 25.003. Defendant contends that Aventura's products were all substantially transformed in the United States (or, at the very least, that he believed, in good faith, that was the case). Accordingly, Defendant contends that any representations to the federal government concerning TAA-compliance or a product's country of origin that are governed by the TAA's substantial transformation standard were not false or made with fraudulent intent.[14] Defendant attests that:

> [I]t was my belief and intent that Aventura complied with the [TAA] and the Federal Acquisition Regulations (FAR). Large security systems were assembled and manufactured at Aventura's Commack facility using numerous individual components sourced primarily from China and other foreign countries. These components were "substantially transformed" into final products within the United States, thereby rendering the country of origin to be the United States under applicable law.

(Cabasso Aff. ¶ 15.) In support of this argument, Defendant cites to an opinion that he obtained from U.S. Customs and Border Protection ("CBP") in April 2023 which indicates, based on a

[14] Defendant concedes that "[t]he TAA does not govern private commercial transactions." (ECF No. 427 at 9.)

hypothetical set of facts, that multi-component video management systems that include Chinese-made cameras and other parts from various countries (including China) qualify as having been "substantially transformed" in the United States when, inter alia, certain relatively minimal assembly is performed in the United States along with the installation of "U.S.-origin firmware and software"—actions that link all the various parts of the system and allow them to function together. (ECF No. 428-5.)

Defendant also asserts various other arguments in support of his claim of actual innocence, including that:

- Aventura obtained much of its revenue from services contracts.
- Selling individual cameras that were imported from China was only a small part of Aventura's business and, in any event, those individual cameras were also substantially transformed by Aventura at its Long Island facility based on the addition of Aventura's software to the cameras.
- None of Aventura's "domestic private customers" required the use of components that were only manufactured in the United States and they were primarily concerned with reliable products and advanced technologies.

(Cabasso Aff. ¶¶ 12, 14, 16.)

Defendant also contends that the fact that only four victims have sought restitution for their losses (along with the Government's purported inability to prove that they suffered any losses or the existence of any other victims) is compelling evidence of innocence.

Defendant's arguments erroneously assume that the only potentially relevant representations made by Aventura concerned compliance with the TAA and country of origin determinations governed by the TAA's substantial transformation standard. The Government, however, points to evidence of Defendant (and subordinates at his direction) making specific fraudulent misrepresentations that go well beyond claims of purported compliance with the TAA. Defendant essentially has no answer for any of these specific and concrete instances of fraud,

which often involve customers outside of the federal government. At bottom, Defendant contends that he is innocent because certain other transactions involving Aventura were allegedly not fraudulent. That, however, is not a viable defense to the conspiracy charged in Count One.

*iv. Defendant Is Not Innocent of the Scheme to Defraud Charged in Count One*

At his allocution, Defendant admitted that:

(1) he and Aventura employees acting at his direction "represented to some of Aventura's clients that some of the products we were selling were American made but we were all aware that they were imported from China";

(2) he and his employees made these representations "[i]n furtherance of the fraud";

(3) he told "customers that Aventura made the product that [he was] selling" when that was not true; and

(4) "[t]he victims of the fraud included buyers of the private sector, agency of the U.S. and foreign governments."[15]

(Plea Tr. 19–20.) That allocution and the Government's additional offer of proof at the plea hearing both established Defendant's guilt and are supported by the evidence set out below.[16] Defendant's allocution was supported by overwhelming evidence, including Defendants' own

[15] Defendant claims that Zone drafted this allocution and Defendant only saw it on Zone's phone shortly before entering court on the day of the plea. (Cabasso Aff. ¶ 52.) Defendant then transcribed the allocution into his notebook and inserted, on his own, the word "some" at two points so that the allocution now indicated that he had "represented to <u>some</u> of Aventura's clients that <u>some</u> of the products we were selling were American made but we were all aware that they were imported from China." (<u>Id.</u> ¶¶ 54–55 (emphasis added).) While Defendant claims that this allocution was actually not the truth, Defendant's hand-editing of the allocution is, in fact, compelling evidence that this allocution was voluntary, considered, and accurate.

[16] In filings submitted after his reply brief, Defendant contends that, in addition to his plea being neither knowing nor voluntary, Defendant's plea allocution was also factually insufficient. According to Defendant, the Government's failure to "identify any actual victim of the charged fraud, coupled with material deficiencies in the defendant's allocution, demonstrates that the record at the time the plea was accepted did not establish a sufficient factual basis for the offense "legally cognizable fraud scheme" and, as such, does not support his conviction. (ECF No. 474; <u>see also</u> <u>e.g.</u>, ECF No. 70-4 at 3–4.) This argument is meritless.

emails and incriminating statements Defendant made at proffer sessions with the Government.[17]

Before addressing some of the particular misrepresentations made by Defendant and by his subordinates to specific customers, the Court first notes the evidence showing that Aventura marketed itself as an American manufacturer, labeled cameras with American flags and/or as "Made in the USA," and attempted to hide or scrub all evidence of Chinese manufacture.

*v. Aventura Markets Itself as an American Manufacturer, Labels Its Products as "Made in the USA," and Goes to Great Length to Hide Evidence of Chinese Manufacture*

Aventura marketed itself as manufacturing products in the United States. In 2019, Aventura's catalog stated that Aventura is a "true 'single-source' manufacturer" and "we proudly manufacture[] in the U.S.A." (Compl., Ex. C, ECF No. 1.)

The packaging for Aventura's products often included "Made in the USA" labels and/or American flag logos.

According to the Government, Aventura's graphic designer created "Made in the USA" labels for PRC manufacturers to print onto products and Aventura's suppliers in the PRC were coached to put "Made in the USA" labels on Aventura-branded cameras, but not on shipping boxes to avoid alerting customs officials. (ECF No. 462 at 3.)

In August 2018, government agents inspected a shipment from a PRC manufacturer that included 336 cartons that were described as "IP Camera." (ECF No. 462 at 9.) Inside the shipment were thousands of cameras, networked video recorders, and digital video recorders in individually

[17] The evidence set out at length below is relevant, in various ways, to Defendants' motion to withdraw, as this evidence: (1) supports Defendant's allocution and the Government's offer of proof at that allocution; (2) contradicts Defendant's contrary claims of innocence in his affidavit; (3) as discussed infra, contradicts Defendant's ineffective assistance claim that Zone, his attorney, should have, after investigating the case further, counseled him that he had viable defense at trial; and (4) relatedly, also shows that the purported Brady evidence Defendant cites is not material and would not have led Defendant to go to trial if it had been disclosed earlier.

wrapped Aventura boxes that were already sealed and ready for sale. (Id.; Gov. Ex. K, ECF No. 461-11.) Many of these boxes were marked with an American flag. (Id.)

In May 2017, government agents had similarly inspected a shipment from a PRC manufacturer that contained 98 cameras in sealed individual Aventura boxes that bore an American flag and Aventura's corporate address. (Gov. Ex. M, ECF No. 462-2; ECF No. 462 at 5.) Many of these cameras already had hologram stickers on them stating "Made in USA." (Id.) There is evidence that Aventura employees subsequently lied about where these cameras were manufactured. (Gov. Ex. N, ECF No. 462-3.)

As discussed further infra, the Government asserts that, in conjunction with these and other representations described infra, Defendant and Aventura employees worked extensively behind the scenes to disguise the Chinese origin of its products, by, inter alia, working to ensure that the initials of Chinese manufacturers were scrubbed from Chinese-made circuit boards. (Gov. Ex. B, ECF No. 461-2.) Emails between Aventura and Chinese manufacturers document Aventura's efforts to ensure that Aventura's customers could not trace Aventura's products back to these Chinese manufacturers.[18] (ECF No. 462 at 2–3.)

In addition to Aventura's efforts to hide any physical and visual indications of Chinese manufacture, the Government has also represented that: (1) Aventura paid China-based programmers to write its computer code; and (2) Aventura programmers and I.T. specialists reviewed firmware code for clues that might reveal Chinese manufacture, such as Chinese characters. (Plea Tr. 22.; ECF No. 462 at 3.)

[18] Defendant does not dispute Aventura's extensive efforts to hide or scrub any physical identifiers that would indicate that the Chinese manufacturers, and not Aventura, had actually manufactured these products. Given the entire record here, these efforts are part of a broader scheme to defraud and are also compelling evidence of fraudulent intent.

*vi. Defendant Conspired to Defraud Customers Outside the Federal Government*

As discussed infra, Defendant's actual innocence argument focuses on Aventura's sales to the federal government and his purported compliance with the TAA. Defendant, however, largely ignores the blatant misrepresentations Aventura made to its other customers outside of the federal government. Of course, at his plea, Defendant explicitly admitted that victims of the fraud "included buyers of the private sector" and "foreign governments." (Plea Tr. 20.)

In conjunction with Aventura's fraudulent marketing and labelling, and efforts to scrub all evidence of Chinese manufacture from its products, Defendant (and other Aventura employees acting at his direction) also made numerous specific misrepresentations to customers outside the federal government about the origins of Aventura's products.

Defendant never even attempts to explain many of these damning incidents.

In a November 2018 email thread of Defendant's communications with a Kuwaiti government contractor, the contractor was asked whether "the cameras are made in Aventura's own factory." (Gov Ex. A, ECF No. 461-1.) Defendant responds that "they are made in the Aventura factory here in New York and MOI or any representative may visit at any time." (Id.) Along with that statement, Defendant attached the below picture of Aventura's purported factory:



(Id.) That picture, however, is not of Aventura, but "of a facility in the PRC belonging to Aventura's largest source of PRC-manufactured goods." (ECF No. 462 at 6; Compl., Ex. B.)

This is clear and blatant fraud. Defendant tried to deceive this customer—using the fraudulent photographs above—into believing that Aventura was manufacturing the products at issue at "the Aventura factory" in the United States in an effort to convince the customer, who was obviously concerned about this issue, to purchase Aventura's products. Defendant sought to obscure the truth about the origin of Aventura's products and to falsely hold out the company as a U.S.-based manufacturer.

In January 2018, a foreign customer requested a certificate of origin attested to by a local chamber of commerce for certain cameras and other products. (Gov. Ex. N, ECF No. 462-3.) In response, an Aventura employee provided a "certificate of origin" attesting that these cameras and other products were all "manufactured by Aventura" and are "products of the United States of America." (Id. (emphasis added).) Defendant is copied on this email exchange and the employee notes that she "spoke with Mr. Cabasso" before preparing the certificate. (Id.) Two of the camera models identified in the certificate were the same models found in the shipment that, as discussed

earlier, government agents had intercepted and inspected at JFK in May 2017. (See Gov. Ex. M, ECF No. 462-2 at 5–6.)

In another damning email thread from January 2019, a Swedish reseller of Aventura goods complained to Aventura about the purchase of a specific camera, which "according to the certificate of origin was manufactured by Aventura Technologies." (Gov. Ex. C (emphasis added), ECF No. 461-3.) However, the reseller reported that the package that was shipped to their customer "had no trace of Aventura whatsoever." (Id.) The reseller relayed that its customer proceeded to search the internet and found "a Chinese identical camera with that part number." (Id.) The reseller then asked if Aventura had any explanation as to why "the cameras are provided in this way with no trace that they are manufactured in US by Aventura." (Id. (emphasis added).) When this complaint was brought to Defendant's attention, he responded that "[n]obody looked and they left the [PRC Manufacturer's] label and part number on there." (Id.) Defendant then directed Matulik, Aventura's Director of International Sales, to lie to the reseller. Matulik falsely reported that these were "R&D units" and Defendant instructed Matulik to further embellish the lie by stating that Aventura's research and development area was "located right next to the production lines" and "[o]ne of the line workers mixed up the products." (Gov. Ex. D, ECF No. 461-4.) Again, this is blatant fraud orchestrated by Defendant to lie about, and hide, the truth concerning Aventura's purported domestic manufacture of the cameras it sold.

After users on a security industry messaging board and news site complained that Aventura's cameras were made in the PRC, Cabasso directed Lazarus, in a March 2017 email, to respond to the message board posts by stressing her title—namely, Aventura's Director of Business Development—and stating that the poster and anyone else is "welcome to visit our manufacturing facility any time in New York where our cameras are produced." (Gov Ex. E, ECF

No. 461-5; ECF No. 462 at 4.) This was, again, another blatant lie. Aventura's cameras were not manufactured or "produced" at Aventura's facility. The same news site posted a related article about Aventura's reselling of Chinese-made products, which sparked Cabasso to tell the PRC Manufacturer that "WE CANNOT HAVE THIS HAPPEN." (Gov. Ex. F, ECF No. 461-6; see also ECF No. 463 at 4.) In this email exchange, Cabasso explains that Aventura needs a "true OEM"[19] that will "hide the identity" of the manufacturer and proceeds to request that the PRC manufacturer make numerous changes so that customers could not detect the PRC manufacturer's involvement. (Gov. Ex. F, ECF No. 461-6.)

In a May 2017 email exchange with a private customer, the customer tells Lazarus that she liked Aventura's camera offerings, but that "it appears you may be getting them from Hikvision"—a PRC manufacturer—"and just private labeling Aventura" and she wanted Lazarus to "verify" this because she did not "want Hik cameras." (Gov. Ex. I, ECF No. 461-9.) Lazarus lies to the customer, stating that Aventura is "not a Hikvision OEM." (Id.) In response, the customer reiterates that the project she is working on will not allow Hikvision to be used and mentions that she had asked about others' experiences with Aventura on the web forum where Lazarus had herself responded. (Id.) The customer also presses Lazarus further on the fact that Aventura and Hikvision manuals were very similar and one picture in the manuals was "identical." (Id.) At this point, Defendant joins the email thread and responds to the customer stating that this is an "old manual." (Id.) Defendant then lies to the customer, stating that Aventura cameras are "not Hikvision OEM," and claiming that the absence of a Hikvision part number on the "board" is proof that it is not a Hikvision product. (Id.)

[19] As used within the security equipment industry, the term "OEM," which was originally short for "original equipment manufacturer," typically refers to the practice of reselling items as one's own products that were in fact manufactured by another company. (ECF No. 462 at 2 n.2)

The Government's papers also detail additional fraudulent representations made to specific customers outside the federal government. (ECF No. 462 at 2 (Defendant's statements in September 2018 to Saudi customer that "Aventura is not an OEM company," invitation to customer to visit Aventura's purported "factory," and fraudulent claim that if other companies' products resembled Aventura it was because "virtually every time we come up with new product it is copied by China, Korea, and Taiwan").)

In addition to the misrepresentations set out in the emails above, there is also evidence that, when customers visited Aventura's facility on Long Island, Aventura employees engaged in additional deception to further the fraudulent scheme. Alan Schwartz, who was Aventura's Systems Engineering Manager, admitted, during plea allocution, that:

> In May 2019, I participated in a demonstration for a potential client of a foreign-made radar system that Aventura was falsely representing as manufactured by Aventura in the United States. I participated in an effort to disguise the true affiliation of a manufactur[er's] representative who was on hand for the demonstration by acting as if this person from the foreign manufacture was a company employee. Aventura's staff disguised a foreign manufacture[r]'s employee as Aventura personnel during a customer visit to Aventura's headquarters. I saw he was wearing an Aventura shirt that was meant to mislead the customer, and I acted as though he was an Aventura employee at the meeting.

(Schwartz Plea Tr. at 17–18, ECF No. 272.)[20] If he had proceeded to trial, Defendant faced the prospect that multiple co-defendants, including Schwartz, had likely agreed to cooperate with the Government.

Defendant is not innocent of the scheme to defraud set out above. His affidavit and the other evidence he cites never address these specific incidents of blatant fraud. Cf. United States v. Blackledge, 721 F. App'x 41, 44 (2d Cir. 2018) (affirming district court's rejection of defendant's claim of innocence in connection with motion to withdraw and explaining that

[20] Similarly, the Government has also represented that Defendant "built a fake clean room to show his visitors, complete with 'lab coats' on chairs." (ECF No. 429 at 12.)

although the defendant contended "that he could not have brandished a gun or participated in criminal activity on the day specified in his plea allocution, because he was still incarcerated," the defendant was released in the early afternoon on the day in question and he "offers no concrete accounting for the time of the events in question"); United States v. Rodriguez, No. 12-cr-844, 2017 WL 1498049, at *3 (S.D.N.Y. Apr. 26, 2017) (denying motion to withdraw filed by defendant who pled guilty to conspiracy to distribute cocaine in connection with scheme to import and distribute cocaine, because although her newly proffered affidavit claimed that she did not know about the contents of the containers at issue, the affidavit did not "substantively undermine[] her previous statements" and "fail[ed] to explain the more than one hundred and twenty thousand dollars [she] received for preparing documents"); United States v. Livingston, No. 21-cr-558 2023 WL 3374503, at *9 (S.D.N.Y. May 11, 2023) (finding that defendant's "belated assertion of innocence" did not overcome his earlier sworn admission of guilt or "cast doubt on the evidence the Government has presented").

Instead, Defendant's affidavit claims that "[a]t no time between 2000 and 2019 did any domestic private customer of Aventura, including Trimble, require the use of electronic or other components only manufactured in the United States." (Cabasso Aff. ¶ 12 (emphasis added).) According to Defendant, "the primary concern of the customers was the development of reliable products and advanced technologies." (Id.)

Based on this statement, Defendant appears to be arguing that all the lies set above were, somehow, not material and, relatedly, that he did not harbor an intent to defraud any of these customers. This argument, which is based on Cabasso's conclusory affidavit, is meritless.

First, on its face, Defendant's statement above only refers to "domestic private customer[s]" and thus, by its own terms, does not even address the foreign private customers and

foreign governments that the evidence above shows Defendant schemed to defraud. Of course, Defendant also explicitly admitted in his plea allocution that both foreign government and private customers were victims of his fraud.

Second, there is overwhelming evidence that the products discussed in these communications, including cameras, were not, as Aventura claimed, "manufactured" in the United States, "made" in the United States, or made at Aventura's purported "factory" that was falsely depicted in the email exchange with the Kuwaiti government contractor. Notably, in his motion to withdraw, Defendant concedes that even when a camera is "substantially modified," Aventura could not claim that "it was ever manufactured in the United States." (ECF No. 470-3 at 5.)

Third, contrary to Defendant's claims, there is overwhelming evidence that Aventura's representations about the manufacture and origin of their products were material to its private and foreign government customers and that Defendant also knew this to be the case.

> A statement is material if the "misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." In other words, a "lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal." A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed." Recently, the Supreme Court explained that, "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."

United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017) (cleaned up).

Defendant's suggestion that these blatant misrepresentations to customers were not material—because, allegedly, Aventura's customers did not explicitly require (presumably in their contracts or purchase orders) that Aventura's products be manufactured by Aventura in the United States—is meritless.

One, customers explicitly inquired about this information or raised questions about the origin and manufacture of Aventura's products, which is powerful evidence that this information was material to their purchasing decisions.

Two, Defendant admitted in multiple emails that this information was material to Aventura's customers. In one email exchange from 2018 between Defendant and a representative from RaySharp (a PRC-based manufacturer), Defendant admitted that Aventura had lost several potential customers because they observed markings inside the cameras that indicated the cameras were made by RaySharp. (See Gov. Ex. B, ECF No. 461-2.) In a damning email exchange from November 2014, Defendant also complained that Aventura was "constantly facing losing orders for 10,000s of cameras because of the connection" between Aventura and Hikvision and thus sought to obscure the product's PRC origins by using different camera housings. (Gov. Ex. C, ECF No. 429-3; ECF No. 462 at 3.) These are devastating admissions by Defendant. (See also Gov. Ex. G, ECF No. 463-7 (November 2012 email from Defendant to Hikvision representative stating that when customers find "out our supply" they drop the product line and suggesting that Hikvision markers and indicators on products are costing Aventura $750,000 in sales per quarter).)

The materiality of Aventura's lies—including the lies that Aventura made its own cameras and were not "Hikvision OEM"—is further evidenced by a November 2016 email in which Defendant himself states that Hikvision is "actually the Communist Chinese Government and has 'significant' cybersecurity issues aside from TAA compliance." (Compl., Ex. A, ECF No. 1.)

Furthermore, "the very fact" that Defendant "made the misrepresentations" at issue "suggests that the defendant[] expected the statements to have a tendency to influence" customers. United States v. Ghilarducci, 480 F.3d 542, 547 (7th Cir. 2007).

As set out above, Defendant's claim that he is innocent of conspiring to defraud these private customers and foreign governments is meritless. Cf. Velissaris, 2024 WL 4502001, at *1 (affirming denial of motion to withdraw in which defendant subsequently claimed that his misrepresentations were not material and concluding, based on "evidence in the record beyond [the] defendant's plea allocution," that there was "no merit" to defendant's claim of innocence).

Defendant also insists that "[c]ameras were not profit centers for the company." (Cabasso Aff. ¶ 29.) That, however, is not a viable defense to the fraud charges here. Aventura sold individual cameras, not just VMS products, and emails show that Defendant was intimately involved in crafting lies about cameras. Defendant was also personally involved in efforts to procure cameras and emails show that he was keenly interested in marketing individual cameras as being American-made. For example, in an email exchange from 2014, Cabasso asked a PRC manufacturer if Aventura could buy assembled internal camera components from the Chinese manufacturer and then have Aventura employees perform only simple assembly of two or three parts in New York. (Gov. Ex. C, ECF No. 429-3.) Defendant explained that Aventura also had an opportunity to "supply OEM for Honeywell and IBM," which did not want "Made in China." (Id.) Cabasso even noted that Honeywell cannot sell in the Middle East "because of this." (Id.)

Defendant is not actually innocent of conspiring to defraud these customers.

*vii. Defendant Conspired to Defraud the Federal Government Through Misrepresentations that Went Beyond TAA Compliance*

Defendant's claim of actual innocence is also premised on a mistaken assumption that the only relevant representations that Aventura made to the federal government about Aventura products concerned: (1) TAA compliance and; (2) representations that the United States was, for purposes of the TAA and FAR § 52.225-5, the county of origin for products sold by Aventura. Not only does Defendant's motion largely ignore the overwhelming evidence that he schemed to

defraud purchasers outside of the federal government, but the evidence in the record also shows that Defendant conspired to defraud the federal government through representations that went beyond TAA compliance or "country of origin" representations governed by the TAA. This conspiracy included sales of body cameras to the United States Air Force and turnstiles to the Department of Energy ("DOE").

Aventura's marketing materials falsely represented that its "Guardian" body cameras were "Made in USA," when those body cameras were, in fact, made in China. (Gov. Ex. P, ECF No. 462-5; ECF No. 462 at 6.)

In May 2018, Aventura supplied the Air Force with 25 body cameras for $11,829.50 pursuant to a contract containing "Buy American" provisions. (ECF No. 462 at 6.) Emails show that Defendant was aware that these body cameras were made in the PRC as he had worked with PRC-based staff to source the cameras and route payments to the PRC-based manufacturer of these items. (Gov. Ex. Q, ECF No. 463-1.)

In other emails, Defendant directed his PRC-based staff to google the United States Air Force logo and to provide it to the PRC manufacturer so that it could be uploaded to the body cameras and would display when the cameras were "boot[ed] up." (Gov. Ex. S, ECF No. 463-3.)

During his proffer sessions, Defendant admitted that these body cameras were wholly made in the PRC and that it was wrong to sell them as American-made. (ECF No. 462 at 7.)

Air Force military police eventually discovered the fraud after the cameras began displaying Chinese characters on their displays. (ECF No. 462 at 7.) Air Force investigators later determined that the cameras' firmware contained not only the Air Force logo, but also logos of the PRC's civilian police force and other PRC entities. (Id.; Compl., Ex. E, ECF No. 1).

The evidence outlined above concerning these Air Force body cameras is devastating and none of Defendant's arguments concerning this transaction suggest he has a viable defense to this fraud.

One of Defendant's filings contends that Federal Procurement Data System ("FPDS") records show that the relevant contract at issue was, in fact, not subject to BAA requirements and was, instead, only subject to TAA requirements, which permit purchase of products "substantially transformed" in the United States even if the products are not manufactured domestically. (ECF No. 453 at 6–7.) In support, Defendant cites "Exhibit J" to that filing. (Id.) That exhibit, however, is not even an FPDS record.[21]

Defendant also feebly argues that even if the BAA did apply to this Air Force contract, the "cameras were waiver-eligible, and PRC-origin cameras had previously been deemed BAA-compliant." (ECF No. 453 at 6–7.) In support, Defendant cites to a letter from the Federal Transit Administration ("FTA") indicating internet protocol security cameras were covered by a "microprocess waiver" issued by the FTA and thus may be "considered as a Buy America-compliant component of security and surveillance systems procured with FTA financial assistance." (Def. Ex. J, ECF No. 453-10.) Nothing in this letter, however, indicates that this waiver applies to procurement by the Air Force or any other federal agencies. Moreover, any waiver would still not permit Defendant to falsely claim that these cameras were "Made in the

[21] The Court notes that although Exhibit I to this filing is an FPDS record, it is not an FPDS record concerning the $11,829.50 purchase of body cameras at issue here. Moreover, Defendant does not explain how such FPDS records would indicate whether or not a contract contained BAA provisions.

The record does not support Defendant's claim that only the TAA applied to this contract. Moreover, to the extent that Defendant contends that only the TAA applies to this Air Force contract (or that he somehow believed that only the TAA applied), Defendant cannot possibly claim that these body cameras complied with the TAA through "substantial transformation" or that he believed that to be the case. Defendant admitted that these cameras were wholly made in China and there are emails showing that Aventura had the PRC-based manufacturer upload the Air Force logo to the cameras' firmware. This belies any claim Defendant might make that Aventura substantially transformed these body cameras by developing the firmware for these body cameras at its facility on Long Island.

USA." Defendant's argument concerning this waiver would not provide Defendant with a viable defense concerning either materiality or his purported good faith/lack of fraudulent intent.

Defendant also schemed to defraud the DOE. According to the Government, the DOE conducted a controlled purchase of Aventura turnstiles that were destined for the Oak Ridge National Laboratory. (ECF No. 462 at 6.) In January 2019, Government agents at JFK Airport intercepted the shipment of the turnstiles from the PRC to Aventura and covertly marked them. (Id.) In February 2019, the turnstiles arrived at the Oak Ridge lab. (Id.) The turnstiles were undisturbed in their crates and bore the covert markings that had been applied at JFK Airport. (Id.; see also ECF No. 447-1 at 28.) A DOE official then complained, in an email, to Aventura that on the turnstiles "[t]here were a couple of stickers that were on the glass [that] had what looked like Chinese writing." (Gov. Ex. O, ECF No. 462-4.) After the complaint was forwarded to Defendant, he emailed Lazarus and directed her to lie and tell the DOE official that "[t]he marking is 'specific' to the acrylic not the turnstile which is US manufacture/assemble. Aventura buys the acrylic in sheets and then cuts, mounts and polishes flaps in New York." (Id.) At his proffer, Defendant admitted that he had directed Lazarus to say this, he knew it was false, and the entire item had been made in the PRC. (ECF No. 462 at 6.) This incident is, again, a blatant lie—Aventura did not "manufacture/assemble" the turnstile in the United States and did not cut and mount the acrylic in New York.

Defendant makes no effort to defend his actions in connection with this incident, which he admitted at his proffer were wrong. This evidence is, again, devastating proof that Defendant not only conspired to defraud the federal government in connection with this specific transaction, but also that, more broadly, he acted with fraudulent intent.

*viii. Defendant's Arguments that Other Transactions with the Federal Government Were Not Fraudulent and Caused No Losses Do Not Establish that He is Innocent*

Defendant contends that he would have a viable defense at trial (and is actually innocent of Count One) based on:

(1) the purported absence of evidence in the current record showing that the alleged victims—particularly, the four victims who are seeking restitution—suffered actual losses as a result of the alleged fraud; and

(2) other sales by Aventura to the federal government that were allegedly not tainted by fraud because, according to Defendant, those transactions involved no representations about the origins of Aventura's products or only involved representations concerning TAA compliance and country-of-origin determinations governed by the TAA—representations that Defendant insists were accurate.

As explained below, none of these arguments establish that Defendant is innocent, given all his other fraudulent conduct outlined above.[22]

Defendant maintains that the existence of only four potential victims who have sought restitution undercuts the Government's theory of a broad conspiracy to defraud. Relatedly, Defendant contends that the record does not show that these four victims (or other putative victims) were defrauded or suffered actual losses, as they claim, from the alleged fraud. Defendant focuses on Aventura's dealings with the Bureau of Engraving and Printing ("BEP"), which seeks $14,307,091.51 in restitution. Defendant contends that Aventura did not defraud the BEP, relying on: (1) an affidavit from William Brabson, the BEP procurement official who oversaw Aventura's contract with BEP from 2010 until 2020; (2) certain procurement documents concerning the BEP that Defendant characterizes as newly discovered evidence that he was only able to obtain through FOIA requests or other means; and (3) evidence, including those newly discovered documents,

[22] These arguments would, at best, be relevant to determining the loss amount under the Guidelines for sentencing purposes. While Defendant stipulated to a loss amount in his plea agreement, he also raises various challenges concerning that sentencing stipulation. As explained infra, the Court declines to address those points here because the Court's resolution of the pending restitution claims may ultimately moot those challenges.

indicating that Aventura merely certified TAA compliance concerning its work at BEP and that the only cameras it installed at BEP were from South Korea, not China.[23]

While this evidence is relevant to BEP and another restitution claimant, this evidence certainly does not establish that Defendant is, as he claims, actually innocent of Count One, given the other overwhelming evidence of Defendant's guilt outlined earlier that is unrelated to BEP or the other restitution claimants.[24]

Defendant maintains that the Government's failure to identify additional victims or to provide (in response to the motion to withdraw his plea) sufficient evidence supporting the claims that the four victims who seek restitution were actually defrauded and suffered losses is powerful proof that Defendant is completely innocent of Count One. The Court disagrees. There is overwhelming evidence that Defendant conspired to defraud customers of Aventura. Even if Defendant were to ultimately prevail in contesting the restitution sought by these four victims (and the Government is ultimately unable to establish that the transactions involving these four victims were part of the alleged scheme to defraud), Defendant would still be guilty of Count One. There is overwhelming evidence in the record that Defendant conspired to defraud other customers in addition to the four customers who have sought restitution. Moreover, the Government did not have to prove that any targets of the scheme to defraud suffered actual losses in order to prove the conspiracy charged in Count One.

---

[23] These documents are also addressed infra in the context of Defendant's Brady claim.

[24] In response to Defendant's arguments concerning the BEP, the Government asserts that it has proof that Aventura installed Chinese-made equipment at BEP, with software written by that Chinese company, and that, when Aventura was unable to get the equipment to work, Aventura brought employees of the Chinese company to the BEP and misrepresented them as Aventura employees. (ECF No. 486 at 5.) As discussed infra, the parties will have an opportunity, as part of restitution proceedings, to present evidence to the Court concerning their divergent narratives and theories concerning Aventura's alleged scheme to defraud the BEP as well as the other three victims seeking restitution.

Defendant also argues that, for Aventura's other transactions with the federal government (outside of the body cameras and turnstiles): (1) the contracts at issue involved services/contained no representation about the origin of Aventura's products; or (2) the only relevant representations that Aventura made about the origin of its products concerned TAA compliance or were representations that the United States was the products' country of origin for purposes of the TAA and FAR § 52.225.[25] Defendant, thus, maintains that these sales were not tainted by any fraud.

According to Defendant, the United States could be considered, for TAA purposes, to be the country-of-origin for the multi-component video management systems it sold as well as Aventura's individual products, such as cameras, that were also listed and sold as standalone items. Defendant also maintains that he believed in good faith that Aventura's representations concerning TAA compliance and "country of origin" determinations under the TAA were accurate.

Defendant takes this argument a step further and suggests that purported compliance with the TAA (and his purported belief in that compliance) for such contracts would provide him with a viable defense to all the other affirmative misrepresentations catalogued above that were not limited to TAA compliance and included blatant factual misrepresentations.

In response to Defendant's arguments about the TAA in his recent motions, the Government stated that it "does not allege that [Defendant] violated the TAA." (ECF 429 at 12–13.) As the Court previously noted, the TAA's provisions are ancillary to this wire fraud scheme.

Even if Defendant were correct that certain transactions with the federal government were TAA-compliant and involved no other misrepresentations, that would not present a viable defense to Count One, given the other evidence of blatant fraud in the record concerning other transactions involving both the federal government and other purchasers. In light of the evidence set out earlier,

---

[25] Aventura also represented that certain cameras it sold (including, purportedly, to the BEP) originated from South Korea, which, if those representations were accurate, would have rendered those cameras TAA-compliant.

Aventura's purported compliance with the TAA is simply not a viable defense to the conspiracy to commit wire fraud charged in this case.

Even assuming that these sales to the federal government were TAA-compliant and Aventura could represent the United States as the relevant "country of origin" for those products for TAA-purposes based on the TAA's "substantial transformation" standard, that would not immunize or excuse Defendant and Aventura from making blatant factual misrepresentations and falsely claiming that its products (including individual cameras) were "manufactured" in the United States or "Made in the USA." Similarly, Defendant also repeatedly lied to customers that Aventura made its cameras and that Aventura's cameras were not OEM products made by Chinese manufacturers. Those lies cannot be excused by Defendant's purported belief that Aventura's products were TAA-compliant.

Defendant's claim that he had no intent to defraud is belied by the substantial record of lies set out earlier. This is simply not a case where the only potential misrepresentations Aventura made concerned TAA compliance. Defendant told bald-faced lies to customers and the evidence of fraudulent intent for those lies is overwhelming.

While the Government states that it does not allege that Defendant violated the TAA, the Government also notes that Aventura did not actually comply with the TAA and that Defendant did not even believe that Aventura's products were TAA-compliant. (See ECF No. 429 at 13 n.8, ECF No. 450 at 5). There is ample evidence showing, at the very least, that: (1) all of Aventura's representations concerning TAA-compliance and "country of origin" status for purposes of the TAA were not accurate; and (2) Defendant did not actually believe that all of these

representations were accurate.[26]

As set forth above, Defendant's claim that he is actually innocent of Count One fails. All three relevant factors weigh against Defendant's arguments that his plea was involuntary and that there are fair and just reasons for allowing him to withdraw his plea. The Court now turns to Defendant's further arguments in support of his motion to withdraw.

---

[26] While Defendant focuses on Aventura's VMS products and Aventura's purported "substantial transformation" of those products, Aventura also sold individual cameras and other items that Aventura represented as originating from the United States. With respect to these individual cameras, Defendant claims:

> Insofar as Aventura sold individual cameras to government agencies, each camera—whether manufactured in China, South Korea, or Taiwan—only ran Aventura's software and contract manufacturers were specifically required to have the cameras remove detection of their firmware and recognize Aventura's firmware and software, which required licensing and provisioning on Long Island. Therefore, I believed, was TAA compliant. I formed this belief based on publications from GSA, Customs and Border Protection and precedent cases dating back a century.

(Cabasso Aff. ¶16; see also Cabasso Aff. ¶ 47 (Defendant's claim that "adding U.S. software to a camera by itself in the U.S. that alone qualifies as substantial transformation").) Defendant points to Data General v. United States, 4 Ct. Int'l. Trade 182 (1982), in which the court found that the permanent programming of imported memory chips in the United States was sufficient to substantially transform the chips where, inter alia, the programs were designed by a project engineer in the United States and required substantial time and expertise.

However, there is ample evidence in the record that Aventura did not perform comparable actions in the United States for all the individual cameras it sold. First, Defendant's affidavit does not even squarely attest that Aventura developed the firmware/software found on all individual cameras in the United States and that Aventura installed the firmware/software on all these individual cameras in the United States. Instead, Defendant's affidavit vaguely claims that Aventura's firmware and software "required licensing and provisioning on Long Island." (Cabasso Aff. ¶ 16.) Second, there is substantial evidence in the record showing that, for individual cameras it sold, Aventura did not install firmware/software on these cameras at its Long Island facility, which would be an essential step under even Defendant's proffered interpretation of substantial transformation. The Government intercepted thousands of cameras and other items from China that were already in individually wrapped boxes, sealed, and ready for sale, which belies any suggestion that Aventura installed firmware/software on those cameras at its Long Island facility. Cabasso even admitted at a proffer that "Aventura 'sometimes' shipped out products from the PRC without modification, including the Air Force body cameras. (ECF No. 462 at 8.) Third, there are emails involving both the Air Force body cameras and other cameras that indicate Aventura did not develop or install the firmware and software for these cameras. (See, e.g., Gov. Ex. F, ECF No. 461-6 (Defendant states that "SW Version which clearly identifies RaySharp needs to be completely revised" and RaySharp representative responds "Please advise which sw and what changes you need us to do"); id. (RaySharp representative discusses cameras with "face recognition" and asks if Aventura prefers to use RaySharp's software or prefers to purchase a license from a third-party "AI developer"). This evidence comports with the Government's representation at the plea hearing that Defendant paid "China-based programmers to write his computer [code]." (Plea Tr. 22.) Finally, there is evidence that Defendant knew he was selling cameras in violation of the TAA. In a 2016 email to a GSA representative, Defendant called out his competitors for selling Hikvision cameras, proclaiming that "as far as TAA it doesn't get any worse." (Compl., Ex. A.)

**D. Defendant's Brady Claims and Motions to Compel Discovery**

Littered throughout Defendant's motion to withdraw (and subsequent filings) are various assertions regarding the Government's "suppress[ion of] favorable evidence necessary to defend against the charge in Count One," and the Government's "serial misstatements of fact." (Def's Br. at 2; Def's Reply at 7.) Bound up in these claims are arguments previously made in Defendant's motion to compel discovery, (ECF No. 427; ECF No. 431), and his motion for reconsideration after that motion was denied, (see ECF No. 447; ECF No. 453.) Defendant insists that the Government has and continues to suppress evidence in violation of its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and its progeny. For the following reasons, the Court once again rejects Defendant's arguments and finds that he fails to show that the purported suppression of evidence rendered his plea defective.

**1. Brady Standard in the Plea Context**

"To establish that a Brady violation has occurred before a guilty plea, a defendant must show that: (1) the government failed to disclose exculpatory evidence; and (2) the evidence was material." Overton, 24 F.4th at 878 (citing United States v. Payne, 63 F.3d 1200, 1208–09 (2d Cir. 1995)). "Materiality is analyzed through an 'objective inquiry' which turns, in the plea context, on whether 'there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial.'" Id. (quoting United States v. Avellino, 136 F.3d 249, 256 (2d Cir. 1998)). "Assessment of that question involves an objective inquiry that asks not what a particular defendant would do but rather what is the likely persuasiveness of the withheld information." Avellino, 136 F.3d at 256. Additionally, "[a] reasonable probability of a different result is shown when suppression of the evidence undermines confidence in the outcome of the [plea proceeding.]"

Basciano v. United States, No. 12-cv-280, 2014 WL 12978824, at *4 (E.D.N.Y. Dec. 17, 2014) (internal quotations and citations omitted).

**2. Motion for Reconsideration**

Defendant filed a motion for reconsideration of the Court's July 2 order denying his motion to compel discovery. The Court previously denied that motion in a short docket order.

In the motion for reconsideration, Defendant contends that "[t]he [requested] records are essential to Mr. Cabasso's due process rights not because TAA compliance would exculpate him from lying to customers about cameras made in the United States, but to show that such cameras were never so misidentified." (ECF No. 447 at 2.) The crux of the motion for reconsideration concerns the Government's allegations concerning the night-vision camera that the Navy purchased from Aventura in 2019 as part of a controlled buy. Defendant contends that:

> (1) Aventura's GSA price list merely represented that this camera's country of origin, for TAA purposes, was the United States, (Def. Ex. F, ECF No. 447-6, Def. Ex. G, ECF No. 447-7);
>
> (2) contrary to the Government's claim, this price list did not represent that this camera was "manufactured in" or "made in" the United States;
>
> (3) Defendant's proffered interpretation of the price list is supported by an April 2019 email exchange between Defendant and a GSA representative, (Def. Ex., ECF No. 453-1)[27]; and
>
> (4) Aventura's QuickBooks records purportedly indicate that the night vision camera was sold as part of a system, rather than as a standalone product, and was, thus, substantially transformed in the United States.

These documents and arguments concerning this night vision camera do not offer any reason for the Court to reconsider the denial of Defendant's motion to compel. The Government

[27] The defense also recently asked a GSA representative what the term "Other End Products" represents on this price list and the GSA representative stated that this "likely refers to the Trade Agreements Act country of origin," but that this column is "erroneously labeled" because "[t]here is no reference to 'Other End Products' or 'place of manufacture' in the I-FSS-600 clause" that concerns such contracts with GSA. (ECF No. 491-1.)

produced the GSA price list and email exchange years ago—Defendant does not contend otherwise. (ECF No. 484.) While Defendant insists that the Government did not disclose Aventura's Quickbooks records until 2025, that claim is meritless. As set forth on the docket, the Government turned over Defendant's QuickBooks records in an easily accessible format back in September 2020. (ECF No. 154.) The Government's representations about this production are also corroborated by the absence of any contemporaneous complaints, by the defense, that the QuickBooks records had not been produced. (See e.g., ECF No. 464-5.)

Defendant and the Government offer different interpretations of the GSA price list and the other evidence concerning the night vision camera sold to the Navy.[28] This dispute, however, does not indicate that the Government suppressed any Brady material. Defendant suggests that the

[28] The Government has cited evidence concerning the Navy's controlled purchase of this night vision camera—including the representation concerning this camera on Aventura's GSA price list—as proof of Defendant's scheme to defraud. According to the Government, Aventura represented on this price list that this camera was manufactured or made in the United States. As explained earlier, for many of the instances of fraud cited by the Government, Defendant either: (1) never attempts to address the specifics of the damning incidents; or (2) offers, as in the case of the Air Force body cameras, a meritless defense of his conduct. For the night vision camera, Defendant has at least advanced a colorable interpretation of the ambiguous phrase "Other End Products" on the price list, which Defendant contends, given the context, refers to the applicable country-of-origin under the TAA. (ECF No. 447 at 6.) Thus, according to Defendant's interpretation, the reference to "USA" on the price list is merely a representation that this camera was either "substantially transformed" or "manufactured" in the United States. Of course, if this camera had not, in fact, been "substantially transformed" in the United States by Aventura, then this representation would be false even under Defendant's interpretation.

In addition to the parties' disputed interpretation of this price list, there are also other incriminating aspects of this transaction, which suggest that this camera was not "substantially transformed." Defendant claims that Aventura actually sold the Navy an integrated system in this transaction involving multiple items, in an apparent effort to show these items were "substantially transformed" into a larger system in the United States. The Government, however, points out that the Government never ordered an integrated system—rather, this was a controlled purchase that sought various standalone items. While Defendant cites to Quickbooks records and other documents as part of his defense of this sale, his claim that Aventura sold the Government a TAA-compliant integrated system is contradicted by an incriminating email exchange which recounts that although Defendant was told by Lasker (Aventura's Director of Operations) that the items in this order "made no sense" and "cannot be sold as requested," Defendant nevertheless told Lasker to "Quote it as is." (ECF No. 450-1.) Additionally, these items, including the night vision camera, were listed separately on Aventura's GSA price list and were each individually represented as being an "Other End Product[]" of the "USA." Notably, Defendant's affidavit does not address this specific transaction or offer an explanation for this incriminating email. Ultimately, it is unnecessary to resolve the parties' differing interpretations over this evidence. Even assuming, for the sake of argument, that Defendant might have a colorable defense to this transaction, he would still not be innocent of Count One given his fraudulent conduct in connection with the numerous other transactions recounted previously.

parties' disputed interpretation of the GSA price list concerning this night vision camera shows that additional procurement records the Government has not disclosed related to Aventura's sales to the federal government constitute Brady material. Defendant reasons that those records would provide necessary context to show that the Government has erroneously characterized representations concerning the TAA as broader misrepresentations. The evidence concerning the night vision camera, however, does not support this argument. Defendant's interpretation of Aventura's GSA price list is based on the specific language used on the face of the price list along with an email from GSA that points to the substantial transformation standard in FAR § 52.225. While Defendant asserts that the "Navy's procurement contract records for this transaction" would further contradict the government's characterization of the GSA price list, (ECF No. 447 at 7), that argument makes little sense as this transaction involved a controlled purchase.

None of Defendant's arguments in this motion warrant reconsideration of the Court's earlier denial of the motion to compel.[29] Moreover, the Court takes this opportunity to state that, in addition to the grounds cited in the Court's July 2 order, the Court's earlier denial of the motion to compel was also warranted because the record does not establish that the Government suppressed the purportedly exculpatory evidence Defendant sought to obtain. Defendant's motion to compel focused on two categories of evidence—materials seized from Aventura and the procurement files that Government agencies were supposed to compile and retain for procurement contracts pursuant to FAR § 4.803.

[29] Defendant stresses that the Government's motion papers included an excerpt of this GSA price list as an exhibit that omitted the "Other End Products" heading for the column at issue. The Government, however, produced the complete document to the defense prior to the plea, and this criticism of the Government's briefing does not support Defendant's Brady claim or requests for discovery.

Defendant has not established that the Government suppressed any exculpatory evidence that was seized from Aventura. As explained earlier, the Government turned over Aventura's Quickbooks records in an accessible format years ago. As for Aventura's CCTV footage and Aventura's CRM program, the Government has represented that it never found those items and the Court accepts those representations. The Government also explained that it believed that the CRM records were hosted on an external server maintained by a third party, which did not have the records when the government sought to obtain them.[30] (ECF No. 429 at 13.) The Government "does not have a duty to disclose items it does not possess." United States v. Bradley, 105 F.4th 26, 35 (2d Cir. 2024).

Prior to Defendant's guilty plea, the Government attempted to return electronic devices seized from Aventura that the Government determined did not have evidentiary value. (ECF No. 427 at 14; ECF No. 428-8.) Defendants, however, never arranged to accept those items from the Government. (Id.) The motion to compel defends counsels' decision not to accept those items from the Government, insisting that the Government should have "image[d] copies of those computers to protect the discovery record in the interests of both parties," rather than offering to simply return the computers "like so much investigative flotsam and jetsam." (ECF No. 431 at 7.) Defendant also still insists that the Government should be required to image all seized computers

---

[30] In Defendant's initial motion to compel, Defendant did not provide an affidavit supporting various factual claims in the motion. That, alone, was an additional reason to deny the motion. As part of his motion to withdraw his guilty plea, Defendant did eventually submit an affidavit in which he asserts, inter alia, that, for the CRM system, the "primary server and both its local and cloud backups are missing." (Cabasso Aff. ¶ 34.) However, Defendant's statements to Zone in October 2023 about the CRM system were much more equivocal. In October 2023, Defendant merely told Zone that "there should have been a backup on a server and can someone identify where it could be found with which cloud provider." (ECF No. 464-5.) In this communication with Zone, Defendant never mentions a "primary" server, equivocally states that there "should have been a backup on a server," and references a "cloud provider," which is where the Government has stated it believes this information was stored. Defendant's equivocal statements about the CRM program to Zone in 2023 support the Government's representation that it never found the CRM program in the evidence seized from Aventura. Additionally, the fact that the Government stated in its search warrant that it believed that the data for the CRM system was stored locally has little probative value and does not contradict the Government's representation that it subsequently never found the CRM program in the materials it seized.

for the defense. (Id.) Defendant's claim that the Government suppressed items that it offered to turn over to the defense is meritless. Defendant's motion to compel also sought to forensically inspect these computers to see if the CCTV footage was deleted "by accident or otherwise." (ECF No. 431 at 8.) Even if the plea agreement did not contain a waiver of additional disclosure, the Court would still deny this post-plea request for discovery about discovery.

Defendant also contends that the Government failed to produce copies of hard-copy documents from Defendant's office as well as "drawings" seized from Aventura. The Government, however, represented that it scanned and produced more than 300,000 pages of hard-copy documents seized from Aventura and Defendant has not offered any compelling evidence that relevant hard copy documents were not produced. Defendant's affidavit does not even address these purportedly missing documents and, as the Government pointed out, Defendant's motion to compel—which frivolously accused the Government of withholding the Quickbooks records—"reflects no effort to parse what has already been provided." (ECF No. 429 at 15.)

The remaining category of documents at issue in the motion to compel are procurement files that Defendant contends federal agencies and departments that contracted with Aventura should have maintained pursuant to FAR § 4.803. The Government, however, has represented that it "already turned over all the contract files in its possession during pre-plea discovery." (ECF No. 429 at 14.) While it is possible that the federal agencies and departments that contracted with Aventura may have additional documents in such procurement files, Defendant has not shown that any such documents would be considered to have been in the possession of the prosecution for purposes of Brady. Even assuming that the prosecution engaged in a sufficiently joint investigation with the investigative arms of other federal agencies, the prosecution would only be required to review documents arising from that joint investigative effort. See United States v.

Gupta, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (Although "all of the documents the SEC prepared and accumulated in its investigation of [defendant] are [not necessarily] part of the joint investigation . . . . where the Government and another agency decide to investigate the facts of a case together . . . the Government has an obligation to review the documents arising from those joint efforts to determine whether there is Brady material that must be disclosed."). There is no evidence in the record indicating that the prosecution failed to disclose any such Brady material or that these procurement files contained any documents that would have led Defendant to reject the plea and proceed to trial.

Any government procurement files would not possibly rebut any of the evidence outlined earlier, which shows that Defendant conspired to defraud Aventura's customers outside the federal government. Prior to his guilty plea, Defendant had attended a reverse proffer and was clearly aware of the strength of the Government's damaging evidence against him. Nothing in the record suggests that there is a reasonable probability that the contents of these FAR procurement files would have led Defendant to not plead guilty and instead go to trial.

**3. Brady Claims**

In addition to Defendant's motion to compel and related motion for reconsideration of the Court's July 2, 2026 Order, Defendant also moved to withdraw his plea on the basis that the Government has suppressed other purported Brady material. Defendant's motion to withdraw, however, does not identify any specific exculpatory evidence that the Government suppressed. Rather, Defendant filed his unsuccessful motion to compel in the hopes of uncovering exculpatory material that he could subsequently use to support his motion to withdraw. Accordingly, in his motion to withdraw his plea, Defendant is left to speculate that items were suppressed and cannot

identify any actual Brady material. Defendant's Brady claim—as articulated in his motion and reply brief—provides no basis to withdraw his plea.

Since the filing of Defendant's motion to withdraw and reply brief in October, Defendant has filed numerous supplemental letters. These submissions recount various FOIA requests submitted by Defendant, many of which resulted in no relevant documents being provided. Defendant contends that this absence of documentation supports his claims of innocence. Whereas at trial, a defendant can certainly point to an absence of proof as a defense, these unsuccessful FOIA requests do not support a claim that the Government suppressed specific Brady material. Nor do any responses to these FOIA requests—including those that indicate an apparent absence of communication between the relevant agency and the prosecution team in this case—justify granting Defendant's motion to withdraw his plea.

While some of Defendant's recent filings also include documents that Defendant claims the Government failed to produce in discovery, none of those documents constitute exculpatory Brady material that would justify permitting Defendant to withdraw his guilty plea.

One undisclosed document from GSA discusses an investigation by GSA into potential TAA violations that was eventually closed in 2015. In an abundance of caution, the Government should have disclosed this document, but it is not material under Brady. This document merely states that the investigators have "not been able to determine if Aventura violated the TAA pertaining to GSA contracts" and closed the investigation for "lack of leads." (ECF No. 486.) The Government's case, however, does not hinge on misrepresentations concerning TAA compliance. Moreover, even if TAA compliance was a critical aspect of this case, this document from GSA has minimal, if any, exculpatory value.

Defendant has also provided the Court with additional documents concerning two federal restitution claimants (BEP and West Point), which Defendant characterizes as newly discovered Brady material. (ECF Nos. 494, 495, 496.) These documents do not contradict, or provide a defense to, the numerous misrepresentations Defendant made to other customers. There is not a reasonable probability that earlier disclosure of these documents would have resulted in Defendant not pleading guilty and proceeding to trial. The Court will consider all those documents in addressing the restitution claims of BEP and West Point.[31] However, none of these documents justify granting Defendant's motion to withdraw his plea.

**E. Defendant's Claims of Coercion**

Defendant also argues that he was coerced, both by the Government and his wife's defense counsel, into pleading guilty. The Court addresses each of these arguments in turn.

**1. Alleged Coercion by the Government**

Defendant first argues that the Government coerced him into pleading guilty because it threatened to supersede the indictment, conditioned Defendant's plea deal on the acceptance of his wife's plea deal, and misrepresented its case. (See ECF No. 470-3 at 9–10; ECF No. 470-4 at 13–15.) Defendant also claims that the Government's prosecution of him constitutes unconstitutional selective enforcement and that the Government engaged in "economic coercion" by allegedly informing a major customer to withhold payments to Aventura. (ECF No. 470-4 at 16–17.) For the following reasons, the Court finds that none of these claims support Defendant's assertion that his plea was involuntary.

First, as the Government correctly points out, "it was entitled to tell the defendant that it would seek additional charges if no plea bargain was reached." (ECF No. 462 at 23.) As the

[31] In its briefing concerning restitution, the Government is directed to address these documents.

Supreme Court has made clear, "[w]hile confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable—and permissible—attribute of any legitimate system which tolerates and encourages the negotiation of pleas." Bordenkircher v. Hayes, 434 U.S. 357, 364–65 (1978). In fact, it is "firmly established that a prosecutor may threaten in the course of negotiating a plea bargain to bring additional charges against a defendant if the defendant does not enter a guilty plea 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute.'" United States v. Livingston, No. 21-cr-558, 2023 WL 3374503, at *6 (S.D.N.Y. May 11, 2023) (quoting Perilli v. United States, No. 04-cv-4430, 2005 WL 1162914, at *1 (E.D.N.Y. May 17, 2005)).

Here, Defendant refers to several "tax-related counts" that the Government threatened to add in a superseding indictment. (ECF No. 470-4 at 11.) Nowhere, however, does Defendant argue or establish that the Government lacked probable cause to bring these charges. The Government even "showed evidence regarding the defendant's tax evasion to defense counsel during both [of Defendant's] reverse proffers." (ECF No. 462 at 13 n.6.) Rather than being coerced, Defendant was able to obtain a valuable benefit in his plea bargain that precluded his prosecution on these potential new charges as well as on the other charges in the current indictment.

The global nature of Defendant's plea deal was also not improper. Not only did Defendant secure several benefits for himself, but he also secured similar benefits for his wife. As noted earlier, it is not lost on the Court that Defendant only moved to withdraw his plea after Frances Cabasso was sentenced to time served, which ensured that she did not risk losing any benefit of

this global deal. Again, the timing of Defendant's motion to withdraw cuts against his assertion that this global plea deal was somehow involuntary.

Defendant's claims that the Government has fabricated and misrepresented its case against him on both the Country-of-Origin Scheme and the WOSB scheme are similarly meritless. Notably, Frances Cabasso, who actually pled guilty to the WOSB scheme, has not moved to withdraw her guilty plea. By contrast, Defendant did not plead guilty to the WOSB scheme. While the WOSB scheme could be considered relevant conduct for purposes of sentencing, Defendant can challenge the Government's account of that alleged scheme at sentencing.

Defendant also makes a meritless claim for selective prosecution. (See ECF No. 470-4 at 16–17.) This claim comes nowhere close to meeting the high bar for selective prosecution claims. Bereft of any relevant supporting evidence, Defendant asserts, for the first in his reply brief, that the record shows both "discriminatory effect and retaliatory purpose" because other government contractors who engaged in allegedly identical practices only faced administrative sanctions, while Defendant—who had recently prevailed in unspecified litigation against the Department of Justice (apparently in connection with a bid protest)—was prosecuted. (Id. at 16–17.) There is no evidence to support these assertions and there is certainly no evidence showing that any other companies and defendants engaged in the blatant lies and egregious conduct set out above. The Court rejects Defendant's conclusory and conspiratorial speculation that he was selectively prosecuted.

Finally, the Court rejects Defendant's contention that the Government's seizure or freezing of "all of Defendant's and Aventura's operating funds" and purported instructions to "private-sector clients, including Trimble Inc. to withhold payment on legitimate receivables . . . deprived Defendant of the ability to fund his defense, retain counsel of choice, or maintain even minimal

operations." (Def's Reply at 15-16.) Defendant styles this seizure as "economic coercion." (Id.) This argument is meritless. Defendant has privately retained numerous lawyers over the course of this litigation.

Defendant's arguments that alleged Government misconduct rendered his plea involuntary all fail.

**2. Alleged Coercion Involving Frances Cabasso's Counsel**

Next, Defendant asserts that statements from his wife's counsel rendered his plea coerced and involuntary. The source of Defendant's contention is a June 12, 2023, discussion between Defendant, Defendant's counsel at the time (Dayan), Frances Cabasso, and her counsel (Kenneth Kaplan). (See Transcript of June 12, 2023 Call ("6/12/23 Call Tr."), Ex. A, ECF No. 444-2.) The purportedly coercive portion of the call comes from Kaplan, who stated:

> I don't think you could fuck around with these people. I think basically you're going to get a bad result the more you fuck around. As Jack knows from this set aside thing [involving the WOSB charges], they're basically saying something which is not true and we can't do anything about it. You know what I mean? So we're not going to litigate it because if we litigate it we get hurt. You got to know when to when to pull your troops in and take your losses.

(Id. at 10.)

Kaplan had previously represented Defendant in other matters. (Cabasso Aff. ¶¶ 41–42.) Defendant contends that Kaplan's accusation that the prosecutors were "basically saying something which is not true" and that if they "litigated it" they would "get hurt" constituted Kaplan's opinion that the prosecution was willing to commit misconduct and lie and that, as such Defendant had no choice but to plead guilty.

This statement did not coerce Defendant into pleading guilty. First, "[d]efense counsel's blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea," does not "constitute improper behavior or coercion that would suffice to

invalidate a plea." United States v. Juncal, 245 F.3d 166, 172 (2d Cir. 2001). And, given the evidence facing Defendant at the time, the Court finds the general assessment by Kaplan about Cabasso's chances at trial to be correct. Additionally, the allegedly coercive statement was made by Frances Cabasso's counsel, in which Defendant's own lawyer, Dayan, did not join. Notably, later in the conversation, after Kaplan had left the call, Dayan and Defendant discussed the Government's threat to file a superseding indictment if the defense filed any further motions—an arrangement that Dayan explained was a permissible "type of quid pro quo." (6/23/23 Call Tr. 11.) During this discussion, when Defendant asks Dayan if that means the prosecutor can "lie, cheat, steal, do whatever they want, and we have no right," Dayan tells him "no" and that those are "extreme words." (Id. at 11.) Thus, shortly after Kaplan's statement, Dayan informed Defendant that the prosecutors cannot just lie and that Defendant has recourse in the event of that type of "extreme" conduct. Moreover, Zone, who was Defendant's counsel when he eventually pled guilty, was not retained until a month after the allegedly coercive phone call. Defendant, of course, had the opportunity to consult with Zone concerning Kaplan's allegation and Defendant's plea itself was not entered for another six months. Given all these circumstances, Kaplan's statement is simply not the kind that could have produced an "overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally." United States v. Roque, 421 F.3d 118, 122 (2d Cir. 2005). It certainly is "insufficient to overcome the 'strong presumption of accuracy' that is afforded to Defendant's own sworn testimony that his plea was voluntary."[32] Albarran, 943 F.3d at 124 (2d Cir. 2019); see ECF No. 316 at 19.) Thus, the Court finds that Defendant's argument with respect to coercion from former counsel is unfounded.

[32] At the plea hearing, of course, Defendant affirmed that he was entering his plea "freely, voluntarily, and of your own free will" and was not "threatened or forced . . . to plead guilty in any way." (Plea Tr. 19.)

The Court has considered Defendant's various claims of coercion, along with, as explained earlier, the other relevant factors relevant to motions to withdraw and finds that none of Defendant's claims show that his plea was involuntary or otherwise warrant granting the motion to withdraw.

**F. Ineffective Assistance of Counsel Claims**

Defendant also asserts that Zone provided ineffective assistance of counsel, which, according to Defendant, resulted in an allegedly coerced and invalid guilty plea and also warrants releasing Defendant from the sentencing stipulation in his plea agreement. (See Def's Reply at 10–13.)

**1. Ineffective Assistance of Counsel Standard**

"To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy a two-part test: (1) "he 'must show that counsel's performance was' . . . so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,'" and (2) "he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011) (quoting Strickland v. Washington, 466 U.S. 668, 687, 690, 694 (1984)). The Strickland standard is "highly demanding" and "rigorous," and "if the defendant fails to meet either the performance prong or the prejudice prong," the claim must be rejected. Bennett, 663 F.3d at 85 (citations and internal quotation marks omitted).

Regarding the first prong, "[i]n evaluating counsel's competence, the court '"must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."' Lewis v. United States, No. 10-cv-00718, 2012 WL 2394810, at *3 (E.D.N.Y. June

25, 2012) (quoting Strickland, 466 U.S. at 689). Moreover, "strategic choices must be respected in these circumstances if they are based on professional judgment." Id. (citing United States v. Tribote, 297 F.2d 598, 601 (2d Cir. 1961)).

Regarding the second prong, where the defendant has pleaded guilty, he may show prejudice if "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); accord United States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001) ("A defendant must first establish that counsel's representation fell below an objective standard of reasonableness. Second, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").

**2. Background**

Defendant's affidavit recounts communications with Zone after he took over the case from Dayan. Defendant asserts that he had three or four brief conversations with Zone before his guilty plea on December 20, 2023. (Cabasso Aff. ¶ 49.)

Defendant told Zone that the "government's claim that he sold Chinese cameras, mislabeled as made in the United States was not true and a fairy tale, and that I never tried to defraud any buyer." (Cabasso Aff. ¶ 47.) Defendant explained the "substantial transformation" standard to Zone and told him about the CBP's ruling concerning video management systems, which purportedly "confirm[ed] what [Defendant] had been saying all along about compliance and representations of country of origin." (Id.) Zone responded that he had discussed the CBP's ruling with the prosecutors, without giving away the actual document, and the prosecutors responded that it could be "hypothetical." (Id.) According to Defendant's affidavit, "[Zone's] response was that

they don't accept any rulings, they don't accept any books and records, they ostensibly accept nothing and it's a TAA violation and fraud end of story." (Id.)

According to Defendant:

> Zone responded that there was no need to go into the facts of this case as those are "trial issues." Instead, he claimed that he would negotiate a disposition to "keep me out of jail."

(Id. ¶ 48.)

The record also includes two emails Defendant sent Zone as well as the transcript of a recording Defendant made of his conversation with Zone the day before he pled guilty. The recording covers only a portion of that conversation.

**3. Zone's Alleged Assurance Concerning Incarceration**

Defendant contends that Zone assured him that he would avoid jail if he pled guilty. (ECF No. 470-3 at 8.) This claim is meritless.

According to Defendant, Zone "claimed that he would negotiate a disposition to 'keep me out of jail.'" (Cabasso Aff. ¶ 48.) Later in his affidavit, Defendant states that "[a]s the preparation of the Presentence Investigation Report proceeded, and Mr. Zone had no answers as to how to object to the government's Sentencing Guidelines estimate recommending incarceration of between 10 and 15 years for a 66 year old at the time, despite his earlier promises that I had to plead guilty to somehow stay out of prison[.]" (Id. ¶ 57 (emphasis added).) While Defendant characterizes certain prior statements by Zone as "earlier promises that I had to plead guilty to somehow stay out of prison," Defendant never identifies exactly what Zone had said to him previously. Defendant's very limited use of actual direct quotes from Zone here is notable.

These vague statements do not establish that Zone assured or promised Defendant that he would receive no jail time if he pled guilty. By contrast, Defendant clearly affirmed on his plea

form and at his plea hearing that he had not received any promises about his sentence. Moreover, Defendant sent a lengthy email to Zone on December 13, 2023 in which Defendant parsed the particulars of the plea agreement in detail, including the loss amount. (ECF No. 464-3 at 3.) There is, however, no mention—or even suggestion—in the email that Zone had told Defendant that he was guaranteed to serve no jail time if he pled guilty. That email further undermines the vague statements in Defendant's affidavit that he tries to characterize as improper assurances or promises by Zone concerning sentencing.

**4. Alleged Ineffective Assistance Concerning Defendant's Guilty Plea**

Defendant's arguments concerning Zone's purported ineffective assistance largely concern the sentencing stipulation in the plea agreement and other aspects of the plea that Defendant claims bear on sentencing. (See ECF No. 470-4 at 10 ("the lack of investigation led Mr. Cabasso to agree to a loss amount based on transactions unrelated to the alleged fraud of selling Chinese cameras falsely claimed to be American-made").) The Court addresses those arguments infra.

Defendant also asserts, at one point, that if Zone had sufficiently investigated the case, he would have determined "no criminal 'scheme' existed." Specifically, Defendant contends that:

> [C]ounsel permitted Defendant to plead "in the blind," tethering him to unknown future terms and forfeiting challenges to false counts, rendering the plea unknowing and involuntary. Had counsel cross-referenced the public FPDS data with Aventura's own QuickBooks and CBP import records—both of which the Government had seized—he would have proven that the loss range was false, that BEP's transactions were lawful, and that no criminal "scheme" existed. Competent counsel would have taken those basic steps before permitting a plea in a case built entirely on fabricated losses and imaginary victims.

(ECF No. 470-4 at 11.)[33]

[33] Even this argument is largely focused on alleged ineffective assistance concerning sentencing aspects of the plea agreement.

Defendant appears to argue that: (1) Zone was insufficiently familiar with the evidence in the case; (2) should have investigated the case further; and (3) based on such investigation, Zone should have come to conclusion that the evidence cited above supported Defendant's claim of innocence and advised Defendant that he had a viable defense and should have proceeded to trial.

This claim fails on multiple grounds.

First, Defendant's arguments that Zone, who took over from Albert Dayan—the counsel who had defended the case for years—failed to sufficiently investigate the case before Defendant pled guilty are not supported by the record.

According to Defendant, Zone was focused on negotiating a potential plea and purportedly told Defendant that "there was no need to go into the facts of this case as those are 'trial issues.'" That does not establish that Zone failed to adequately investigate this case.[34] Nor does the fact that Defendant only had 3-4 brief conversations with Zone before his guilty plea. (Cabasso Aff. ¶ 48.)

There is no evidence that Zone did not speak about the case with Dayan, Defendant's prior counsel who had represented Defendant since his arrest in December 2019, or counsel for Aventura. More importantly, there is no evidence indicating that, in the months leading up to the plea, Zone did not review critical evidence in the case outside of Defendant's presence. Additionally, the brief recorded conversation between Zone and Defendant affirmatively indicates

[34] Given the damning and largely indisputable evidence of fraud outlined above, Zone was correct to characterize many of the points Defendant focuses on in his papers as "trial issues."

that Zone was, in fact, familiar with critical evidence and aspects of the case.[35]

Second, as explained in detail earlier, Defendant's claim of innocence is not supported by the record. The evidence Defendant maintains Zone failed to investigate would not have provided him with a viable defense at trial. Accordingly, the Court rejects any claims that Zone should have, after reviewing that evidence, concluded that "no criminal scheme existed" and that Defendant had a viable defense based on TAA compliance through "substantial transformation" and the other arguments Defendant asserted in his affidavit and papers. As explained earlier, Defendant's asserted compliance with the TAA, purported good-faith belief in that compliance, and insistence that some of Aventura's other transactions were not tainted by fraud is simply not a viable defense to Count One.

The Government's evidence included devastating proof of blatant misrepresentations and a scheme to defraud. At trial, the Government could also seek to introduce the admissions from Defendant's proffer if Defendant asserted, at trial, the type of defense case and claims of innocence outlined in his affidavit.[36] Defendant also faced the prospect that multiple Aventura employees involved in the fraud would be cooperating with the Government and would provide damaging testimony, such as Schwartz's allocution about the fraud concerning the radar system.

---

[35] For example, when Defendant suggests during the call that the TAA's "substantial transformation" standard provides him with a viable defense at trial, Zone tells him Defendant that while Zone understands the substantial transformation "theory" and agrees with the "concept," the problem is that "you spend more time [in emails] being angry at the Chinese companies, because there were remnants of Chinese identifying information on the Chinese products, than discussing substantial transformation." (Transcript of Dec. 19, 2023 Call ("12/23/23 Call Tr."), Def. Ex. EE, ECF No. 470-8.) This exchange shows that Zone was familiar with the record in this case and was providing sound advice to Defendant. The indisputable email exchanges described earlier include both blatant misrepresentations and extensive evidence of Defendant trying to hide and scrub evidence of Chinese manufacture. As explained earlier, Defendant's arguments concerning substantial transformation do not provide a viable defense against these blatant misrepresentations and the overwhelming evidence in the record shows that, in making those misrepresentations, Defendant had an intent to defraud.

[36] Given Defendant's reliance on his affidavit as the basis of his innocence claim and insistence—in the face of blatant misrepresentations—that he actually had no intent to defraud, Defendant presumably intends to take the stand to support this defense.

Of course, not only did Defendant have no viable defense to Count One, but the plea agreement Zone negotiated also included numerous benefits, including dismissal of the other charges, coverage for potential tax evasion charges, a sentencing advocacy cap, a valuable forfeiture carveout that exempted the Cabassos' home, and sentencing benefits for his wife.

**5. Defendant's Ineffective Assistance Claim Concerning the Factual Basis for the Sentencing Stipulation**

Defendant also claims that Zone provided ineffective assistance in connection with the plea agreement's sentencing stipulation, which Defendant insists has no factual basis. As discussed infra, Defendant also asserts that Zone failed to explain the effect of the sentencing stipulation on Defendant's ability to raise objections and arguments at sentencing.

Defendant also raises other arguments about the sentencing stipulation, including an argument that, separate from his ineffective assistance claim, the Court is not bound by the sentencing stipulation and should sua sponte inquire into whether there is a factual basis for the sentencing stipulation and independently determine the loss amount.

Defendant's plea agreement stipulates to a loss greater than $9.5 million.[37] Defendant insists that there is no factual basis for the greater than $9.5 million loss because, according to Defendant, the four victims who are together seeking restitution that exceeds $14 million, did not, for various reasons, actually suffer any losses as a result of the charged fraudulent scheme. Defendant similarly seeks to dispute the four restitution claims on the same grounds.

[37] The plea agreement does not specify whether this amount is based on customers' actual losses or Defendant's gain from the fraud, which is an alternative measure for calculating loss. The PSR, however, bases the greater than $9.5 million loss amount on Defendants' gain. Similarly, in negotiating the plea agreement, the parties treated the stipulated loss amount as reflecting Defendant's gain rather than the victims' actual losses.

To prevail on this ineffective assistance claim concerning the sentencing stipulation as framed by Defendant, Defendant would have to show that there was not a factual basis for the stipulated loss amount and would also have to overcome numerous other hurdles.

The Court will, as part of sentencing proceedings, have to decide these disputed restitution claims and the Court's determination concerning restitution may render Defendant's challenges to the sentencing stipulation moot. Accordingly, the Court declines to address Defendant's ineffective assistance challenge to the sentencing stipulation at this time. In advance of sentencing, the parties will have an opportunity to provide the Court with complete submissions concerning restitution that will provide the parties the opportunity to present any relevant evidence concerning these claimed losses from the alleged fraud. If the Court were to conclude that these victims did, in fact, suffer over $14 million in losses as a result of Defendant's fraudulent scheme, then Defendant's ineffective assistance claim concerning the sentencing stipulation would necessarily fail.[38]

**6. Allegedly Deficient Advice Concerning the Sentencing Stipulation**

In addition to claiming that the sentencing stipulation lacks a factual basis, Defendant also claims that Zone provided ineffective assistance concerning the effect of the sentencing stipulation. In his motion, Defendant argues that:

- "Zone assured [Defendant] that, notwithstanding his guilty plea, he would not be forced to forego making arguments in his defense for the purpose of mitigating any punishment," (ECF No. 470-3 at 10); and
- "[Zone] failed to adequately advise [Defendant] regarding any ability to interpose objections or mitigating information at sentencing without triggering a breach and its negative collateral consequences for all parties to the global plea." (ECF No. 470-4 at 2.)

[38] Even if Defendant could prevail on any of his claims concerning the sentencing stipulation, that would not be a basis for vacating his guilty plea. At best, the Court would release Defendant from the sentencing stipulation. If the Court were to grant Defendant such relief, the Government would presumably have the discretion to void the entire plea agreement and proceed to trial.

Thus, Defendant appears to be arguing that Zone both failed to explain the import of the sentencing stipulation and that Zone also affirmatively misled him about the sentencing stipulation. However, the evidence in the record does not support the ineffective assistance arguments advanced in Defendant's motion.

Defendant's affidavit never claims that Zone made any affirmative misstatements about the sentencing stipulation prior to Defendant's guilty plea. As for any alleged omissions by Zone, Defendant's affidavit does not say anything about the time period before his guilty plea. Defendant never claims that, when he pled guilty, he was not aware of the sentencing stipulation in the plea agreement, which the record shows Defendant reviewed in painstaking detail. Nor does Defendant's affidavit ever state what he believed about the sentencing stipulation at the time he entered his plea.

Defendant's affidavit instead jumps forward to post-plea period, stating that "[a]s the preparation of the Presentence Investigation Report proceeded, . . . Mr. Zone had no answers as to how to object to the government's Sentencing Guidelines estimate recommending incarceration of between 10 and 15 years for a 66 year old at the time." (Cabasso Aff. ¶ 57.) According to Defendant, after reviewing the PSR, he spent hours discussing objections to the PSR with Zone. (Cabasso Aff. ¶ 60.) Zone wanted to submit a "1-2 page response with few objections," whereas Defendant wanted "the accurate truth and facts for the Court to consider." (Id.) Zone advised Defendant that "if we argued that the truth was inconsistent with the plea agreement, it would be a breach of the plea agreement and loss of acceptance of responsibility points." (Id.)

During these discussions, Zone correctly advised Defendant that he could not object to the sentencing guidelines range to which he had previously stipulated and that advancing arguments

inconsistent with the plea agreement would "be a breach of the plea agreement and loss of acceptance of responsibility points."

Defendant's affidavit goes on to state that he "would not have pled guilty but for Mr. Zone's failure to adequately advise me of critical terms of the plea agreement, specifically <u>that I would have no opportunity to explain how Aventura actually worked as I am doing now</u>." (Cabasso Aff. ¶ 63 (emphasis added).) Defendant, however, never explains this vague phrase. Defendant's affidavit claims he is entirely innocent and never intended to defraud anyone. Defendant could not possibly have believed that, after pleading guilty and agreeing to a sentencing stipulation, he could later claim, at sentencing, that he was entirely innocent and had no intent to defraud anyone. There is certainly no evidence in the record indicating that Zone said anything to Defendant that would engender such a belief.

In fact, Zone's recorded conversation with Defendant indicates otherwise and shows that Zone previewed, for Defendant, some of the nuanced arguments Zone intended to raise at sentencing. These arguments sought to dispute the Government's narrative, but, at the same, were not inconsistent with the sentencing stipulation and did not claim that Defendant was completely innocent. Specifically, during this conversation, Zone told Defendant: "we're going to show them why this is nothing more than a technical violation of the law, and my right to private label, and create a picture . . . and show the court why. It's not like you were selling VHSes with rocks in them."[39] (12/23/23 Call Tr. 5.) Zone also told Defendant that if he pled guilty, they would explain why the Government's version of events was "not 100% true," another permissible and reasonable

[39] Notably, Defendant insists that Aventura sold quality products and its customers were satisfied with those products. The sentencing argument previewed by Zone reflects that theme. As part of this argument, Zone could argue that the stipulated $9.5 million loss amount—which, according to the PSR, is an estimate based on Defendant's gain rather than the actual losses sustained by customers—overstates the seriousness of the crime and results in an inflated Guidelines range that should not determine the Court's ultimate sentence. Such arguments are not foreclosed by the sentencing stipulation.

argument that could be made at sentencing without breaching the plea agreement. (Id.) Based on Zone's statements, Defendant had no basis to believe that Zone would argue at sentencing that Defendant never defrauded anyone or that Zone would object to a Guidelines calculation to which Defendant had stipulated in the plea agreement.

**7. Defendant's Remaining Ineffective Assistance Claims**

Defendant argues that Zone provided ineffective assistance concerning other aspects of the plea agreement relevant to sentencing. Defendant contends that Zone "negotiated a 'global plea agreement' purporting to bind Defendant on December 20, 2023, though the related corporate plea did not yet exist" and that "Defendant's plea was tied to that unresolved disposition, leaving him bound to undefined terms." (ECF No. 470-4 at 11.) Defendant also contends that Zone was ineffective for failing "to object to false PSR data incorporating dismissed and uncharged counts, including WOSB, money-laundering, and 'tax-fraud' allegations." (Id. at 12.)

These arguments are meritless. Defendant does not identify any specific provisions of Aventura's corporate plea that "bound" him, particularly with respect to issue of "relevant conduct" involving the charges to which Aventura pled guilty. As for Zone's purported failure to object to the PSR, Defendant does not offer any proof that the objections he contends Zone failed to pursue would have had any merit. Nevertheless, since sentencing has not yet occurred, the Court will, in an abundance of caution, permit Defendant, who is now represented by new counsel, to submit objections to the PSR on these issues.

Defendant also asserts that Zone was ineffective for not acting to protect Defendant from the Government's purported coercion and misconduct involving the threats of additional charges and the linkage of the Cabassos' pleas. Defendant contends that Zone should have sought to "sever the cases, seek judicial inquiry, or create a record of the coercive linkage." (ECF No. 470-4.) This

argument is meritless. For reasons discussed above, none of the Government's actions here constituted coercion or misconduct.

### G. Defendant's Request for a Hearing

Defendant requests a hearing, claiming that various factual disputes exist that warrant a hearing. (See ECF Nos. 466, 468, 477, 490, 491, 492, 495, 496.) "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013).

As explained above, after receiving additional briefing, the Court will address the outstanding restitution claims, which may render moot Defendant's challenges to the sentencing stipulation. The Court will determine whether a hearing for those restitution claims is necessary after receiving the parties' submissions. Defendant's other requests for a hearing are denied. Defendant has not identified any material factual disputes that require a hearing on his other claims.

## III. CONCLUSION

For the reasons set forth above, Defendant's motion to withdraw his guilty plea is denied. Defendant's guilty plea was knowing and voluntary and Defendant is not actually innocent. The Court has rejected numerous claims raised by Defendant, including various claims of ineffective assistance and coercion. The Court has also considered the potential cumulative impact of all of Defendant's claims and concludes that, even when considered in the aggregate, his claims do not compel or warrant granting his motion to withdraw his guilty plea.

The Court sets the following briefing schedule concerning the restitution claims. The Government/Restitution Claimants shall file their opening submission by September 18, 2026. Defendant shall file his opposition by October 19, 2026. The Government/Restitution Claimants

shall file any reply by November 2, 2026. The parties' submissions shall include the relevant evidence cited in support of their positions. The Government shall promptly disclose to Defendant any loss affidavits that have previously been submitted to Probation. The Court will set a sentencing hearing after resolving the restitution claims.

**SO ORDERED.**

Dated: August 19, 2026
Central Islip, New York

/s/ (JMA)
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE